**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARTHA PERAZA and MAURA GAWIN, individually and on behalf of all others similarly situated,** | ) ) ) | |
| | ) | **Civil Action No. 11 C 8390** |
| **Plaintiffs,** | ) | |
| | ) | **Judge Lee** |
| **v.** | ) | |
| | ) | |
| **DOMINICK'S FINER FOODS, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**INDEX OF EXHIBITS TO
MEMORANDUM OF LAW IN SUPPORT OF
THE PARTIES' MOTION FOR PRELIMINARY APPROVAL OF PROPOSED
SETTLEMENT AND FOR CLASS CERTIFICATION**

Order Preliminarily Approving Proposed Settlement, Scheduling Hearing for Final Approval of, and Approving Proposed Class Notice........................................................................................1

Declaration of Maureen A. Salas in Support of Preliminary Approval of Settlement ...................2

Electronic Cases Cited in the Memorandum ...................................................................3

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MARTHA PERAZA and MAURA GAWIN, individually and on behalf of all others similarly situated,** ) ) ) | |
| ) | **Civil Action No. 11 C 8390** |
| **Plaintiffs,** ) | |
| ) | **Judge Lee** |
| **v.** ) | |
| ) | |
| **DOMINICK'S FINER FOODS, LLC,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**ORDER PRELIMINARILY APPROVING PROPOSED SETTLEMENT,
SCHEDULING HEARING FOR FINAL APPROVAL OF, AND
<u>APPROVING PROPOSED CLASS NOTICE</u>**

WHEREAS, the Parties have made application for an order preliminarily approving the settlement of this Litigation as stated in the Class Action Settlement Agreement, which, together with the exhibits attached thereto, sets forth the terms and conditions for a proposed settlement of the Litigation and for dismissal of the Litigation upon the terms and conditions set forth therein;

WHEREAS, the Court has read and considered the Settlement Agreement, the exhibits attached thereto, and the briefing submitted in support of preliminary approval of the Settlement;

NOW, THEREFORE, IT IS HEREBY ORDERED:

1.     The Court hereby preliminarily approves the Settlement Agreement and the Settlement set forth therein as being fair, reasonable and adequate. The Settlement Agreement is the result of arm's-length negotiations between experienced attorneys who are familiar with class action litigation in general and with the legal and factual issues of this case in particular.

2.     The Court has considered the pleadings and arguments made by the parties in support of the motion for preliminary settlement approval and finds that the proposed Settlement

Class is proper and the IMWL class should be certified. Solely for purposes of the proposed

Settlement, a Settlement Class is hereby certified pursuant to Fed. R. Civ. P. 23 as follows:

> All persons who worked for Defendant in the State of Illinois in the job
> position Starbucks Manager between November 23, 2008 and November
> 14, 2012 ("Class Period") and who were paid on a salary basis (herein the
> "Class" or "Settlement Class").

The Court specifically finds (i) the class is so numerous that joinder is impracticable; (ii)

common questions of fact and law exist; (iii) the Named Plaintiffs' claims are typical of the

class's claims; and (iv) the Class Representatives will be able to fairly and adequately protect the

interests of the class. In addition, the Court finds that questions of law or fact common to the

class predominate over questions affecting individual members, and the class action is superior

to other available methods. Certification of the Settlement Class for settlement purposes is the

best means for protecting the interests of all of the Settlement Class Members.

3. The Court does hereby approve Douglas M. Werman and Maureen A. Salas of

Werman Law Office, P.C. as Class Counsel. The Court also approves Martha Peraza and Maura

Gawin as Class Representatives.

4. The Court does hereby appoint the class action settlement administration firm

Simpluris, Inc. as the Settlement Administrator in this class action settlement.

5. A hearing, for purposes of determining whether the settlement should be finally

approved, shall be held before this Court on _____ ___, 2012, at __:___ _.m., in Room

1225 of the U.S. District Court, 219 S. Dearborn, Chicago, Illinois. At the hearing, the Court

will hear final arguments concerning whether the proposed Settlement of the Litigation on the

terms and conditions provided for in the Settlement Agreement is fair, reasonable and adequate

and should be approved by the Court. The Court will also hear at that time any objections

submitted by Class Members. The Court will also consider Class Counsels' request for an award

of attorneys' fees and costs and for Enhancement Payments to be made to the Class Representatives and Consent Plaintiffs.

6. The Court approves, as to form and content, the Summary Notice and Complete Notice, as attached as Exhibits B and C to the Joint Stipulation and Agreement to Settle Class Action Claims, and finds that the distribution of the Class Notice set forth in Section V, Paragraph 14 of the Settlement Agreement: (1) meets the requirements of federal law and due process; (2) is the best notice practicable under the circumstances; and (3) shall constitute due and sufficient notice to all individuals entitled thereto.

7. All Class Members who are entitled to opt-out of the Settlement Class and do not do so shall be bound by all determinations and judgments in the Litigation concerning the Settlement, whether favorable or unfavorable to the Settlement Class.

8. Class Members shall not be required to submit a claim form to participate in the Settlement and receive a monetary award.

9. Within sixty-three (63) days of the mailing of the Class Notice, Class Members objecting to the terms of the settlement must do so in writing. The written objection must be sent to the Claims Administrator, postmarked on or before this date, and filed with the Clerk of the Court.

10. Within sixty-three (63) days of the mailing of the Class Notice, Class Members who wish to exclude themselves from (opt out) the Settlement Class and not participate in the proposed Settlement must submit a written request for exclusion to the Claims Administrator. Class members submitting opt-out statements shall postmark, sign and date the statement and send it to the Claims Administrator.

11.     Any member of the Settlement Class may enter an appearance in the Litigation, at his or her own expense, individually or through counsel of his or her own choice.  Any member of the Settlement Class who does not enter an appearance or opt out of the Settlement Class will be represented by Class Counsel.

12.     Any member of the Settlement Class may appear at the Final Approval Hearing and show cause, if any, why: (1) the proposed Settlement of the Litigation should or should not be approved as fair, reasonable, and adequate; (2) why a judgment should or should not be entered thereon; (3) why attorneys' fees should or should not be awarded to Class Counsel; and/or (4) why the Class Representative should or should not receive extra compensation in the form of an Enhancement Payment.  However, no Class Member or any other person shall be heard or entitled to contest the approval of the terms and conditions of the proposed Settlement, or, if approved, the Judgment to be entered thereon approving the same, or, if awarded, compensation for the Class Representatives or the attorneys' fees and costs awarded to Class Counsel, unless that person has, no later than sixty-three (63) days after mailing of Class Notice to the Settlement Class, served by hand or by first class mail on the Claims Administrator, written objections, and copies of any papers and briefs in support thereof, explaining the basis of the objection.  All timely filed and served objections also shall be filed with the Clerk of the Court and considered and ruled upon by the Court at the Final Approval Hearing.  Any member of the Settlement Class who does not timely file and serve his or her objection in the manner provided above shall be deemed to have waived such objection and shall forever be foreclosed from making any objection to the fairness or adequacy of the proposed Settlement as incorporated in the Settlement Agreement and any award of attorneys' fees and costs awarded to Class Counsel, unless otherwise ordered by the Court.

13.     Class Counsel shall file their petition for an award of attorneys' fees no later than ten (10) days prior to the Final Approval Hearing.

14.     All papers in support of the Settlement shall be filed no later than ten (10) days prior to the Final Approval Hearing.

15.     At the Final Approval Hearing, the Court shall determine whether the proposed Settlement, and any application for attorneys' fees or reimbursement of costs, shall be approved.

16.     The Court reserves the right to adjourn the date of the Final Approval Hearing without further notice to the Class members, and retains jurisdiction to consider all further applications arising out of or connected with the proposed Settlement.


DATED: _____         _____
                                    HONORABLE JUDGE JOHN Z. LEE

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **MARTHA PERAZA and MAURA GAWIN, individually and on behalf of all others similarly situated,** | ) ) ) | |
| | ) | **Civil Action No. 11 C 8390** |
| **Plaintiffs,** | ) ) | |
| | ) | **Judge Lee** |
| **v.** | ) ) | |
| **DOMINICK'S FINER FOODS, LLC,** | ) ) | |
| **Defendant.** | ) ) ) | |

**DECLARATION OF MAUREEN A SALAS IN SUPPORT
OF PRELIMINARY APPROVAL OF SETTLEMENT**

Maureen A. Salas, being first duly sworn on oath, deposes and states under penalty of perjury the following:

1.      I am over 21 years old, and I currently reside in Chicago, Illinois.

2.      I am a member of good standing of the Illinois State Bar. I am an attorney at Werman Law Office P.C. representing the Plaintiffs in the matter *Peraza, et al. v. Dominick's Finer Foods, LLC, et al.*

3.      I graduated from DePaul University College of Law in May 2006 *summa cum laude* (top 5%) and was elected into the Order of the Coif.

4.      I submit this Declaration in Support of the Parties' Motion for Preliminary approval of Proposed Settlement and for Class Certification. A copy of the Parties' Joint Stipulation and Agreement to Settle Class Action Claims is attached to this Declaration as Attachment A.

5.      I was admitted to practice law in the State of Illinois in 2006. I am admitted to

practice before the following federal courts: the United States District Court for the Northern District of Illinois and the United States District Court for the Central District of Illinois. I was admitted to the Trial Bar for the Northern District of Illinois on May 16, 2012.

6.     Since I became admitted in 2006, I have practiced primarily in representing employees in cases arising under federal and state wage and hour laws, including the Fair Labor Standards Act ("FLSA") and the Illinois Minimum Wage Law ("IMWL"). I have been counsel in over two hundred fifty cases filed in the Northern and Central Districts of Illinois and the State of Illinois, Circuit Court of Cook County, involving the non-payment of overtime pay, minimum wages, and other owed compensation. The majority of these cases proceeded as collective actions under §216(b) of the FLSA and/or set forth class action claims under the Illinois Minimum Wage Law and Illinois Wage Payment and Collection Act.

7.     I have been a speaker on wage and hour matters. In October 2011, I was a speaker at the National Employment Lawyers Association's meeting on "Representing Workers in Individual & Collective Actions Under the FLSA."  In August 2012, I was a speaker at the American Bar Association's - Section of Labor and Employment Law's - Annual Meeting.  In October 2012, I was a speaker for a continuing legal education "Wage & Hour Law" program hosted by Bridgeport Legal Conferences.

8.     I am a Contributing Editor to Chapter 19, "Collective Actions," of the leading treatise on the Fair Labor Standards Act, entitled, "Kearns, *The Fair Labor Standards Act*."

9.     I have been designated as class counsel in several wage and hour class actions certified under Fed. R. Civ. P. 23 or under Section 2-801 of the Illinois Code of Civil Procedure, including:

   a.     *O'Donnell v. AT&T Services, Inc.,* Case No. 10 CH 46886, in the Circuit Court of Cook Country, Chancery Division.  This case was certified under the Illinois

Minimum Wage Law for overtime wages for settlement purposes.

b.     *Gonzalez v. Fellowes, Inc.,* Case No. 10 CV 7682, in the Northern District of Illinois. This case was certified as a class action under the Illinois Minimum Wage Law and the Illinois Wage Payment and Collection Act for settlement purposes.

c.     *Flores v. EVA Investments,* Case No. 10 CH 12293, in the Circuit Court of Cook County, Chancery Division. This case was certified under the Illinois Minimum Wage Law for overtime wages for settlement purposes.

d.     *Barragan v. Evanger's Dog and Cat Food Co., Inc.,* Case No. 09 CV 227, in the Northern District of Illinois. This case was certified under the Illinois Minimum Wage Law for owed overtime wages.

e.     *Villareal v. El Chile Inc.,* Case No. 07 C 1656, pending in the United States District Court for the Northern District of Illinois. This case was certified under the Illinois Minimum Wage law for owed overtime wages.

f.     *Jimenez v. Yamuna Enterprises, Inc.,* Case No. 07 CH 20918, in the Circuit Court of Cook County, Chancery Division. This case was certified under the Illinois Minimum Wage Law and Illinois Wage Payment and Collection Act for owed overtime, minimum wages, and other unpaid compensation.

10.     On November 23, 2011, Named Plaintiffs Martha Peraza and Maura Gawin filed this Action in the United States District Court for the Northern District of Illinois, Eastern Division, on behalf of themselves and others similarly situated, alleging that Defendant violated the Illinois Minimum Wage Law ("IMWL") and Fair Labor Standards Act ("FLSA") by classifying salaried Department Managers in the Starbucks cafes located inside Defendant's grocery stores as "exempt" and by not paying them overtime wages. Plaintiffs later filed a First Amended Complaint to correct the name of the Defendant.

11.     On January 6, 2012, Named Plaintiffs filed a Motion for Class Certification of Their Illinois Minimum Wage Law Claim and Request for Discovery on Class Certification Issues. The Court entered and continued that motion. Later, the Parties filed a Stipulation,

agreeing to dismiss that motion without prejudice and allowing Plaintiffs time to renew the motion.

12.     Defendant filed its Answer on January 24, 2012, acknowledging that it classified Plaintiffs and other salaried Starbucks Managers as exempt from the FLSA and IMWL and acknowledging that it did not pay Plaintiffs and other salaried Starbucks Managers overtime wages. Defendant denies that the "exempt" classification was unlawful.

13.     In February 2012, the Parties discussed the prospect for early settlement discussions and alternative dispute resolution. Counsel for Plaintiffs requested that Dominick's produce payroll information to advance the parties' discussions on settlement. In February 2012, Defendant provided Plaintiff's Counsel with payroll and job history data for persons who were employed as salaried Starbucks Managers between November 23, 2008 and December 31, 2011. Counsel for Plaintiffs reviewed that information and issued a class-wide written settlement demand on April 26, 2012.

14.     The parties continued to discuss settlement, and in June 2012, the Parties scheduled a private mediation in this Action. On August 15, 2012, the Parties participated in a mediation with a highly regarded mediator, Lynn P. Cohn of Northwestern University School of Law. The Parties were unsuccessful in resolving the class-wide claims on that date, but scheduled a second mediation session with Ms. Cohn for September 18, 2012. The Parties were unsuccessful in resolving the claims at the second mediation session, but with the assistance of the mediator, the Parties were able to agree on a resolution of the class action claims raised in the lawsuit shortly following the September 18, 2012 mediation for a cash payment of $1,450,000.00. Described in further detail below, the Settlement provides for a payment to all

Class Members who do not opt-out of the Settlement. Class Members do not need to submit claim forms to participate in the Settlement.

15.    Exhibit A of the Settlement Agreement identifies the individuals who are members of the Settlement Class.

16.    Each Class Member's *pro rata* settlement share will be calculated as set forth in Section 8 of the Settlement Agreement. Class Members estimated payments are listed in Exhibit A of the Settlement Agreement. For purposes of calculating payments to Class Members from the Settlement Fund, the gross compensation paid to each Class Member and the dates of employment each Class Member worked were determined from supplemental job history data Defendant produced to Plaintiffs' Counsel on October 19, 2012 and on November 1, 2012. Each Class Member will receive a Short Form Notice document that will identify the approximate amount they will be paid from the Settlement Fund. Each Class Member will have an opportunity to object to or opt-out of the Settlement.

17.    The Settlement Agreement also contemplates enhancement payments to the Class Representatives and other actively-participating opt-in plaintiffs, to acknowledge their service to the class. Plaintiffs shall request Enhancement Payments in the amount of seven thousand five hundred dollars ($7,500.00) for Named Plaintiffs Martha Peraza and Maura Gawin, as well as one thousand five hundred dollars ($1,500.00) for each plaintiff who filed a consent form and opted into this case. These payments are in addition to any payment that these individuals receive as their pro rata share of the Settlement Fund.

18.    In light of their efforts resulting in a $1,450,000.00 settlement on behalf of the Settlement Class, the Named Plaintiffs are entitled to a modest enhancement payment.

19.    In this case, the Named Plaintiffs were responsible for initiating and maintaining

this action. They participated in the case, attended both mediation sessions, and performed everything that was asked of them. The plaintiffs who filed consent forms to join this lawsuit – Lenise Maxey, Selena Mussay, Theresa Froelich, Juan Cuarenta, Yesenia Serna-Vazquez, Eralba Duckollari, Danielle Mayfield, and Paul Yamauchi – also provided a material service to the class. They provided valuable documents and information to Plaintiffs' Counsel that assisted the Named Plaintiffs in recovering wages on behalf of all Class Members. Without the efforts of the Named Plaintiffs and the Consent Plaintiffs, this case would not have been filed and this settlement would not have been achieved. As a result of these efforts and the result achieved, the incentive payments to these individuals are well justified

20.     Plaintiffs' counsel has gained comprehensive knowledge of the facts and legal issues relating to the respective claims and defenses and has ample evidence on which to base an informed assessment of the parties' settlement. Based on their knowledge of the case and the applicable law, as well as their experience in other large class action cases, Plaintiffs' counsel believes the settlement is fair, reasonable and adequate.

21.     The Named Plaintiffs support the settlement, as do Plaintiffs' Counsel and Defendant. At this preliminary stage, Plaintiffs' counsel is unaware of any opposition to the settlement, which provides an excellent result to all class members.

22.     It is appropriate for the Court to place significant weight on the unanimously strong endorsement of this Settlement by Plaintiffs' Counsel. Counsel exercised their experience based on an intimate knowledge of the facts of the case and the legal issues facing the Class, including conducting an independent analysis of the strength and weakness of the claims and value of the claims, the time costs and expense of protracted litigation, discovery, trial and appeals. The Settlement was only reached after the conclusion of two mediations sessions overseen by a well-

respected mediator.

23.     As explained above, this complex class action was resolved only after Defendant produced employment history and salary information for the class, and after the Parties engaged in two mediation sessions with a third party mediator. In addition, at the time the action was resolved, eight individuals, in addition to the Named Plaintiffs, opted into this action and provided information and documents to Plaintiffs' Counsel. The stage of litigation has advanced so that Plaintiffs' counsel could fairly and fully evaluate the value of the settlement.

24.     Eighty-five (85) salaried Starbucks managers were classified as exempt during the Class Period and were not paid one and one half times their regular rate for overtime hours worked.

25.     Large-scale class actions of this type are, by their very nature, complicated and time-consuming. Any lawyer undertaking representation of large numbers of affected employees in wage and hour actions inevitably must be prepared to make a tremendous investment of time, energy and resources. Due also to the contingent nature of the customary fee arrangement, lawyers must be prepared to make this investment with the very real possibility of an unsuccessful outcome and no fee of any kind. The demands and risks of this type of litigation overwhelm the resources — and deter participation — of many traditional claimants' firms.

26.     Class Counsel had executed fee arrangements with the Class Representatives that entitled Class Counsel to 33.33% of any recovery. Plaintiffs could not have afforded to retain counsel on any basis other than a contingent fee basis. Plaintiffs' Counsel would receive nothing if they ultimately failed to secure a monetary recovery for Plaintiffs. Plaintiffs' Counsel took the risk that they would obtain no recovery at all

27.     Plaintiffs' counsel was prepared to prosecute and finance this litigation for as long

as necessary, with the possibility that they would come away with nothing.

28.     Plaintiffs' counsel in this case has substantial experience in prosecuting large-scale wage and hour class and collective actions such as this, and routinely negotiates contingency fee compensation rates at or near forty percent (40%).

29.     Plaintiffs' Counsel have and will continue to fairly and adequately protect the interests of the class. Plaintiffs' Counsel are highly experienced and are recognized attorneys in wage and hour law and have been designated class counsel in dozens of class actions under the Illinois Minimum Wage Law, Illinois Wage Payment and Collection Act and Fair Labor Standards Act ("FLSA").

30.     Plaintiffs' counsel has exceeded expectations in this case, securing a settlement and avoiding the risks of trial.

31.     Defendant's ability to pay a judgment or a settlement was not a factor in the parties' settlement.  Thus, the settlement has not been discounted for that factor.

32.     The fact that a significant monetary recovery is available to class members without the uncertainty of trial, and is being delivered through this settlement rather than after substantial further litigation, qualifies this settlement as a favorable result.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of November, 2012.

_Maureen A. Salas_
Maureen A. Salas

# ATTACHMENT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARTHA PERAZA and MAURA GAWIN, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | Civil Action No. 11 C 8390 |
| Plaintiffs, | ) | |
| | ) | Judge Lee |
| v. | ) | |
| | ) | |
| DOMINICK'S FINER FOODS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## JOINT STIPULATION AND AGREEMENT TO SETTLE CLASS ACTION CLAIMS

This Joint Stipulation and Agreement to Settle Class Action Claims ("Settlement," "Stipulation," or "Agreement") is made by Martha Peraza and Maura Gawin ("Named Plaintiffs" or "Class Representatives"), individually and on behalf of the class of individuals they seek to represent ("Class Members"), as well as opt-in plaintiffs Lenise Maxey, Selena Mussay, Theresa Froelich, Juan Cuarenta, Yesenia Serna-Vazquez, Eralba Duckollari, Danielle Mayfield, and Paul Yamauchi (Consent Plaintiffs") (Named Plaintiffs, Class Members, Consent Plaintiffs collectively the "Plaintiffs") and Defendant Dominick's Finer Foods, LLC ("Defendant" or "Dominick's") (Plaintiffs and Defendant are collectively referred to as the Parties), in the above-captioned action ("Class Action" or "Action").

## I.    PROCEDURAL HISTORY

On November 23, 2011, Named Plaintiffs Martha Peraza and Maura Gawin filed this Action in the United States District Court for the Northern District of Illinois, Eastern Division, on behalf of themselves and others similarly situated, alleging that Defendant violated the Illinois Minimum Wage Law ("IMWL") and federal Fair Labor Standards Act ("FLSA") by classifying

salaried Starbucks Managers as "exempt" and by not paying salaried Starbucks Managers overtime wages. Plaintiffs later filed a First Amended Complaint to correct the name of the Defendant. On January 6, 2012, Named Plaintiffs filed a Motion for Class Certification of Their Illinois Minimum Wage Law Claim and Request for Discovery on Class Certification Issues. The Court entered and continued that motion, and stayed the motion pending further order of court.

Defendant filed its Answer to the First Amended Complaint on January 24, 2012, acknowledging that it classified Plaintiffs and other salaried Starbucks Managers as exempt from the FLSA and IMWL and acknowledging that it did not pay Plaintiffs and other salaried Starbucks Managers overtime wages. Defendant denied that the "exempt" classification was unlawful.

In February 2012, the Parties discussed the prospect for early settlement discussions and alternative dispute resolution. Counsel for Plaintiffs requested that Dominick's produce payroll information to advance the parties' discussions on settlement. In February 2012, Defendant provided Plaintiff's Counsel with payroll and job history data for persons who were employed as salaried Starbucks Managers between November 23, 2008 and December 31, 2011. Counsel for Plaintiffs reviewed that information and issued a class-wide written settlement demand on April 26, 2012.

The parties continued to discuss settlement, and in June 2012, the Parties scheduled a private mediation in this Action. On August 15, 2012, the Parties participated in a mediation with a highly regarded mediator, Lynn P. Cohn of Northwestern University School of Law. The Parties were unsuccessful in resolving the class-wide claims on that date, but scheduled a second mediation session with Ms. Cohn for September 18, 2012. The Parties were unsuccessful in

resolving the claims at the second mediation session, but with the assistance of the neutral mediator, the Parties were able to agree on a resolution of the class action claims raised in the lawsuit shortly following the September 18, 2012 mediation.

## II.    DEFINITION OF "CLASS MEMBERS"

As part of this settlement, the Parties ask that the Court certify a class composed of:

All persons who worked for Defendant in the State of Illinois in the job position Starbucks Manager between November 23, 2008 and November 14, 2012 ("Class Period") and who were paid on a salary basis (herein the "Class" or "Settlement Class").

Exhibit A to this Stipulation identifies the individuals who are members of the Settlement Class. The Parties also ask that the Court appoint Douglas M. Werman and Maureen A. Salas as Class Counsel and the Named Plaintiffs, Martha Peraza and Maura Gawin, as Class Representatives.

## III.    BENEFITS OF SETTLEMENT TO CLASS MEMBERS

Dominick's expressly denies any liability or wrongdoing of any kind associated with the claims in the Action and maintains that it has complied with all applicable laws at all times. Named Plaintiffs Peraza and Gawin recognize the expense and length of the proceedings necessary to continue the litigation against Defendant through trial and through any possible appeals. Named Plaintiffs Peraza and Gawin also have taken into account the uncertainty and risk of the outcome of further litigation, the defenses raised by Defendant, and the difficulties and delays inherent in litigation.  In addition, this Agreement will provide a substantial monetary settlement for Class Members without requiring Class Members to submit a claim form.  Based on the foregoing, the Named Plaintiffs have determined that the Settlement set forth in this Agreement is a fair, adequate and reasonable settlement, and that it is in the best interests of the Class.

## IV.    DEFENDANT'S REASONS FOR SETTLEMENT

Dominick's has concluded that any further defense of this litigation would be protracted and expensive for all Parties.  Unless this Settlement is made, Dominick's will need to devote substantial amounts of time, energy and resources to the defense of the claims asserted by Plaintiffs.  Dominick's also has taken into account the uncertainty and risk of further litigation. Defendant has, therefore, agreed to settle in the manner and upon the terms set forth in this Agreement to put to rest the Claims as set forth in the Class Action.

## V.    SETTLEMENT TERMS

NOW, THEREFORE, IT IS HEREBY STIPULATED, by and among the Named Plaintiffs and Class Representatives on behalf of the Consent Plaintiffs and Class Members on the one hand, and Defendant on the other hand, and subject to the approval of the Court, that the Class Action hereby be compromised and settled pursuant to the terms and conditions set forth in this Agreement and that upon the Final Approval (as defined below), the Class Action shall be dismissed with prejudice, subject to the recitals set forth hereinabove which, by this reference, become an integral part of this Agreement and subject to the following terms and conditions:

### 1.    Final Approval Date and Effective Date

As used in this Settlement, "Final Approval" means the date by which this Settlement is finally approved as provided herein and the Court enters Final Judgment and Order of Dismissal with Prejudice ("Final Judgment" or "Judgment").  The term "Effective Date" means the first date after the judgment by the Court finally approving this Settlement Agreement is no longer appealable, or if an appeal has been filed, the date on which the appeal is final.  Notwithstanding the foregoing, the Parties agree to waive all rights to appeal on entry of Final Judgment, except that Plaintiffs may appeal an award of Class Counsel's fees and costs, or the Enhancement Payments, should the sums awarded by the Court fall below that requested.  Accordingly, where

4

the Final Judgment entered by the Court grants full relief sought by the Parties in the absence of any objection, the Effective Date shall be the date of the Final Judgment.

2.    **Direct Payment to Class Members**

Class Members shall not be required to submit a claim form to participate in this Settlement.  Class Members who do not exclude themselves from the Settlement will receive a check for their ratable share of the "Overtime Awards Fund," as defined in Paragraph V.6(a).

3.    **Plaintiffs' Release**

As of Final Approval, Plaintiffs who do not exclude themselves from this Settlement, pursuant to Paragraph V.15(b) of this Settlement, release and forever discharge the "Released Claims" arising during the Class Period against Defendant, and its past, present, and future direct and indirect parents, affiliates, subsidiaries, divisions, officers, directors, and employees (the "Released Parties") for the period of time they were paid a salary and worked in the job position of Starbucks Manager.  For purposes of this Agreement, the "Released Claims" are defined as: all claims, demands, rights, liabilities, and causes of action based on Defendant's alleged failure to pay overtime, whether known or unknown, which the Plaintiffs have, have had, or may have under the IMWL, 820 ILCS 105/1 *et seq.,* for wages, interest, and other damages.  All persons who cash Settlement Checks shall also release claims for owed overtime pay under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201 *et seq.,* arising during the Class Period against the Released Parties for the period of time they were paid a salary and worked in the job position of Starbucks Manager. All Settlement Checks shall contain on the back of the check, the following limited endorsement:

"**CONSENT TO JOIN AND FINAL RELEASE OF CLAIMS:**

I understand that I have up to 180 days from the date I was mailed this Settlement Check to sign and cash this Settlement Check. By endorsing this check, I consent

to join in the case entitled Peraza, et al v. Dominick's Finer Foods, LLC, No. 11 C 8390, pending in the United States District Court for the Northern District of Illinois, and agree to be bound by the Settlement Agreement negotiated by Class Counsel in that case. I irrevocably and unconditionally waive, release, extinguish, acquit, and forever discharge any claim I might have for unpaid overtime pay under federal or state wage and hour laws, relating to my employment with Defendant as a salaried Starbucks Manager, up to and including November 14, 2012.

_____          Dated:_____
Signature"

### 4.   Settlement Fund

The term "Settlement Fund" shall refer to the funds that will be distributed to the Named Plaintiffs, Consent Plaintiffs and Class Members in accordance with Paragraphs V.6, V.7 and V.8 below.  The Settlement Fund shall consist of $1,450,000, which represents (i) payment of overtime wages and interest alleged to be owed to the Named Plaintiffs, Consent Plaintiffs, and Class Members, (ii) the Class Representatives' and Consent Plaintiffs' enhancement payments, (iii) Plaintiffs' attorneys' fees and costs, and (iv) settlement administration fees and costs. Defendant will make the $1,450,000 payment into the Settlement Fund within twenty-one (21) days of Preliminary Approval. The Settlement Administrator shall establish the Settlement Account and it will be an interest bearing account. All interest earned on the payment Defendant deposits into the Settlement Fund will be retained by Defendant.

### 5.   Settlement Administration Costs

The Parties have selected Simpluris, Inc. to administer this class action settlement. The costs of settlement administration shall be paid out of the Settlement Fund and not by Defendant.

### 6.   Allocation of Settlement Fund

The Settlement Fund shall be allocated as follows, subject to Court approval:

(a)    The amount available from the Settlement Fund for Class Members ("Overtime Awards Fund") shall be the Settlement Fund minus the amounts paid to (i) the Named Plaintiffs as a Class Representative enhancement payment, (ii) the Consent Plaintiffs as an opt-in enhancement payment, (iii) Class Counsel for attorneys' fees and costs, and (iv) the Settlement Administrator for settlement administration fees and costs.  The amounts to be deducted from the Settlement Fund are set forth below in subparagraphs (b), (c), (d) and (e).

(b)    A payment up to $7,500 to Named Plaintiffs Martha Peraza and Maura Gawin for a Class Representative Enhancement Award (as explained in Paragraph V.9(d) below);

(c)    A payment up to $1,500 to Consent Plaintiffs Lenise Maxey, Selena Mussay, Theresa Froelich, Juan Cuarenta, Yesenia Serna-Vazquez, Eralba Duckollari, Danielle Mayfield, and Paul Yamauchi for an Opt-In Enhancement Award (as explained in Paragraph V.9(e) below);

(d)    A sum of no more than 1/3 of the Settlement Fund to be paid for Class Counsel's attorneys' fees and an amount not to exceed $10,000 in reasonably incurred litigation costs (as explained in Paragraphs V.8(a) and V.9(a) below);

(e)    A sum of $10,000.00 to be paid for settlement administration costs and fees.

**7.    <u>Timeline of Settlement Events</u>**

The Parties contemplate the following timeline for settlement events listed.  The date of Preliminary Approval is the base timeline for all actions.  The Parties contemplate presenting this Agreement to the Court on or before November 5, 2012.  If the parties are unable to complete the preparation of the pleadings necessary for a motion for preliminary approval of the class action

settlement by November 5, 2012, they will use their best efforts to prepare and file the pleadings as soon as practical after November 5, 2012.

- On October 19, 2012, Dominick's provided Plaintiffs' Counsel with a complete set of payroll data identifying class members' names, with corresponding Employee ID number, Date Plaintiff became Starbucks Manager within the Class Period, Termination Date (if applicable), last-known mailing address, telephone number, and Social Security number.

- The Settlement Administrator will mail a Summary Notice to Class Members in accordance with Paragraph V.14 of this Agreement twenty-one (21) days after Preliminary Approval.

- All objections to the Settlement and requests for exclusion from the Settlement must be postmarked within sixty-three (63) days from the first mailing of the Summary Notice.

- Plaintiffs' Counsel shall file a motion for final approval of this Settlement and petition for attorneys' fees no later than ten (10) days before the Final Approval Hearing or on another date set by the Court.

- The Settlement Administrator will mail settlement checks to all absent Class Members, who did not exclude themselves from this Settlement, fourteen (14) days after the Effective Date. The Claims Administrator shall also deliver the Named Plaintiffs' settlement checks, the Consent Plaintiffs' settlement checks, and Class Counsel's check for attorneys' fees and costs, to Class Counsel.

- The deadline for Class Members to cash checks will be one-hundred-eighty (180) days from the date the Settlement Administrator mails the settlement checks.

- Any unclaimed money remaining in the Settlement Fund twenty-one (21) days after the check-cashing deadline will be returned to Defendant as set forth in Paragraph V.10 of this Agreement. Thereafter, the Settlement Administrator shall close the Settlement Fund.

8. **Calculation of Settlement Amount and Plan of Allocation for Payment to Class Members and Attorneys' Fees**

(a)     Within fourteen (14) days of the Effective Date of this Settlement Agreement or entry of an Order granting Plaintiffs' Counsel's petition for attorneys' fees, whichever is later, the Settlement Administrator shall pay to Plaintiff's attorneys from the Settlement Fund the amount of attorneys' fees and costs approved by the Court, in amounts not to exceed $483,333.33, in attorneys' fees and $10,000 in costs as more fully set forth in Paragraph V.9(a) hereof.

(b)     By the date specified in Paragraph V.7 hereof, the Settlement Administrator will issue checks to each Class Member who did not exclude himself or herself from the Settlement and transmit the checks to the Class Members, in accordance with the following criteria:

(1)     Each Plaintiff will receive a gross check, less legal payroll deductions for state and federal withholding taxes and any other applicable payroll deductions, for his or her ratable share of the settlement fund for overtime pay according to the formula set forth in V.8(c).

(2)     Each Plaintiff will receive a second check in an amount equal to the Plaintiff's overtime pay award to account for interest.  The Named Plaintiffs' and Consent Plaintiffs' second check will also

9

include the monies paid to them as an Enhancement Award, as described in Paragraph V.9(d) and (e). Payroll deductions will not be taken from Plaintiffs' second check.

(c)    Named Plaintiffs', Consent Plaintiffs' and Class Members' ratable share of the Overtime Awards Fund, estimated to equal $919,666.67, has been calculated as follows:

(1)    Named Plaintiffs, Consent Plaintiffs, and Class Members were assumed to have worked 45.05 hours in each individual work week they were employed by Dominick's in the Starbucks Manager job position during the Class Period.

(2)    Each Named Plaintiff's, Consent Plaintiff's, and Class Member's regular rate was computed by dividing annual salary by fifty-two (52) weeks to determine Weekly Salary. Weekly Salary was divided by 45.05 hours to determine regular rate of pay.

(3)    Overtime Wages were computed on an individual work week basis by multiplying the Named Plaintiff's, Consent Plaintiff's, and Class Member's regular rate of pay by one-half and then by 5.05 overtime hours for each individual work week they were employed by Dominick's in the Starbucks Manager job position during the Class Period.

(4)    For each individual work week Named Plaintiffs, Consent Plaintiffs, and Class Members were employed by Dominick's in the Starbucks Manager job position during the Class Period, their weekly interest equals their weekly overtime wages.

      (5)     Each Plaintiff's overtime wages and interest were totaled for the Class Period. Each Plaintiff's estimated awards are identified on Exhibit A.

      (6)     If the Overtime Awards Fund is different than the estimated amount of $919,666.67, the Named Plaintiff's, Consent Plaintiff's, and Class Member's Awards will be computed by multiplying the Overtime Awards Fund by the Plaintiffs' ratable share of the Fund. Each Named Plaintiff's, Consent Plaintiff's, and Class Member's ratable amount shall be determined by dividing the sum of his/her overtime wages and interest awards by the total of all Plaintiffs' overtime wages and interest awards.

      (d)     As provided in Paragraph V.10, settlement checks that are not cashed within one-hundred-eighty (180) days from the issuance date will revert to Defendant consistent with the terms of this Agreement.

      (e)     The Settlement Administrator will pay the amounts withheld from the Named Plaintiffs', Consent Plaintiffs' and Class Members' checks as payroll deductions to the appropriate taxing authorities. Defendant will pay, separate and apart from the overtime pay, the employer's share of all applicable state and federal payroll taxes on any overtime pay check distributed to the Plaintiffs. The Settlement Administrator will issue an IRS form W-2 for the overtime pay payment to Plaintiffs. The Settlement Administrator will issue an IRS Form 1099 to the Named Plaintiffs and Consent Plaintiffs for the second check issued to them for interest and Enhancement Awards and an IRS Form 1099 to Class Members for the second check issued to them for interest.

9. **Fees Award and Class Representative and Consent Plaintiff Enhancement Awards**

(a)     Class Counsel shall seek a portion of the Settlement Fund as attorneys' fees and costs.  The total fees shall not exceed $483,333.33. The total costs award shall not exceed $10,000.  Defendant will not object to a request by Class Counsel for Court approval of a fees and costs award from the Settlement Fund in these amounts.

(b)     The fees and costs award approved by the Court shall be paid by the Settlement Administrator to Class Counsel from the Settlement Fund as set forth in Paragraphs V.7 and V.8 hereof.

(c)     The payment of the fees and costs award to Class Counsel shall constitute full satisfaction of the obligation to pay any amounts to any person, attorney or law firm for attorneys' fees, expenses or costs in the Action incurred by any attorney on behalf of the Named Plaintiffs, Consent Plaintiffs and the Class Members, and shall relieve Defendant, the Settlement Fund, and Defendant's Counsel of any other claims or liability to any other attorney or law firm for any attorneys' fees, expenses and/or costs to which any of them may claim to be entitled on behalf of the Named Plaintiffs, Consent Plaintiffs, and the Class Members.  In exchange for such payment, Class Counsel will remise, release and forever discharge any attorneys' lien on the Settlement Fund.

(d)     Class Counsel may apply for a "Enhancement Award" to Class Representatives Martha Peraza and Maura Gawin in an amount not to exceed Seven-Thousand-Five-Hundred Dollars ($7,500.00) each, to be paid for their time and effort spent conferring with Plaintiffs' Counsel, filing and pursuing the Action, attending the mediation sessions, and in recovering wages on behalf of all Class Members.  The Class Representative Enhancement Awards shall be paid from the Settlement Fund in the form of a check as described in Paragraph

V.8(b)(2). Defendant agrees not to oppose such application, so long as it is consistent with the provisions of this Agreement.

(e)     Class Counsel may apply for a "Enhancement Award" to the Consent Plaintiffs Lenise Maxey, Selena Mussay, Theresa Froelich, Juan Cuarenta, Yesenia Serna-Vaszquez, Eralba Duckollari, Danielle Mayfield, and Paul Yamauchi in an amount not to exceed One-Thousand-Five-Hundred Dollars ($1,500.00) each, to be paid for their time and effort spent conferring with Plaintiffs' Counsel and in sharing information and documents that assisted Named Plaintiffs in recovering wages on behalf of all Class Members. The Consent Plaintiffs' Enhancement Awards shall be paid from the Settlement Fund in the form of a check as described in Paragraph V.8(b)(2). Defendant agrees not to oppose such application, so long as it is consistent with the provisions of this Agreement.

### 10.     Remainder Distribution

Any portion of the Settlement Fund that is unclaimed after the closure of the distribution period described in Paragraph V.18(d) of this Agreement ("Remainder Amount") shall be paid to Defendant within twenty-one (21) days after the expiration of the one-hundred-eighty (180) day check-cashing period.

### 11.     Responsibilities of Defendant

Defendant shall:

(a)     Perform all duties as stated in this Agreement.

(b)     Provide Plaintiffs' Counsel and the Settlement Administrator with each of the Named Plaintiffs', Consent Plaintiffs' and Class Members' most recent or last known mailing address, telephone number, and Employee Identification Number. Defendant shall also provide Class Counsel and the Settlement Administrator the Social Security Number or other tax

13

identification numbers used by Plaintiffs while working for Defendants, which the Settlement Administrator will use for purposes of locating Class Members to deliver notice to them and in preparing Plaintiffs' Form W-2's and Form 1099's.

(c)     Refrain from initiating communications with Plaintiffs regarding the Settlement. In the event any Plaintiff communicates with Defendant or its managers regarding the Settlement, Defendant shall make its best effort to direct the Plaintiff to contact the Settlement Administrator or Plaintiffs' Counsel.

12.     **Operation of the Settlement Fund**

(a)     The Settlement Administrator shall make payments to Plaintiffs from the Overtime Awards Fund according to his or her ratable percent share, as set forth in Exhibit A. Class Counsel has calculated the estimated back overtime and interest awards to be paid to Plaintiffs (before legal withholdings) from the Overtime Awards Fund in accordance with the terms and provisions of this Agreement.  *See* Exhibit A.

(b)     The Settlement Administrator shall make all proper payments from the Overtime Awards Fund.  The Settlement Administrator shall prepare and mail all payments to Class Members and shall deliver the Named Plaintiffs' and Consent Plaintiffs' payments to Class Counsel.

(c)     The Settlement Administrator shall cause to be timely and properly filed all informational and other tax returns, if any, necessary with respect to the Overtime Awards Fund.  Such returns shall be consistent with this paragraph.  If any taxable income is generated by the Settlement Fund, in all events the tax returns filed shall reflect that all taxes payable on the taxable income of these funds, if any, shall be paid by the Settlement Administrator from the amounts retained from the Settlement Fund.

14

13.    **Additional Claims**

No person shall have any claim against Defendant, Defendant's Counsel, the Named Plaintiffs, the Consent Plaintiffs, Class Members or Plaintiffs' Counsel based on distributions and payments made in accordance with this Agreement.

14.    **Notice/Approval of Settlement and Settlement Implementation**

As part of this Settlement, the Parties agree to the following procedures for obtaining preliminary Court approval of the Settlement, notifying Class Members, obtaining final Court approval of the Settlement, and processing the settlement payments:

(a)    <u>Preliminary Approval Hearing</u>.  Plaintiffs shall move for Preliminary Approval of the Settlement ("Preliminary Approval" or "Order") by November 5, 2012 or as soon as practicable.  In conjunction with the motion for Preliminary Approval, Plaintiffs will submit this Agreement, which sets forth the terms of this Settlement, and will include proposed forms of all notices and other documents as attached hereto necessary to implement the Settlement.

(b)    <u>Notice to Class Members</u>.  Notice of the Settlement shall be provided to the Named Plaintiffs, Consent Plaintiffs and Class Members, and Plaintiffs shall submit any objections to the Settlement, and/or requests for exclusion from the Class, using the following procedures:

(1)    <u>Settlement Administration</u>.  The Settlement Administrator, with the assistance of the Parties, shall administer the Settlement on the timetable stated in Paragraph V.7 of this Agreement and for such other tasks as the Parties mutually agree or the Court orders to be performed in the administration of the Settlement.

(2)    <u>Summary Notice to Class Members</u>.  On the timetable specified in Paragraph V.7 of this Agreement, the Settlement Administrator shall send a copy of the

15

Summary Notice, attached hereto as Exhibit B, to all Plaintiffs via First Class regular U.S. mail. The Summary Notice will be mailed using the most current mailing address information. Prior to mailing the Class Notice, the Settlement Administrator will verify the most recent mailing address for the Plaintiffs by using Accurint, or a comparable database, and shall furnish this information to Class Counsel. The Settlement Administrator shall promptly conduct a second mailing for any Class Member whose Summary Notice is returned as undeliverable within forty-five (45) days of the date of the initial mailing, provided that a forwarding address is provided by the U.S. Postal Service or otherwise located by the Settlement Administrator. If after this second mailing, the Summary Notice is again returned as undelivered, or if no other forwarding address is available, the notice mailing process shall end for that Class Member.

(3)    <u>Complete Notice</u>

The Summary Notice will explain that Class Members may obtain a Complete Notice from the Settlement Administrator. The Complete Notice is attached hereto as Exhibit C. The Settlement Administrator or Plaintiffs' Counsel will mail a Complete Notice to each Class Member who requests one.

(4)    <u>Update of Contact Information</u>

The Settlement Administrator will operate a telephone line that allows Plaintiffs to update their contact information with a live person. Plaintiffs will be asked to provide their Employee Identification Number or Social Security Number or other tax identification number to confirm their identity when updating their address by telephone.

**15.**     **<u>Procedure for Objecting to or Requesting Exclusion from Class Action Settlement</u>**

(a)     <u>Procedure for Objecting</u>. The Summary Notice shall provide that Class Members who wish to object to the Settlement must mail a written statement objecting to the

16

Settlement to the Clerk of the Court and the Settlement Administrator. Such written statement must be postmarked no later than sixty-three (63) days after the date the Notice is first mailed (the "Objection/Exclusion Deadline Date"). No Class Member shall be entitled to be heard at the Final Approval Hearing (whether individually or through separate counsel) or to object to the Settlement, and no written objections or briefs submitted by any Class Member shall be received or considered by the Court at the Final Approval Hearing, unless written notice of the Class Member's intention to appear at the Final Approval Hearing (if such Class Member does intend to appear either personally or through counsel), and/or copies of any written objections or briefs, shall have been mailed to the Clerk of the Court and the Settlement Administrator on or before the Objection/Exclusion Deadline Date. The date of the postmark on the mailing envelope shall be the exclusive means used to determine whether an objection to the Settlement has been timely submitted. No later than ten (10) days after the Objection/Exclusion Deadline Date, the Settlement Administrator shall furnish to Defendant's Counsel and Plaintiffs' Counsel copies of objections received from Class Members. Class Members who fail to submit timely written objections in the manner specified above shall be deemed to have waived any objections and shall be foreclosed from making any objection (whether by appeal or otherwise) to the Settlement.

(b) <u>Procedure for Requesting Exclusion ("Opt Outs")</u>. The Notice shall provide that Class Members who wish to exclude themselves from the Class must submit a written statement requesting exclusion from the Class on or before the Objection/Exclusion Deadline Date. Such written request for exclusion must contain the name, address and the last four digits of the Social Security number the Class Member used when working for Defendant, must be returned by mail to the Settlement Administrator on or before the Objection/Exclusion

Deadline Date. The date of the postmark on the return mailing envelope shall be the exclusive means used to determine whether a request for exclusion has been timely submitted. Any Class Member who opts out of the Class will not be entitled to any recovery under the Settlement and will not be bound by the Settlement or have any right to object, appeal or comment thereon. No later than ten (10) days after the Objection/Exclusion Deadline Date, the Settlement Administrator shall furnish to Defendant's Counsel and Plaintiffs' Counsel a complete list of all Class Members who have timely requested exclusion from the Class.

**16.** **No Solicitation of Settlement Objections or Exclusions**

The Parties agree to use their best efforts to carry out the terms of this Settlement. At no time shall either Party or their counsel seek to solicit or otherwise encourage Class Members to submit written objections to the Settlement or requests for exclusion from the Class, or appeal from the Court's Final Judgment.

**17.** **Final Settlement Approval Hearing and Entry of Final Judgment**

Upon expiration of the Objection/Exclusion Deadline Date, with the Court's permission, a Final Approval Hearing shall be conducted to determine final approval of the Settlement along with the amount payable for (i) attorneys' fees and cost award and (ii) the Class Representatives' and Consent Plaintiffs' Enhancement Awards. Upon final approval of the Settlement by the Court at or after the Final Approval Hearing, the Parties shall present a Final Judgment and Order of Dismissal with Prejudice ("Final Judgment") to the Court for its approval.

**18.** **Undistributed Settlement Awards**

(a) A Class Member who excludes himself or herself from this Settlement will not receive any payment from the Settlement Fund.

(b) The Settlement Administrator will deliver the settlement checks as specified above and will forward any returned checks to any address provided by the U.S. Postal

Service, the Class Member, or otherwise identified by Plaintiffs' Counsel or the Settlement Administrator.

(c)     As specified in Paragraph V.7, Class Members will have one-hundred-eighty (180) days after the mailing of their settlement checks to cash the checks. The Settlement Administrator will issue checks which on their face are not valid more than 180 days after their date of issuance.  If any Class Member's settlement check is not cashed within that 180-day period, the check will be void.  In such event, any Class Member whose check was not cashed will be deemed to have waived irrevocably any right or claim to his or her payment from the Settlement Fund, but the Settlement nevertheless will be binding upon the Class Member.

(d)     If the Settlement Administrator is unable to deliver a Settlement check to a Class Member, or if a check remains uncashed within one-hundred-eighty (180) days after it is mailed, the amount of such Settlement payments will revert to Defendant.

**19.     Defendant's Legal Fees and Settlement Administration Costs**

All of Defendant's own legal fees, costs and expenses incurred in this Action shall be borne by Defendant. The Parties agree to cooperate in the Settlement administration process and to make all reasonable efforts to control and minimize the costs and expenses incurred in administration of the Settlement.

**20.     Nullification of Settlement Agreement**

This Settlement Agreement is contingent upon the final approval and certification by the Court of the Settlement Class for settlement purposes. Defendant does not waive, and instead expressly reserves, its rights to challenge the propriety of class certification on any ground and for any purposes as if this Settlement Agreement had not been entered into by the Parties.  In the event: (i) the Court does not enter the Order specified herein; (ii) the Court does not finally approve the Settlement as provided herein; (iii) the Court does not enter a Final Judgment as

provided herein, which becomes final as a result of the occurrence of the Final Approval; or (iv) the Settlement does not become final for any other reason, this Settlement Agreement shall be null and void, and any order or judgment entered by the Court in furtherance of this Settlement shall be treated as void *ab initio*. In such a case, the Parties and any funds to be awarded under this Settlement shall be returned to their respective statuses as of the date and time immediately prior to the execution of this Agreement, and the Parties shall proceed in all respects as if this Settlement Agreement had not been executed, except that any fees already incurred in the administration of the settlement shall be paid to the Settlement Administrator from the Settlement Fund and those fees shall not be reimbursed by the Named Plaintiffs, the Consent Plaintiffs, Class Members, or Class Counsel. In the event an appeal is filed from the Court's Final Judgment, or any other appellate review is sought prior to the Final Approval, administration of the Settlement shall be stayed pending final resolution of the appeal or other appellate review.

### 21.  **Certification of Distribution of Settlement Checks**

The Settlement Administrator shall keep Class Counsel and Defendant's Counsel apprised of the status of all mailings of the Settlement payments, and any returned mailings, upon request by the Parties' Counsel. The Settlement Administrator shall also provide Class Counsel and Defendant's Counsel with an accounting of the proceeds disbursed from the Settlement Fund upon request.

### 22.  **No Effect on Employee Benefits**

The Settlement payments paid to Plaintiffs shall be deemed not to be pensionable earnings and shall not have any effect on the eligibility for, or calculation of, any of the employee benefits (*e.g.*, 401(k) plans, retirement plans, etc.) of Plaintiffs and Class Members. The Parties agree that any Settlement payments paid to Plaintiffs under the terms of this

Agreement do not represent any modification of Plaintiffs' previously credited hours of service or other eligibility criteria under any employee pension benefit plan or employee welfare benefit plan sponsored by Defendant. Further, any Settlement payments paid to former employees hereunder shall not be considered "compensation" in any year for purposes of determining eligibility for, or benefit accrual within, an employee pension benefit plan or employee welfare benefit plan sponsored by Defendant.

### 23. <u>Exhibits and Headings</u>

The terms of this Agreement include the terms set forth in any attached Exhibits, which are incorporated by this reference as though fully set forth herein. Any Exhibits to this Agreement are an integral part of the Settlement. The descriptive headings of any paragraphs or sections of this Agreement are inserted for convenience of reference only and do not constitute a part of this Agreement.

### 24. <u>Interim Stay of Proceedings</u>

The Parties agree to hold all proceedings in the Class Action, except such proceedings necessary to implement and complete the Settlement, in abeyance pending the Final Approval Hearing to be conducted by the Court. In this regard, the Parties stipulate that until the Settlement is either approved fully or nullified under the circumstances set forth in Paragraph V.17 above, neither party need serve or respond to discovery, or file responsive pleadings or motions.

### 25. <u>Amendment or Modification</u>

This Agreement may be amended or modified only by a written instrument signed by counsel for all Parties or their successors in interest.

26. **Entire Agreement**

This Agreement and any attached Exhibits constitute the entire agreement among these Parties, and no oral or written representations, warranties or inducements have been made to any Party concerning this Agreement or its Exhibits other than the representations, warranties and covenants contained and memorialized in such documents.

27. **Authorization to Enter Into Settlement Agreement**

Counsel for all Parties warrant and represent they are expressly authorized by the Parties whom they represent to negotiate this Agreement and to take all appropriate action required or permitted to be taken by such Parties pursuant to this Agreement to effectuate its terms, and to execute any other documents required to effectuate the terms of this Agreement. The Parties and their counsel will cooperate with each other and use their best efforts to effect the implementation of the Settlement. In the event the Parties are unable to reach agreement on the form or content of any document needed to implement the Settlement, or on any supplemental provisions that may become necessary to effectuate the terms of this Settlement, the Parties may seek the assistance of the Court to resolve such disagreement.

28. **Binding on Successors and Assigns**

This Agreement shall be binding upon, and inure to the benefit of, the successors or assigns of the Parties hereto, as previously defined.

29. **Illinois Law Governs**

All terms of this Agreement and the Exhibits hereto shall be governed by and interpreted according to the laws of the State of Illinois.

30.     **Counterparts**

This Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument provided that counsel for the Parties to this Agreement shall exchange among themselves original signed counterparts.

31.     **This Settlement is Fair, Adequate and Reasonable**

The Parties warrant and represent they have conducted a thorough investigation of the facts and allegations in the lawsuit and have diligently pursued an investigation of the claims alleged in the lawsuit. The Parties further represent and warrant that they believe this Settlement is a fair, adequate and reasonable settlement of this action and that they have arrived at this Settlement in arms-length negotiations, taking into account all relevant factors, present and potential. This Settlement was reached after extensive negotiations.

32.     **Jurisdiction of the Court**

The Court shall retain jurisdiction with respect to the interpretation, implementation and enforcement of the terms of this Agreement and all orders and judgments entered in connection therewith, and the parties and their counsel hereto submit to the jurisdiction of the Court for purposes of interpreting, implementing and enforcing the Settlement embodied in this Agreement and all orders and judgments entered in connection therewith.

33.     **Cooperation and Drafting**

Each of the Parties has cooperated in the drafting and preparation of this Agreement. Hence, in any construction made to this Agreement, the same shall not be construed against any of the Parties.

34.     **Invalidity of Any Provision**

Before declaring any provision of this Agreement invalid, the Court shall first attempt to construe the provisions valid to the fullest extent possible consistent with applicable precedents so as to define all provisions of this Agreement valid and enforceable.

35.     **Circular 230 Disclaimer**

Each Party to this Agreement (for purposes of this section, the "Acknowledging Party"; and each party to this Agreement other than the Acknowledging Party, and "Other Party") acknowledges and agrees that (1) no provision of this Agreement, and no written communication or disclosure between or among the Parties or their attorneys and other advisers, is or was intended to be, nor shall any such communication or disclosure constitute or be construed or be relied upon as, tax advice within the meaning of United States Treasury Department Circular 230 (31 CFR Part 10, as amended); (2) the acknowledging party (A) has relied exclusively upon his, her or its own, independent legal and tax advisers for advice (including tax advice) in connection with this Agreement, (B) has not entered into this Agreement based upon the recommendation of any other party or any attorney or advisor to any other party, and (C) is not entitled to rely upon any communication or disclosure by any attorney or adviser to any other party to avoid any tax penalty that may be imposed on the acknowledging party; and (3) no attorney or adviser to any other party has imposed any limitation that protects the confidentiality of any such attorney's or adviser's tax strategies (regardless of whether such limitation is legally binding) upon disclosure by the acknowledging party of the tax treatment or tax structure of any transaction, including any transaction contemplated by this agreement.

36.     **Attorneys' Fees and Costs**

In the event that one or more of the Parties to this Agreement institutes any legal action, arbitration, or other proceeding against any other Party or Parties to enforce the provisions of this

Agreement or to declare rights and/or obligations under this Agreement, the successful party shall be entitled to recover from the unsuccessful Party or Parties reasonable attorneys' fees and costs incurred in connection with any such action or proceeding.


DATED: _____, 2012.    WERMAN LAW OFFICE, P.C.


By: _____
    DOUGLAS M. WERMAN
    Attorneys for Plaintiffs


DATED: _____, 2012.    VEDDER PRICE P.C.


By: _____
    THOMAS M. WILDE
    Attorneys for Defendant, Dominick's Finer Foods LLC

# EXHIBIT A

**Martha Peraza, et al. v. Dominick's Finer Foods, LLC, et al.**
**Class List**

| Name | Estimated Overtime Wages Award | Estimated Interest Award | Total Estimated Award |
|---|---|---|---|
| Adamah,Ayele Pamela | $2,730.40 | $2,730.40 | $5,460.80 |
| Aguirre,Ana I | $3,479.56 | $3,479.56 | $6,959.11 |
| Alexander,Cynthia | $7,799.29 | $7,799.29 | $15,598.58 |
| Anderson,Julie Ann | $8,984.50 | $8,984.50 | $17,969.00 |
| Atchley,Kristyn A | $5,787.69 | $5,787.69 | $11,575.38 |
| Baratka,Amanda M | $7,642.44 | $7,642.44 | $15,284.87 |
| Bertuca,Pamela | $2,131.43 | $2,131.43 | $4,262.85 |
| Bishop,Cory | $9,769.43 | $9,769.43 | $19,538.85 |
| Bowen,Ebba M | $3,634.27 | $3,634.27 | $7,268.53 |
| Cady,Melissa J | $8,022.96 | $8,022.96 | $16,045.92 |
| Canestrini,Annelyse | $1,635.11 | $1,635.11 | $3,270.22 |
| Chavez,Ivan | $674.11 | $674.11 | $1,348.23 |
| Cuarenta,Juan | $7,768.54 | $7,768.54 | $15,537.07 |
| Derbedyenyeva,Nataliya | $7,558.15 | $7,558.15 | $15,116.30 |
| Derminer,Jonathan E | $3,615.44 | $3,615.44 | $7,230.88 |
| Driscoll,Kelly E | $7,886.81 | $7,886.81 | $15,773.63 |
| Duckollari,Eralba | $4,680.71 | $4,680.71 | $9,361.41 |
| Fahey,Debra | $7,697.18 | $7,697.18 | $15,394.36 |
| Froelich,Theresa Anne | $8,450.85 | $8,450.85 | $16,901.70 |
| Gawin,Maura | $10,837.44 | $10,837.44 | $21,674.88 |
| Gonzalez,Otoniel Ricardo | $523.92 | $523.92 | $1,047.84 |
| Greinke,Sandi M | $4,475.03 | $4,475.03 | $8,950.07 |
| Griparis,Elaine Catherine | $1,828.86 | $1,828.86 | $3,657.72 |
| Guiglio,Frank J | $8,330.62 | $8,330.62 | $16,661.24 |
| Hightower,Naomi Lyda | $7,297.15 | $7,297.15 | $14,594.30 |
| Howard,Renee A | $4,788.49 | $4,788.49 | $9,576.97 |
| Johnson,Agnes | $9,438.27 | $9,438.27 | $18,876.55 |
| Joseph,Yessica A. | $2,188.68 | $2,188.68 | $4,377.35 |
| Jungles,Debbie Ann | $3,007.53 | $3,007.53 | $6,015.06 |
| Karacayli,Ali | $7,852.77 | $7,852.77 | $15,705.55 |
| Kosut,Indira | $8,431.40 | $8,431.40 | $16,862.80 |
| Lavelle,Brian | $7,748.64 | $7,748.64 | $15,497.29 |
| Lee,Courtney M | $7,488.09 | $7,488.09 | $14,976.19 |
| Ligue,Melissa | $7,235.88 | $7,235.88 | $14,471.77 |
| Lukso,Robert W | $7,225.94 | $7,225.94 | $14,451.88 |
| Mallardo,Emanuele | $6,226.57 | $6,226.57 | $12,453.14 |
| Mandarino,Kimberly Sue | $2,182.46 | $2,182.46 | $4,364.93 |
| Manzella,Teresa | $685.24 | $685.24 | $1,370.49 |
| Mastandona,Daniel M | $5,503.12 | $5,503.12 | $11,006.23 |
| Mattson,Stephen Alexander | $5,843.15 | $5,843.15 | $11,686.31 |

Martha Peraza, et al. v. Dominick's Finer Foods, LLC, et al.
Class List

| Name | Estimated Overtime Wages Award | Estimated Interest Award | Total Estimated Award |
|---|---|---|---|
| Maxey,Lenise | $9,385.92 | $9,385.92 | $18,771.84 |
| Mayfield,Danielle | $10,140.69 | $10,140.69 | $20,281.39 |
| McClary,Jessica M | $1,537.80 | $1,537.80 | $3,075.59 |
| Mikos,Brittany L | $1,509.79 | $1,509.79 | $3,019.57 |
| Montalbano,Maureen Anne | $7,828.46 | $7,828.46 | $15,656.93 |
| Mullins,Joanne R | $8,539.34 | $8,539.34 | $17,078.67 |
| Murphy,William Joseph | $601.76 | $601.76 | $1,203.53 |
| Mussay,Selena | $8,310.79 | $8,310.79 | $16,621.58 |
| Oikion,Jennifer Josephine | $5,989.50 | $5,989.50 | $11,979.00 |
| Oliveira,Caroline | $3,580.78 | $3,580.78 | $7,161.57 |
| Olsick,Danielle | $528.77 | $528.77 | $1,057.54 |
| Patel,Darshana M | $6,556.26 | $6,556.26 | $13,112.53 |
| Pavlovic,Tamara | $4,110.92 | $4,110.92 | $8,221.85 |
| Pellegrino,Laurie A | $4,934.43 | $4,934.43 | $9,868.87 |
| Peraza,Martha | $9,517.02 | $9,517.02 | $19,034.04 |
| Pereira,Inez | $8,392.50 | $8,392.50 | $16,785.00 |
| Pervez,Khurram | $2,440.10 | $2,440.10 | $4,880.20 |
| Pevitts,Diane | $9,489.89 | $9,489.89 | $18,979.77 |
| Pina,Juan | $10,091.10 | $10,091.10 | $20,182.20 |
| Pitts,Rachara | $2,935.64 | $2,935.64 | $5,871.28 |
| Ramirez,Angeline | $4,552.54 | $4,552.54 | $9,105.08 |
| Regan,Heather Rose | $2,667.28 | $2,667.28 | $5,334.55 |
| Reyes,Maritza | $8,630.08 | $8,630.08 | $17,260.16 |
| Rupp,Christopher Paul | $1,213.23 | $1,213.23 | $2,426.47 |
| Saad,Evan | $2,763.48 | $2,763.48 | $5,526.96 |
| Schmidt,Rob A | $5,896.74 | $5,896.74 | $11,793.47 |
| Schnelle,Jayne | $3,602.05 | $3,602.05 | $7,204.09 |
| Serna-Vazquez,Yesenia | $5,957.53 | $5,957.53 | $11,915.06 |
| Seyller,Todd | $805.59 | $805.59 | $1,611.18 |
| Siatras,Van J | $974.80 | $974.80 | $1,949.59 |
| Siroin,Stephanie Rose | $1,251.58 | $1,251.58 | $2,503.16 |
| Smith,Cynthia M | $7,845.20 | $7,845.20 | $15,690.41 |
| Smith,Prescious C | $8,448.33 | $8,448.33 | $16,896.66 |
| Stevens,Stephanie Lynn | $7,366.54 | $7,366.54 | $14,733.07 |
| Stitt,Carol J | $8,096.09 | $8,096.09 | $16,192.17 |
| Straetz,Ronda L | $4,009.01 | $4,009.01 | $8,018.03 |
| Stroud,Valton | $3,648.33 | $3,648.33 | $7,296.65 |
| Thies,Susan M | $9,264.66 | $9,264.66 | $18,529.32 |
| Thomas,Antonio | $3,703.28 | $3,703.28 | $7,406.56 |
| Tucki,Anthony | $2,765.12 | $2,765.12 | $5,530.24 |

**Martha Peraza, et al. v. Dominick's Finer Foods, LLC, et al.**
**Class List**

| Name | Estimated Overtime Wages Award | Estimated Interest Award | Total Estimated Award |
|------|------|------|------|
| Velasquez,Erica | $1,508.33 | $1,508.33 | $3,016.65 |
| Vondrasek,Katherine A | $1,537.80 | $1,537.80 | $3,075.59 |
| Welker,Sandra | $8,638.26 | $8,638.26 | $17,276.51 |
| Yamauchi,Paul E | $8,070.83 | $8,070.83 | $16,141.66 |
| Youngren,Sandy | $1,107.08 | $1,107.08 | $2,214.16 |

# EXHIBIT B

# NOTICE OF CLASS ACTION SETTLEMENT

## For Persons who worked for Dominick's Finer Foods, LLC as a Salaried Starbucks Manager in Illinois between November 23, 2008 and November 14, 2012

A settlement has been proposed in a class action lawsuit filed against Dominick's Finer Foods, LLC (Dominick's) (*Peraza, et al. v. Dominick's Finer Foods, LLC*, Case No. 11-C-8390), alleging that the Company failed to pay salaried Starbucks Managers working in Illinois overtime wages between November 23, 2008 and November 14, 2012 (Class Period). You are receiving this notice because Dominick's records reflect that you are a class member. Dominick's has agreed to pay $1,450,000.00 to settle this action. You may: (i) do nothing and get a share of the settlement; (ii) exclude yourself from the settlement and not receive a share; or (iii) object to the settlement and still receive a share. The U.S. District Court for the Northern District of Illinois has authorized this notice. Before any money is paid, the Court will have a hearing to decide whether to approve the settlement.

### Who Is Included in the Settlement?

This class action and settlement includes persons who worked for Dominick's in the State of Illinois in the job position of salaried Starbucks Manager between November 23, 2008 and November 14, 2012.

### What Is this Lawsuit About?

The lawsuit claimed violations of the Illinois Minimum Wage Law and federal Fair Labor Standards Act for unpaid overtime wages as a result of Dominick's classification of salaried Starbucks Managers as exempt from overtime. Both sides agreed to the settlement to resolve the case. You can get more information, including a detailed notice, by calling the Claims Administrator at **1-xxx-xxx-xxxx** or by calling Plaintiffs' Counsel at **1-312-419-1008**.

### What does the Settlement Provide?

Dominick's has agreed to pay $1,450,000.00 to settle this action. The parties estimate that about $919,666.67 will be available for distribution to class members. **Your estimated recovery in this settlement is $_____ in unpaid overtime and $_____ in interest.** For a full explanation of how the payments were calculated, please see the Settlement Agreement, Section V.8, available by calling Plaintiffs' Counsel at 1-312-419-1008.

Unless you exclude yourself from the settlement as explained below, you will release and forever discharge all claims you have against Dominick's for overtime wages, interest and liquidated damages under the Illinois Minimum Wage Law for the period of time you worked in the job position of salaried Starbucks Manager during the Class Period. If you cash the settlement checks issued to you, you will also release claims for owed overtime pay under the Fair Labor Standards Act.

### What Are Your Options?

If you wish to participate in the settlement and receive a settlement award, you do not need to do anything. A check will be mailed to you.

If you don't want to be legally bound by the settlement, you must exclude yourself by _____, 2013. To do so, you must mail your written request for exclusion to the Claims Administrator at the below address and provide your name, address, telephone number and last four digits of your Social Security Number. If you exclude yourself, you will not receive money from this settlement, but you may be able to sue or continue to sue Dominick's for the legal claims at issue in this case.

If you stay in the settlement, you may object to it by _____, 2013. If you want to object to the Settlement, you must mail a written statement to the Clerk of the Court and the Claims Administrator by _____, 2013. No class member shall be entitled to be heard at the Final Approval hearing or to object to the settlement, unless written notice of the Class Member's intention to appear has been mailed to the Clerk of the Court and the Claims Administrator by _____, 2013.

The complete notice further explains how to exclude yourself from the settlement or object to the settlement. You may review the complete notice prior to excluding yourself or objecting to the terms of the settlement by requesting one from the Claims Administrator or Plaintiffs' Counsel.

> Simpluris, Inc.
> **Address**
> **Address line 2**
> **(xxx) xxx-xxxx**

### How do I update my Contact Information?

You must notify the Claims Administrator of any changes in your mailing address so that your settlement award will be sent to the correct address. To update your mailing address, contact the Claims Administrator, above.

### When is the Final Approval Hearing?

The Court will hold a hearing in this case on _____, 2013, in Courtroom ___, United States Courthouse, 219 S. Dearborn St., Chicago, Illinois 60604 at __:__ _.m., to consider, among other things, (1) whether to approve the settlement, (2) a request by the lawyers representing all class members to an award of no more than $483,333.33 in attorneys' fees and no more than $10,000 in costs for litigating the case and negotiating a settlement, (3) a request for $7,500 as an enhancement award to each class representative for their service to the Class in initiating and pursuing the litigation, and (4) a request for $1,500 as an enhancement award to each opt-

# NOTICE OF CLASS ACTION SETTLEMENT
## For Persons who worked for Dominick's Finer Foods, LLC as a Salaried Starbucks Manager in Illinois between November 23, 2008 and November 14, 2012

in plaintiff for their assistance in resolving this matter.

You may ask to appear at the hearing, but you don't have to appear.

# EXHIBIT C

<u>**NOTICE OF CERTIFICATION OF CLASS, PROPOSED SETTLEMENT,**</u>
<u>**PRELIMINARY COURT APPROVAL OF SETTLEMENT, AND HEARING DATE FOR**</u>
<u>**FINAL COURT APPROVAL**</u>

**TO: All persons who worked for Dominick's Finer Foods LLC in the State of Illinois in the job position Starbucks Manager between November 23, 2008 and November 14, 2012 ("Class Period") and who were paid on a salary basis (herein the "Class" or "Settlement Class").**

**Please read this Notice carefully, it may affect your legal rights to overtime wages from working for Dominick's Finer Foods LLC ("Dominick's").**

**If you wish to participate in the settlement of this class action and receive a settlement award, you do not need to do anything, except possibly to update your mailing address with the Claims Administrator to ensure it has a correct mailing address for you.**

**If you wish to comment in favor of the settlement or object to the settlement, or if you decide not to participate in the settlement, you must follow the directions in this notice.**

**If you intend <u>not</u> to participate in the settlement, you must submit a written statement to the Claims Administrator requesting exclusion from the Class on or before INSERT DATE, 2013. Your written request for exclusion must contain your name, address, telephone number, and the last four numbers of the social security number you used while working for Dominick's. If you do not submit a written request for exclusion, you will be bound by the Settlement.**

The United States District Court for the Northern District of Illinois, Eastern Division (the "Court"), authorized this Notice. This is not a solicitation from a lawyer. A proposed settlement (the "Settlement") has been reached between the parties in the class action brought on behalf of the following individuals (the "Class"):

All persons who worked for Defendant in the State of Illinois in the job position Starbucks Manager between November 23, 2008 and November 14, 2012 ("Class Period") and who were paid on a salary basis (herein the "Class" or "Settlement Class").

The Court has preliminarily approved the Settlement and conditionally certified the Class for purposes of the Settlement only. You have received this notice because Dominick's records indicate that you are a member of the Class.

This notice is designed to inform you of how you can comment in favor of the

Settlement, object to the Settlement, or elect not to participate in the Settlement. Unless you elect not to participate in the Settlement, if finally approved by the Court, the Settlement will be binding upon you, even if you object to the Settlement.

<b>YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT:</b>

| | |
|---|---|
| **PARTICIPATE** | If you want to participate in the Settlement and receive a portion of the Settlement money, you do not need to do anything. In exchange for participating, you will release the claims resolved by this Settlement. |
| **EXCLUDE YOURSELF** | You ***must*** submit a written statement to the Claims Administrator requesting to exclude yourself from the Settlement. The request must include your name, address, telephone number, and the last four numbers of the social security number you used while working for Dominick's. |
| **OBJECT** | You may file an objection with the Clerk of the Court if you wish to challenge this Settlement. A copy of your objection must also be delivered to the Claims Administrator. |
| **ATTEND FAIRNESS HEARING** | You may ask to speak in Court about the fairness of the Settlement. You must submit a written request to appear in Court to the Clerk of the Court. A copy of your request must also be delivered to the Claims Administrator. |

**I.     BACKGROUND OF THE CASE**

On November 23, 2011, Named Plaintiffs Martha Peraza and Maura Gawin filed this Action in the United States District Court for the Northern District of Illinois, Eastern Division, on behalf of themselves and others similarly situated, and currently titled <u>Martha Peraza and Maura Gawin ("Named Plaintiffs" or "Class Representatives"), individually, and on behalf of all others similarly situated v. Dominick's Finer Foods, LLC ( "Dominick's" or "Defendant"),</u> Case No. 11-C-8390. Plaintiffs later filed a First Amended Complaint to correct the name of the Defendant.

Plaintiffs allege that Defendant violated the Illinois Minimum Wage Law and Fair Labor Standards Act by classifying the salaried Starbucks Manager job position as "exempt" and by not paying salaried Starbucks Managers overtime wages. Dominick's filed its answer to the First Amended Complaint in January 2011, acknowledging that the salaried Starbucks Manager job position was classified as exempt from the FLSA and IMWL and acknowledging that it did not pay Plaintiffs and other salaried Starbucks Managers overtime wages. Defendant denied that the "exempt" classification was unlawful.

After litigation and good-faith negotiations, in which both sides recognized the substantial risk of an adverse result in the Action, Named Plaintiffs and Dominick's agreed to settle the Action pursuant to the terms and conditions of the Settlement.

Named Plaintiffs and Dominick's, and their respective counsel, have concluded that the Settlement is advantageous, considering the risks and uncertainties to each side of continued litigation. The parties and their counsel have determined that the Settlement is fair, reasonable, and adequate and is in the best interests of the members of the Class.

As a member of the Class, you will participate in the Settlement and share in the proceeds to be paid under the Settlement unless you elect to exclude yourself as a Class Member.

## II.       SUMMARY OF THE SETTLEMENT

The Settlement provides for the following:

### A.       Who Is Included in the Settlement?

You are included in the Settlement if you meet all of the conditions set forth in the beginning of this notice (See "Class" definition).

### B.       What Will I Receive from the Settlement?

Dominick's has agreed to pay $1,450,000.00 (hereinafter "Settlement Fund") to settle this Action. The Settlement Fund shall be allocated as follows: (a) payment for overtime wages and interest to Class Members who do not exclude themselves from the Settlement (hereinafter referred to as "Overtime Awards Fund"); (b) no more than $7,500 each to the Named Plaintiffs as a Class Representative Enhancement Award (as explained in Paragraph II.G below); and (c) no more than $1,500 each to the opt-in Plaintiffs Lenise Maxey, Selena Mussay, Theresa Froelich, Juan Cuarenta, Yesenia Serna-Vazquez, Eralba Duckollari, Danielle Mayfield, and Paul Yamauchi as a Consent Plaintiff Enhancement Award; (d) no more than 1/3 of the Settlement Fund for Class Counsel's fees, plus no more than $10,000 in costs (as explained in Paragraph II.J below); and (e) no more than $___ in claims administration costs and fees.

The Overtime Awards Fund shall equal the Settlement Fund minus attorneys' fees and costs, the Class Representative and Consent Plaintiff Enhancement Awards, and the claims administration fees and costs.

Dominick's separately will pay the employer's share of all applicable federal and state taxes on the back overtime wages paid to Plaintiffs.

**C.    When Will I Get Paid?**

The awards described above will be paid after final Court approval of the Settlement and after all rights to appeal or review are exhausted or any appeal or review has been resolved in favor of the Settlement.

**D.    How Was My Individual Settlement Award Calculated?**

The following information was used to determine your share of the Settlement Fund: (i) The weeks you worked as a salaried Starbucks Manager between November 23, 2008 and November 14, 2012, and (ii) your annual salary.

For each week you were employed by Dominick's in the Starbuck's Manager job position during the Class Period, you were assumed to have worked 45.05 hours. Your regular rate of pay was computed by dividing your annual salary by fifty-two (52) weeks to determine Weekly Salary. Weekly Salary was divided by 45.05 hours to determine your regular rate of pay. Your overtime wages were computed on an individual work week basis by multiplying your regular rate of pay by one-half and then by 5.05 overtime hours. For each individual work week you were employed during the Class Period, you are entitled to an additional amount equal to your overtime award as an interest award. If the Overtime Awards Fund is different than the estimated amount of $919,666.67, you will be entitled to your ratable share of the Settlement Fund. Your ratable share shall be determined by dividing the sum of your overtime wages and interest awards by the total of all Plaintiffs' overtime wages and interest awards.

### E.  How Do I Participate in the Settlement?

In order to participate in the Settlement and receive a portion of the Settlement Fund, you do not need to do anything. If the Court grants Final Approval of the Settlement, the Claims Administrator will mail you your Settlement Award. See page 7 of this Notice for instructions on updating your mailing address.

### F.  How Do I Not Participate?

You will be included in the Settlement unless you elect not to participate. In order to elect not to participate, you *must* submit a written statement to the Claims Administrator requesting to exclude yourself from the Settlement. The request must include your name, address, telephone number, and the last 4 numbers of the social security number you used while working for Dominick's. The written request for exclusion must be postmarked no later than INSERT, 2013.

### G.  Who is Administrating the Settlement?

The firm Simpluris, Inc., INSERT ADDRESS, and TELEPHONE NUMBER, will be administering the distribution of notices and awards to Class Members.

**H.     What Claims Are Being Released?**

The Settlement includes a release of claims based on Dominick's alleged failure to pay overtime wages under the Illinois Minimum Wage arising during the period of time Class Members worked in the position of salaried Starbucks Managers between November 23, 2008 and November 14, 2012. All persons who cash Settlement Checks shall also release claims for owed overtime pay under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201 *et seq.*, arising during the Class Period against the Released Parties for the period of time they were paid a salary and worked in the job position of Starbucks Manager.

**I.     Class Representative and Consent Plaintiff Enhancement Awards:**

In addition to their share as a participating Class Member, Named Plaintiffs and Class Representatives Martha Peraza and Maura Gawin shall receive a payment of up to Seven-Thousand-Five-Hundred Dollars ($7,500.00) to be paid for their time and effort spent conferring with Plaintiffs' Counsel, filing and pursuing the Action, attending the mediation sessions, and in recovering wages on behalf of all Class Members. This incentive award shall be paid to the Class Representatives from the Settlement Fund.

In addition to their share as a participating Class Member, Consent Plaintiffs Lenise Maxey, Selena Mussay, Theresa Froelich, Juan Cuarenta, Yesenia Serna-Vaszquez, Eralba Duckollari, Danielle Mayfield, and Paul Yamauchi shall receive a payment of up to One-Thousand-Five-Hundred Dollars ($1,500.00) to be paid for their time and effort spent conferring with Plaintiffs' Counsel and in sharing information and documents that assisted Named Plaintiffs in recovering wages on behalf of all Class Members. This incentive award shall be paid to the

Consent Plaintiffs from the Settlement Fund

### J.    Attorneys' Fees and Costs:

Class Counsel identified below will seek approval from the Court for a payment of attorneys' fees in the amount of no more than 1/3 of the Settlement Fund ($483,333.33), plus no more than $10,000.00 in costs, which if approved by the Court will be paid by Dominick's out of the $1,450,000.00 Settlement Fund. Class Counsel believes the amount for costs and attorneys' fees requested is fair and reasonable, and Dominick's will not oppose Class Counsel's request for that amount.

### K.    Costs of Administration:

All costs of administering the settlement, including the Settlement Administrator's Fees and Expenses, will also be paid from the $1,450,000.00 Settlement Fund.

### L.    Updating Your Address:

If your name and/or current address is not correctly stated on your summary notice or if you move, you must inform the Claims Administrator. You can mail your change of address to the Claims Administrator at _____ or call the Claims Administrator at _____.

## III.    PLAINTIFFS' AND CLASS COUNSEL'S SUPPORT OF THE SETTLEMENT.

The Class Representatives and Class Counsel support the Settlement. Class Members will receive their ratable share of the Overtime Awards Fund based on the number of weeks they worked for Dominick's as a salaried Starbucks Manager during the Class Period and based on their annual salary. Class Counsel believe this to be a good result for the Class, especially in light of the risk of denial of class certification, the risk of a trial on the merits, and the inherent delays and uncertainties associated with litigation. Based on Class Counsel's experience litigating similar cases, Class Counsel believes that further proceedings in this case, including a trial and

probable appeals, would be very expensive and protracted. No one can confidently predict how the various legal questions at issue, including the amount of damages, would ultimately be resolved. Therefore, upon careful consideration of all of the facts and circumstances of this case, Class Counsel believes that the Settlement is fair, reasonable, and adequate.

## IV.    WHAT ARE YOUR RIGHTS AS A CLASS MEMBER?

As a Class Member, you can participate in the Settlement or request exclusion from the Settlement. If you choose to participate in the Settlement, you can also tell the Court what you do or do not like about the Settlement.

### A.    Participating in the Settlement:

The Class Representatives and Class Counsel represent your interests as a Class Member. Unless you elect not to participate in the Settlement, you are a part of the Class and you will be bound by the terms of the Settlement and any final judgment that may be entered by the Court. You will also be deemed to have released the claims against Dominick's.  As a member of the Class, you will <u>not</u> be responsible for the payment of attorneys' fees or reimbursement of litigation expenses, other than what is stated above, unless you retain your own counsel, in which event you will be responsible for your own attorneys' fees and costs.  By participating in the Settlement, you will have been deemed to have given the Claims Administrator, INSERT NAME, permission to utilize your Social Security number to facilitate distribution of the Overtime Settlement Award and IRS Forms associated with the distribution of the Overtime Settlement Award.

### B.    Commenting in Favor of the Settlement:

If you wish, you may comment in favor of the Settlement in writing and by appearing in person at the final approval hearing, which will be held on ████████████, 2013. To so, you

must submit a written notice of your comments and/or your intent to appear and comment in favor of the Settlement at the final approval hearing no later than _____, 2013. **Your notice must include the Case Name (*Peraza v. Dominick's*) and Case Number (11-C-8390) and also should include your full name, address, telephone number, and the last 4 numbers of the Social Security number you used while working for Dominick's.** Send your comments to:

Clerk of Court
United States Courthouse
219 S. Dearborn Street, Room 802
50 West Washington Street
Chicago, Illinois 60602

Also send copies of your notice to:

CLAIMS ADMINISTRATOR
INSERT ADDRESS

### DO NOT TELEPHONE THE COURT, DOMINICK'S, OR DOMINICK'S COUNSEL. (See VI. Getting More Information, below).

**C.    The Difference Between Objecting and Excluding:**

Objecting is simply telling the Court that you do not like something about the Settlement. You can object only if you stay in the Class. Excluding yourself is telling the Court that you do not want to be part of the Class. If you exclude yourself, you will not receive any Settlement payment and will have no basis to object because the case no longer affects you.

**D.    Objecting to the Settlement:**

You may tell the Court you do not like the Settlement or some aspect of it before final approval, either by filing a written objection or filing a notice of your intent to appear and object at the final approval hearing. However, if the Court rejects your objection, you will still be bound

by the terms of the Settlement. To object, you must mail a written notice of objection or a written notice of your intent to appear and object at the final approval hearing to the Court and to the Claims Administrator. **Your notice must include the Case Name (*Peraza v. Dominick's*) and Case Number (11-C-8390) and also should include your full name, address, telephone number, and the last 4 numbers of the Social Security number you used while working for Dominick's.** Send your notice to:

Clerk of Court
United States Courthouse
219 S. Dearborn Street, Room 802
50 West Washington Street
Chicago, Illinois 60602

Also send copies of your notice to:

CLAIMS ADMINISTRATOR
INSERT ADDRESS


### DO NOT TELEPHONE THE COURT, DOMINICK'S OR DOMINICK'S COUNSEL (See VI. Getting More Information, below).

Any written objection and/or notice of your intent to appear at the hearing must state each specific reason in support of your objection and any legal support for each objection. To be valid and effective, any written objections and/or notices of intent to appear at the hearing must be postmarked no later than INSERT DATE, 2013. A Class Member who fails to file and serve a written statement of objection in the manner described above and by the specified deadline will be deemed to have waived any objections and will be foreclosed from making any objection (whether by appeal or otherwise) to the Settlement.

**E.     Excluding Yourself from the Settlement:**

If you want to keep the right to sue or continue to sue Dominick's on your own about the legal issues in this case, then you must take steps to get out of the Class. If you exclude yourself from the Class, you will not participate in the Settlement. In order to elect not to participate, you <u>must</u> send a written request for exclusion to the Claims Administrator by INSERT DATE, 2013:

CLAIMS ADMINISTRATOR
Address
Telephone Number

**Your request for exclusion must include the Case Name (*Peraza v. Dominick's*) and Case Number (11-C-8390) and also should include your full name, address, telephone number, and the last 4 numbers of the Social Security number you used while working for Dominick's.** A Class Member who fails to send a written request for exclusion by _____, 2013 will be bound by all terms and conditions of the Settlement approved by the Court, regardless of whether he or she has objected to the Settlement.

Any person who properly submits a request for exclusion will no longer be a member of the Class and will not receive any portion of the Settlement. Any such person, at his or her own expense, may pursue any claims he or she may have against Dominick's, or its respective affiliates, predecessors, or acquired companies.

**V.     FINAL SETTLEMENT APPROVAL HEARING**

The Court will hold a final approval hearing on _____, 2013 in Courtroom _____, Everett McKinley Dirksen United States Courthouse, 219 S. Dearborn Street, Chicago, IL 60604 at _____. _.m., to determine whether the settlement should be finally approved as fair, reasonable, and adequate. The Court will also be asked to approve Class Counsel's request

for costs and attorneys' fees and the enhancement payments made to the Class Representatives and Consent Plaintiffs.

The hearing may be postponed without further notice to the Class. **It is not necessary for you to appear at this hearing. If you have given notice of your comments in favor of the settlement, or your objection to the settlement, you may appear at the hearing at your option so long as you have mailed a notice of intent to appear postmarked on or before INSERT DATE, 2013 to the Clerk of the Court and the Claims Administrator. See page 9 of this Notice for addresses.**

## VI.    GETTING MORE INFORMATION

The above is a summary of the terms of the Settlement. If you wish, you can review the complete Settlement Agreement, which will be on file with the Clerk of the Court, Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois 60604. You may also contact Class Counsel, Werman Law Office PC, 77 W. Washington Street, Suite 1402, Chicago IL 60602, by United States Mail or by telephone, 312-419-1008. The pleadings and other records in this litigation, including the Settlement Agreement, may be examined at any time during regular business hours, or you may contact Class Counsel. **PLEASE DO NOT TELEPHONE THE COURT OR DOMINICK's COUNSEL FOR INFORMATION REGARDING THIS SETTLEMENT.**

# GROUP EXHIBIT 3



2 of 2 DOCUMENTS

**MARIBEL ARANGO, on behalf of herself and all others similarly situated, Plaintiff, v. GC SERVICES, LP, GC FINANCIAL CORP., and DLS ENTERPRISES, INC., Defendants.**

**No. 97 C 7912**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1998 U.S. Dist. LEXIS 9124*

**June 10, 1998, Decided**
**June 11, 1998, Docketed**

**DISPOSITION:** [*1] Plaintiff's motion for class certification granted.

**COUNSEL:** For MARIBEL ARANGO, plaintiff: Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Ignacio Daniel Maramba, Charley Hoon Lee, Edelman & Combs, Chicago, IL.

For GC SERVICES, LP, GC FINANCIAL CORPORATION, defendants: George William Spellmire, David Matthew Schultz, Hinshaw & Culbertson, Chicago, IL.

For GC SERVICES, LP, GC FINANCIAL CORPORATION, DLS ENTERPRISES, INC., defendants: Robert H. Muriel, Hinshaw & Culbertson, Chicago, IL.

**JUDGES:** Paul E. Plunkett, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Paul E. Plunkett

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Maribel Arango has sued defendants, on her own behalf and on behalf of all others similarly situated, for their alleged violations of the Fair Debt Collection Practices Act, *15 U.S.C. § 1692, et seq. (West 1998)* ("FDCPA"). The case is before the Court on Arango's *Fed. R. Civ. P. ("Rule") 23* motion for class certification. For the reasons set forth below, the motion is granted.

*Facts*

On May 20, 1997, GC Services mailed a standard form collection letter to plaintiff. (Am. Compl. P 9.) The letter demands payment of $ 47.40 owed to Wildlife Fact File and states: [*2] "WILDLIFE FACT FILE has already reported your name to a National Delinquent Debtor File. This may adversely affect your ability to obtain credit from other mail order companies." (*Id.* P 10, Ex. A.) "The 'National Delinquent Debtor File' is a list of persons against which certain mail order companies check names before extending credit. It is not any sort of official list of delinquent debtors." (*Id.* P 11.) As a result, plaintiff claims, the demand letter is misleading. (*Id.* P 12.)

Plaintiff seeks to represent a class of all Illinois

residents who were sent a similar demand letter by GC services on or after November 13, 1996 that was not returned by the Postal Service and was sent to collect a periodical subscription sent to a home address. (*Id.* P 15.) Though the precise number of class members is unknown, plaintiff alleges that the impracticability of joinder can be inferred from defendants' use of a form letter. (*Id.* P 16.) [1] Plaintiff alleges that the questions of law and fact common to the class predominate over those that are not. (*Id.* P 17.) One of the common questions, plaintiff alleges, is whether "the reference [in the form letter] to 'National Delinquent [*3] Debtor File' is misleading, in violation of *15 U.S.C. § 1692e*." (*Id.*) Plaintiff also alleges that her claim is typical of those of the class and that she will be a fair and adequate class representative. (*Id.* PP 18, 19.)

    1  While this motion was pending, plaintiff filed, in connection with another motion, GC Services' response to requests for admission. Among other things, GC Services admitted that there are more than 300 people meet who meet the class definition set forth in paragraph fifteen of the amended complaint. (*See* Pl.'s Mot. Compel Defs. Comply Disc., Ex. B, Resp. Req. Admis. at P 18.)

### The Legal Standards

Class certification is only appropriate if all of the requirements of *Rule 23(a)* and one of the requirements of *Rule 23(b)* have been met. *See Fed. R. Civ. P. 23(b)*; *see also Rosario v. Livaditis, 963 F.2d 1013, 1017 (7th Cir. 1992).* Under *Rule 23(a)*, a class can be certified only if: (1) it is "so numerous that joinder of all members is impracticable, (2) there are questions [*4] of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." *Fed. R. Civ. P. 23(a)(1)-(4)*. *Rule 23(b)* is satisfied if: the prosecution of separate suits by individual class members would create the risk of inconsistent adjudications or would dispose of or impair the interests of third-parties; "the party opposing the class has acted or refused to act on grounds generally applicable to the class"; or the common questions of law or fact predominate over any questions that affect only individual class members. *Fed. R. Civ. P. 23(b)(1)-(3)*.

When evaluating a motion for class certification, we do not determine the merits of the case. *Eisen v. Carlisle*

*& Jacquelin, 417 U.S. 156, 177-78, 40 L. Ed. 2d 732, 94 S. Ct. 2140 (1974).* Instead, we accept as true all well-pleaded allegations of the complaint. *Allen v. City of Chicago, 828 F. Supp. 543, 550 (N.D. Ill. 1993)* (citations omitted). However, the burden of showing that certification is appropriate rests with the plaintiff. *Retired Chicago Police Ass'n* [*5] *v. City of Chicago, 7 F.3d 584, 596 (7th Cir. 1993)* (citing *Trotter v. Klincar, 748 F.2d 1177, 1184 (7th Cir. 1984)* [hereinafter *RCPA*].

Plaintiff claims that class certification is appropriate because all of the requirements of *Rule 23(a)* are met and the questions of law and fact common to the class members predominate over those that are not. Defendants concede, and the Court agrees, that plaintiff satisfies the first three requirements of *Rule 23(a)* and the requirement of *Rule 23(b)(3)*. They claim, however, that the class should not be certified because Arango is not an adequate class representative. *See Fed. R. Civ. P. 23(a)(4)*. Accordingly, we will limit our discussion to that one element.

### Discussion

"Adequacy of representation is composed of two parts: 'the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest' of the class members." *RCPA*, 7 F.3d at 598 (quoting *Secretary of Labor v. Fitzsimmons, 805 F.2d 682, 697 (7th Cir. 1986)).* Defendants focus only on the second part. In their view, plaintiff is an inadequate class representative because she "lacks [*6] a basic understanding of the allegations in the complaint," she cannot "communicate effectively in English" and "her lack of monetary injury raises questions as to whether her interests conflict with those of the class." (Defs.' Resp. Mot. Class Certification at 4.) We disagree.

Plaintiff's deposition testimony establishes that she understands enough about the nature of this lawsuit and her duties as class representative to satisfy the adequacy element. She testified, for example, that: she read the complaint before it was filed and had it explained to her by a Spanish-speaking member of her lawyers' firm; she understands that she is suing the company that sent her the debt collection letter; she is "representing a group of persons who have the same type of complaint" and who were sent the same "letter and . . . were threatened"; she filed the suit because "there are many, many letters that have been sent by them, not just one, and so [she] want[s]

to stop them"; and her goal is "for them to stop threatening persons." (Pl.'s Corrected Reply Mem. Supp. Mot. Class Certification, Ex. A at 15, 41, 43-44, 47, 60). She also testified that she has met with her lawyers three times and [*7] spoken to them on the telephone twice since the complaint was filed in November 1997; she reads all of the papers she receives about the case and calls for interpretation and explanation, if necessary; and that she understands she is required, as class representative, "to be aware of the case, be in contact with the attorneys and check all the papers." (*Id.* at 30-33, 51-52.) That is enough.

Plaintiff is not, as defendants' suggest, required to understand the relationships between the corporate defendants or the intricacies of FDCPA law or to conduct the pre-filing investigation personally to be an adequate class representative. *See, e.g., Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 368-71, 15 L. Ed. 2d 807, 86 S. Ct. 845 (1966)* (holding that "a Polish immigrant with a very limited English vocabulary and practically no formal education" who "did not understand any of the legal relationships or comprehend any of the business transactions described in the complaint" and who relied almost exclusively on the advice of her son-in-law was an adequate class representative); *In re Caremark Int'l, Inc. Sec. Litig., 1996 U.S. Dist. LEXIS 8751, No. 94 C 4751, 1996 WL 351182, at *5-6 (N.D. Ill. June 24, 1996)* [*8] (holding that plaintiff who was "familiar with the general allegations in [the] case, the reasons for bringing it as a class action, . . . the definition of the class," who had reviewed the complaints prior to filing and had relied on his counsel for pre-filing investigation was an adequate class representative); *Mace v. Van Ru Credit Corp., 1995 U.S. Dist. LEXIS 13254, No. 94 C 7450, 1995 WL 549088, at *7 (N.D. Ill. Sept. 11, 1995), vacated on other grounds, 109 F.3d 338 (7th Cir. 1997)* (noting that plaintiff's understanding of the duties of class representative and the nature of the suit would satisfy adequacy requirement); *Gammon v. GC Servs. Ltd. Partnership, 162 F.R.D. 313, 318 (N.D. Ill. 1995)* (holding that plaintiff who read collection letter and found it threatening, filed suit to force defendant to change the letter, understood his duties as class representative, spoke to his lawyers before the suit was filed and was aware of its status was an adequate representative).

Nor is she required to speak English. Defendants have not cited, and we could not find, any authority for the proposition that only people who are fluent in English can be adequate class representatives. In fact, the cases [*9] we found suggest that fluency in English is irrelevant. *See Surowitz, 383 U.S. at 368-371; Jaroslawicz v. Engelhard Corp., Civ. A. No. 84-3641, 1986 WL 7044, at *2-3 (D.N.J. June 19, 1986)* (rejecting, without discussion, defendants' claim that plaintiff was an inadequate class representative because he was not fluent in English); *In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig., 78 F.R.D. 622, 626-27 (W.D. Wash. 1978)* (same). Moreover, as plaintiff's deposition testimony illustrates, defendants' asserted fear -- that plaintiff cannot "converse intelligibly with her counsel [or], understand documents sent to her" -- is groundless. (*See* Defs.' Resp. Mot. Class Certification at 7.) Plaintiff testified that Spanish-speaking employees of her lawyers' firm translate conversations and documents for her, when necessary. (Pl.'s Corrected Reply Mem. Supp. Mot. Class Certification, Ex. A at 12-13, 15, 32, 47, 51-52.) In short, there is no legal or factual reason to bar plaintiff from representing the proposed class simply because she is not fluent in English.

Finally, defendants claim that plaintiff cannot represent the proposed class because she suffered no monetary [*10] injury. (Defs.' Resp. Mot. Class Certification at 7-8.) In their view, "the fact that plaintiff's [sic] is motivated by principle alone makes it unlikely that he [sic] will accept a monetary settlement that would benefit those class members who did sustain an actual injury." (*Id.* at 8.) As plaintiff points out, however, none of the putative class members has suffered any monetary injury. (*See* Pl.'s Corrected Reply Mem. Supp. Mot. Class Certification at 12.) Plaintiff does not contest the existence or validity of the debts underlying the collection letter, but seeks to stop defendants, through an award of statutory damages, from using misleading tactics to collect them. Because plaintiff seeks only to recover statutory damages in this suit, her financial interest is identical to that of the putative class members. (*See* Am. Compl., P 22a.) As a result, her lack of monetary loss does not disqualify her from being the class representative. [2]

> 2 Defendants' claim that plaintiff may block a settlement beneficial to the class members is also groundless. (*See* Defs.' Resp. Mot. Class Certification at 7-8.) The Court, not the class representative, has the final authority over settlement of a class action suit. *Fed. R. Civ. P.*

1998 U.S. Dist. LEXIS 9124, *10

23(e).

[*11] *Conclusion*

For the reasons stated above, plaintiff's motion for class certification is granted.

**ENTER:**

Paul E. Plunkett

**UNITED STATES DISTRICT JUDGE**

**DATED:** *6-10-98*



**DAVID BERGER and GERRY TSUPROS, Plaintiffs, v. XEROX CORPORATION RETIREMENT INCOME GUARANTEE PLAN, Defendant.**

**Cause No: 00-584-DRH**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ILLINOIS**

*2004 U.S. Dist. LEXIS 1819; 15 Am. Disabilities Cas. (BNA) 1653; 32 Employee Benefits Cas. (BNA) 1362*

**January 22, 2004, Decided**

**PRIOR HISTORY:** *Berger v. Xerox Corp. Ret. Income Guar. Plan, 338 F.3d 755, 2003 U.S. App. LEXIS 15427 (7th Cir. Ill., 2003)*

**DISPOSITION:** Plaintiffs' Motion for Final Approval of Class Action Settlement granted; plaintiffs' motion for Attorneys' Fees and Costs granted in part. Dismissed with prejudice.

**COUNSEL:** [*1] For David Berger, Plaintiff: Douglas R. Sprong, Korein Tillery - Swansea, St. Clair County, Swansea, IL. Steven A. Katz, Korein Tillery - Swansea, St. Clair County, Swansea, IL. William K. Carr, Law Offices of William K. Carr, Denver, CO.

For Xerox Corporation Retirement Income Guarantee Plan, Defendant: Evan R. Chesler, Cravath, Swaine, et al., New York, NY. Lewis R. Mills, St. Louis, MO. Richard J. Pautler, St. Louis, MO. Sandra C. Goldstein, Cravath, Swaine, et al., New York, NY.

For Conkright, Defendant: Lewis R. Mills, St. Louis, MO.

For Gerry Tsupros, Plaintiff: Douglas R. Sprong, Swansea, IL. Steven A. Katz, Swansea, IL.

**JUDGES:** David R. Herndon, District Judge.

**OPINION BY:** David R. Herndon

**OPINION**

**ORDER AND FINAL JUDGMENT**

**HERNDON, DISTRICT JUDGE:**

This matter comes before the Court on the Class plaintiffs' Motion for Final Approval of Class Action Settlement, preliminarily approved by this Court on December 5, 2003. Pursuant to the Court's Preliminary Approval Order and the Notice provided to the Class, the Court conducted a fairness hearing under *Rule 23(e), Fed.R.Civ.P.*, on January 22, 2004. The Court has reviewed [*2] the materials submitted by the parties, and has heard arguments presented at such hearing. For the reasons cited on the record as well as those stated hereafter, the Court finds and orders as follows:

1. The Court finds that this action satisfies the requirements of *Rule 23*, for the reasons set forth in its prior certification orders and the Seventh Circuit's August 1, 2003 Order, and further finds that the Class has at all times been adequately represented by the Named

2004 U.S. Dist. LEXIS 1819, *2; 15 Am. Disabilities Cas. (BNA) 1653;
32 Employee Benefits Cas. (BNA) 1362

Plaintiffs and Class Counsel.

2. The Notice approved by the Court was provided by first class direct mail notice to the last known address of each individual identified as a potential Class Member. In addition, follow-up efforts were made to send the Notice to individuals whose original notice was returned as undeliverable. The Notice adequately described all the relevant and necessary parts of the proposed settlement agreement. *In the Matter of VMS Ltd. Partnership Sec. Litig., 26 F.3d 50, 51-52 (7th Cir. 1994)*; In the Matter of VMS Ltd. Partnership Sec. Litig., 1992 U.S. Dist. LEXIS 14445 1992 WL 203832 at *4 (N.D. Ill. 1992); *Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370 (9th Cir. 1993).* [*3]

3. The Court finds that the Notice given to the Class fully complied with *Rule 23*, was the best notice practicable, satisfied all constitutional due process concerns, and provides the Court with jurisdiction over the Class members. *Eisen v. Carlisle and Jacqueline, 417 U.S. 156, 177-78, 40 L. Ed. 2d 732, 94 S. Ct. 2140 (1974); Phillips Petroleum v. Shutts, 472 U.S. 797, 86 L. Ed. 2d 628, 105 S. Ct. 2965 (1985).*

4. The Court has subject matter jurisdiction over this action pursuant to *28 U.S.C. § 1331* and *28 U.S.C. § 1367.*

5. The Court has considered and applied the factors set forth in *Armstrong v. Board of School Directors of the City of Milwaukee, 616 F.2d 305, 312 (7th Cir. 1980)*, and has concluded that the settlement is fair, reasonable and adequate. *Armstrong, 616 F.2d at 312.* The Court finds that the delay, potential adverse tax issues, and the small uncertainty of further litigation, strongly supports the marginal reduction in the amounts that would have been paid pursuant to a final judgment.

6. Out of several thousand individuals identified as potential Class Members who were notified, [*4] only one of the Class members objected to the proposed settlement on the grounds that it was inadequate. While the Court disagrees with the objection, the Court also notes that the objector was not receiving additional benefits under the Court's prior Orders and is accordingly not receiving additional benefits under the settlement; therefore, he is without standing to object or appeal. *See Wolford v. Gaekle (In re First Capital Holdings Corp. Fin. Prods. Sec. Litig., 33 F.3d 29, 30 (9th Cir. 1994)* (dismissing appeal of class member who objected to class

counsel fee award because she lacked standing. The class member was not entitled to an award of damages and therefore was not "aggrieved" by the attorney's fees award.).

7. The only other objection to the proposed settlement was lodged by John E. Layaou, who objected to the release as potentially encompassing his claim against Xerox. However, the Settlement Agreement specifically excludes Mr. Layaou's case from the scope of the release and therefore his objection is without merit and he also lacks standing to interpose it.

8. The Settlement is hereby **APPROVED** in its entirety and the Court hereby approves the compromise [*5] of its earlier judgment.

9. A permanent injunction, without the necessity of a bond, is hereby issued against Class members from prosecuting parallel actions.

10. For the reasons set forth in Class counsel's Motion for Attorneys' Fees and Costs and Incentive Awards, the Motion for attorney fees and costs is granted, as modified herein. Specifically, the Court finds based on the evidence presented by Class counsel, and the Court's awareness of the market, that a 29% fee and $ 300,000.00 in costs and expenses award requested is at or below the market rate for this and similar litigation, is fully supported by the Seventh Circuit's decisions in *In re Synthroid Marketing Litig., 264 F.3d 712 (7th Cir. 2001)* (*Synthroid I*), and is otherwise appropriate. *See also In re Synthroid Marketing Litig., 325 F.3d 974 (7th Cir. 2003)* (*Synthroid II*). Class counsel presented affidavit testimony and other evidence demonstrating that no competent attorney would have taken this case on any basis other than a contingent fee basis. Class representative Gerry Tsupros testified that he would not have hired Class counsel on an hourly basis, and the individual recoveries [*6] of the other Class members strongly suggest that none of them would have agreed to pay an hourly fee plus costs in return for the prospect of recovering less than the final hourly fee and costs bill. The Court is further aware that Class counsel are nationally recognized experts in ERISA pension benefit cases and have testified that they have not and would not accept a similar case on any basis other than a contingency fee basis.

In addition, Class counsel presented evidence, and the Court agrees, that an auction for legal services in this

2004 U.S. Dist. LEXIS 1819, *6; 15 Am. Disabilities Cas. (BNA) 1653;
32 Employee Benefits Cas. (BNA) 1362

litigation would have produced a percentage at or higher than the 29% fee awarded, and that the large claimant criterion here supports the 29% fee award. The *Synthroid II* Court noted that the sophisticated third-party payors (the insurance companies) in that litigation negotiated a flat 22% rate even after the risk of the litigation had passed and a recovery was assured. *325 F.3d at 976* (explaining the 22% rate was agreed to "after a good deal of the risk had been dissipated" and that the TPPs still "had to offer 22% to sign up lawyers on a contingent fee."). Applying this reasoning to this case, the risk attendant with [*7] this litigation and the difficulty locating experienced counsel to accept such litigation clearly support a 29% fee.

Thus, the undisputed evidence is that the market for legal services for this litigation is a contingency fee contract. Class Counsel is awarded 29% of the aggregate Settlement Fund (as defined in the Settlement Agreement) as and for their fees expenses and costs. Defendants are ordered to distribute the fee to Class Counsel per the Settlement Agreement.

11. The Named Plaintiffs are hereby awarded incentive fees of $ 20,000 each for their time and effort in pursuing this litigation, to be paid in addition to the attorney fee and costs awards.

12. The Court finds that the distribution of attorneys' fees and costs does not result in a taxable income to any class members and that no withholding or 1099 reporting is required on that basis.

13. The Defendant is ordered to distribute the settlement proceeds under the terms of the Settlement Agreement.

14. All other motions currently pending, but not ruled upon by the Court, are **DENIED** as moot.

15. This cause is hereby **DISMISSED WITH PREJUDICE,** with this Court retaining jurisdiction to enforce the Settlement [*8] terms.

SO ORDERED:

/s/ David R. Herndon

District Judge

Date: January 22, 2004



5 of 5 DOCUMENTS

**ARCHIE COOK, Plaintiffs, v. W. EUGENE MCCARRON, Defendants. TEAMSTER LOCAL UNION 705, et al., Plaintiffs, v. DANIEL C. LIGUROTIS, et al., Defendants.**

**No. 92 C 7042, No. 95 C 0828**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1997 U.S. Dist. LEXIS 1090*

**January 22, 1997, Decided**
**January 30, 1997, DOCKETED**

**DISPOSITION:** [*1] Plaintiff's motion for class certification granted; plaintiff's motion for final approval of class action settlement agreement granted; plaintiff's motion for attorney's fees granted; plaintiff's motion for incentive award granted and plaintiff's motion for adoption of findings of Special Master Frank M. McGarr as findings of court granted

**COUNSEL:** For ARCHIE J COOK, individually and on behalf of a class of persons similarly situated, or derivatively on behalf of the Local 705 International Brotherhood of Teamsters Health and Welfare Fund, plaintiff (92-CV-7042): Robin B. Potter, Potter and Schaffner, Chicago, IL. Charles Pressman, Charles Pressman, P.C., Chicago, IL. Joel M. Hellman, Attorney at Law, Chicago, IL. For LOCAL 705 TRUCK DRIVERS, OIL DRIVERS, FILLING STATION AND PLATFORM WORKERS UNION, JOHN MCCORMICK, trust, Local 705 International Brotherhood of Teamsters Pension Trust Fund, trust, Local 705 International Brotherhood of Teamsters Health & Welfare Fund, GERALD ZERO, trust, Local 705 International Brotherhood of Teamsters Health & Welfare Fund, trust, Local 705 International Brotherhood of Teamsters Pension Trust Fund, ROBERT PERSAK, trust, Local 705 International Brotherhood [*2] of Teamsters Pension Trust Fund, trust, Local 705 International Brotherhood of Teamsters Health & Welfare Fund, MIKE HUSAR, on their own behalf and on the behalf of Local 705 members and the beneficiaries and participants in the Funds, and in their capacity as Trustees on behalf of the Funds and the Funds participants and beneficiaries, trust, Local 705 International Brotherhood of Teamsters Pension Trust Fund, trust, Local 705 International Brotherhood of Teamsters Health & Welfare Fund, THEODORE CLEMONS, JR, FREEMAN WILSON, MICHAEL J MARASOVICH, on their own behalf and on behalf of Local 705 members and the beneficiaries and participants in the Funds, plaintiffs (95-CV-828): Earl V. Brown, Jr., Attorney, Washington, DC. Michael J Passino, Lassiter, Tidwell & Hildebrand, Nashville, TN. Jeffrey Bensley Gilbert, Thomas Edward Johnson, Johnson, Jones, Snelling & Gilbert, Chicago, IL.

For W. EUGENE MCCARRON, individually and as Trustee of Local 705 International Brotherhood of Teamsters Health and Welfare Fund, trust, Local 705 International Brotherhood of Teamsters Health & Welfare Fund, defendant (92-CV-7042): James Patrick Daley, David M. Novak, Melissa Anne Siebert, Robert Raymond [*3] Brown, Bell, Boyd & Lloyd, Chicago, IL.

1997 U.S. Dist. LEXIS 1090, *3

Sherman M. Carmell, Adrianne Edith Hampo, Carmell, Charone, Widmer, Mathews & Moss, Chicago, IL. For STEPHEN BRIDGE, individually and as Trustee of Local 705 International Brotherhood of Teamsters Health and Welfare Fund, trust, Local 705 International Brotherhood of Teamsters Health & Welfare Fund, defendant (92-CV-7042): James R. Cox, Banta, Cox & Hennessy, Chicago, IL. Adrianne Edith Hampo, (See above). For MAT J SIEWERT, individually and as Trustee of Local 705 International Brotherhood of Teamsters Health and Welfare Fund, trust, Local 705 International Brotherhood of Teamsters Health & Welfare Fund, RALPH NIEDERT, SR, individually and as Trustee of Local 705 International Brotherhood of Teamsters Health and Welfare Fund, trust, Local 705 International Brotherhood of Teamsters Health & Welfare Fund, defendants (92-CV-7042): James Patrick Daley, (See above), David M. Novak, (See above), Melissa Anne Siebert, (See above), Robert Raymond Brown, (See above). Adrianne Edith Hampo, (See above). For JOHN MONROE, individually and as Trusxee of Local 705 International Brotherhood of Teamsters Health and Welfare Fund, trust, Local 705 International [*4] Brotherhood of Teamsters Health & Welfare Fund, JOHN NAVIGATO, individually and as Trustee of Local 705 International Brotherhood of Teamsters Health and Welfare Fund, trust, Local 705 International Brotherhood of Teamsters Health & Welfare Fund, DONALD HEIM, trust, Local 705 International Brotherhood of Teamsters Health & Welfare Fund, SAM CANINO, individually and as Trustee of Local 705 International Brotherhood of Teamsters Health and Welfare Fund, trust, Local 705 International Brotherhood of Teamsters Health & Welfare Fund, GERALD RZEWNICKI, individually and as Trustee of Local 705 International Brotherhood of Teamsters Health and Welfare Fund, trust, Local 705 International Brotherhood of Teamsters Health & Welfare Fund, GIL VALERIO, individually and as Trustee of Local 705 International Brotherhood of Teamsters Health and Welfare Fund, trust, Local 705 International Brotherhood of Teamsters Health & Welfare Fund, defendants (92-CV-7042): Adrianne Edith Hampo, (See above). For DANIEL C LIGUROTIS, individually and as Trustee of Local 705 International Brotherhood of Teamsters Health and Welfare Fund, trust, Local 705 International Brotherhood of Teamsters Health & Welfare Fund, [*5] defendant (92-CV-7042): John W. Dondanville, Lisa S. Brogan, Michael A. Pollard, Adriane Worthington Burkland, Baker &

McKenzie, Chicago, IL. For GERALD ZERO, Individually, trust, Local 705 International Brotherhood of Teamsters Health & Welfare Fund, ROBERT PERSAK, Individually, trust, Local 705 International Brotherhood of Teamsters Health & Welfare Fund, JOHN MCCORMICK, Individually, trust, Local 705 International Brotherhood of Teamsters Health & Welfare Fund, HAROLD BURKE, trust, Local 705 International Brotherhood of Teamsters Health & Welfare Fund, trust, 705 Truck Drivers, Oil Drivers, Filling Station and Platform Workers Union, defendants (92-CV-7042): Thomas Deacon Allison, Michael H. Slutsky, Wesley G. S. Kennedy, Allison, Slutsky & Kennedy, P.C., Chicago, IL. For LOCAL 705 INTERNATIONAL BROTHERHOOD OF TEAMSTERS HEALTH & WELFARE FUND, defendant (92-CV-7042): James L. Coghlan, John A. Kukankos, Coghlan, Joyce, Kukankos, Urbut & D'Arcy, Chicago, IL. Thomas Deacon Allison, (See above), Michael H. Slutsky, (See above), Wesley G. S. Kennedy, (See above). For DANIEL C LIGUROTIS, ("Danny"), defendant (95-CV-828): William Michael Sneed, Sidley & Austin, Chicago, IL. John W. Dondanville, [*6] Lisa S. Brogan, Michael A. Pollard, Baker & McKenzie, Chicago, IL. For WILLIAM D DALESSANDRO, WILLIAM D. DELASSANDRO, LTD., D & K VASCULAR LABS, INC., defendants (95-CV-828): James R. Streicker, Matthew F. Kennelly, Cotsirilos, Stephenson, Tighe & Streicker, Chicago, IL. For SHERMAN CARMELL, defendant (95-CV-828): David Edward Morgans, Lloyd E. Williams, Jr., Mary Anne Sliwinski, Gregory William Beihl, Williams & Montgomery, Chicago, IL. For W EUGENE MCCARRON, STEPHEN BRIDGE, RALPH NIEDERT, SR, M J SEIWART, defendants (95-CV-828): James Patrick Daley, David M. Novak, Melissa Anne Siebert, Robert Raymond Brown, Bell, Boyd & Lloyd, Chicago, IL. For GILDO VALERIO, defendant (95-CV-828): Daniel J. Pierce, Daniel J. Pierce, P.C., Chicago, IL. For RICHARD MALL, defendant (95-CV-828): James P. Chapman, Richard Harry Chapman, Fagel & Haber, Chicago, IL.

**JUDGES:** Blanche M. Manning, United States District Court

**OPINION BY:** Blanche M. Manning

**OPINION**

## MEMORANDUM OPINION

This matter comes before the court on motion of plaintiff Archie Cook to adopt Special Master Frank J. McGarr's recommended findings of fact as the findings of this court. This court has carefully considered the settlement terms, the [*7] strength of plaintiffs' case on the merits, the complexity and expense of further litigation, the opinion of counsel for both sides, as well as various other factors necessary to determine whether this settlement agreement should be approved.

We have reviewed Special Master McGarr's comprehensive and thorough report. Accordingly, this court adopts Special Master McGarr's findings of facts, with respect to the fairness of this settlement agreement. Cooks' motion for adoption of the special master's recommended findings of fact as the findings of this court is granted, and the proposed settlement agreement in this case is approved.

## BACKGROUND

### I. 92 C 7042

Case number *92 C 7042* was filed on October 22, 1992. On September 1993, Archie Cook ("Cook") filed his second amended complaint, which is the complaint presently pending in this case. At all times since February 1, 1987, Cook has been a participant in the Teamsters Local 705 Health and Welfare Fund ("Health & Welfare Fund") and a member of Teamsters Local 705 ("Local 705").

The defendants named in the Cook complaint are Local 705, W. Eugene McCarron, Stephen Bridge, M.J. Seiwert, Ralph Niedert, John Monroe, John Navigato, [*8] Don Heim, Sam Canini, Daniel C. Ligurotis, Gerald Rzewnicki, Gildo Valerio, Harold Burke, Gerald Zero, John McCormack and Robert Persak. The Health & Welfare Fund is also named as a defendant.

The Cook complaint has been brought on behalf of Archie Cook, individually, and on behalf of all participants in, or beneficiaries of, the Health & Welfare Fund between February 1, 1987 and January 31, 1996.

Essentially, Cook claims that the Health & Welfare trustees and other fiduciaries caused or allowed the assets of the Health & Welfare Fund to be wasted by the payment of excessive amounts for administrative expenses and benefits in light of the benefits allowable under the relevant trust documents of the Health & Welfare Fund, all in violation of their fiduciary duties under the Employee Retirement Income Security Act of 1974, as amended, *29 U.S.C. Section 1001 et seq.* ("ERISA"). Further, Cook claims that excessive payments that were made to Local 705 are prohibited transactions under ERISA. Cook seeks both equitable relief with respect to the future operation of the Health & Welfare Fund and damages exceeding $ 20,000,000.

### II. 92 C 828

Case No. 92 C 828 was filed on February 9, [*9] 1995 by Local 705, John McCormack, Gerald Zero, Robert Persak, Mike Husar, Theodore Clemons, Jr., Freeman Wilson and Michael J. Marasovich. Defendants in the Local 705 suit are Daniel C. Ligurotis, Dr. William D. Dalessandro, William D. Dalessandro, Ltd., D & K Vascular Labs, Inc., Sherman Carmell, W. Eugene McCarron, Gildo Valerio, Richard Mall, Stephen Bridge, Ralph Niedert, Sr., and M.J. Seiwert.

The Local 705 suit has been brought on behalf of two classes: (1) all persons who have been participants in, or beneficiaries of, the Health & Welfare Fund at any time between July 1, 1989, and January 31, 1996; and (2) all persons who have been participants in, or beneficiaries of, the Teamsters Local 705 Pension Fund at any time between July 1, 1989, and January 31, 1996. The Local 705 suit has been brought derivatively on behalf of the Health & Welfare Fund and on behalf of the Pension Fund.

The plaintiffs in the Local 705 suit claim that assets of the Health & Welfare Fund and the Pension Fund have been wasted through four schemes -- the construction of a restaurant at a building owned by a wholly owned corporation of the Pension Fund, the construction of a new clinic facility that [*10] was grossly overbuilt, an alleged conflict of interest for the attorney representing the Funds, and more favorable contribution treatment for a particular employer participating in the Health & Welfare Fund. The plaintiffs in the Local 705 suit seek damages under ERISA, the Racketeer Influence and Corrupt Organization Act of 1970, as amended, *18 U.S.C. Section 1961 et seq.* and common law fraud. Defendants deny these allegations.

## II. Class certification

1997 U.S. Dist. LEXIS 1090, *10

On February 27, 1996, this court conditionally certified three classes in these cases: (1) in the Cook case, all persons who were participants in, or beneficiaries of, the Health & Welfare Fund at any time between February 1, 1987 and January 31, 1996; (2) in the Local 705 case, all persons who were participants in, or beneficiaries of, the Health & Welfare Fund at any time between July 1, 1989 and January 31, 1996; and (3) in the Local 705 case, all persons who were participants in, or beneficiaries of, the Teamsters Local 705 Pension Fund at any time between July 1, 1989 and January 31, 1996.

**A. Case No. 92 CV 7042**

During the class period, there were more than 5,000 participants in the Health & Welfare Fund. Plaintiff [*11] in case No. 92 C 7042 has presented this court with issues of law and fact that are common to all members of the class. Defendants allegedly acted inappropriately with respect to the assets of the Health & Welfare Fund. Common issues are (a) whether assets of the Health & Welfare Fund have been misspent and wasted on excessive administrative expenses; (b) whether assets of the Health & Welfare Fund have been misspent and wasted on excessive benefits and expenses in light of the controlling trust documents; (c) whether Local 705 overcharged the Health & Welfare Fund for personal services, office services, and rents; (d) whether the defendants participated in or allowed the waste of assets of the Health & Welfare Fund; and (e) whether the defendant trustees of the Fund used the requisite level of care, skill and diligence in administering the assets of the Health & Welfare Fund.

Each class member has allegedly been injured in the same general way as plaintiff Cook has been injured from the waste of the Health & Welfare Fund's assets. Cook's claims are, therefore, typical of the claims of other class members. The nature and character of Cook's interests are the same as those of other [*12] class members.

Cook's attorneys, Charles Pressman, Robin Potter, Stephen Seliger and Joel Hellman are adequate and suitable counsel to represent the class in Case No. 92 C 7042.

Cook seeks to recover for the Health and Welfare Fund money damages allegedly caused by the waste of Fund assets. Cook also seeks equitable relief which governs the future operations of the Health and Welfare Fund. The prosecution of these same claims and issues by

individual class members in separate actions would risk inconsistent adjudications, where one adjudication would, as a practical matter, be dispositive of the interests of other class members who are not parties to these proceedings and would substantially impair or impede the rights of other class members to protect their interests. Thus, pursuant to *Fed.R.Civ.P. 23(b)(1)(B)*, this court conditionally certified a class in Case No. 92 C 7042 comprised of all participants in, or beneficiaries of, the Health & Welfare Fund between February 1, 1987 and January 31, 1996, and now certifies the class as set forth above.

**B. Case No. 95 C 828**

During the class period, there have been in excess of 15,000 participants in the Pension Fund, and over [*13] 5,000 participants in the Health and Welfare Fund. Case No. 95 C 828 presents issues of law and fact common to all members of the respective classes. Defendants allegedly acted in a wrongful manner with respect to the assets of the Pension Fund and Health & Welfare Fund. The waste of assets in the pension fund and the Health and Welfare Fund injures all members of the respective classes. Common issues include whether or not the assets of the pension fund and the Health & Welfare Fund have been wasted by the respective schemes set out in the complaint in Case No. 95 C 828.

Each member of the respective class has allegedly been injured from the waste of the Pension Fund's and Health & Welfare Fund's assets, in the same general way that the individual plaintiffs in Case No. 95 C 828 have been. The claims of the individual plaintiffs are typical of the claims of other members of the respective classes. The nature and character of the individual plaintiffs' interests in Case No. 95 C 828 are the same as those of other members of the respective classes. Further, the individual plaintiffs in Case No. 95 C 828 have no conflict of interest with other members of the respective classes in the [*14] prosecution of this case.

The attorneys for the individual plaintiffs have substantial prior experience in the prosecution of class actions. John McCormack, Gerald Zero, Robert Persak, Mike Husar, Theodore Clemons, Jr., Freeman Wilson and Michael J. Marasovich are adequate and suitable representatives for the respective classes. Their lawyers, Jeffrey Gilbert, Thomas Johnson, Michael Passino, and Earl Brown are adequate and suitable counsel for the respective classes in Case No. 95 C 828.

The plaintiffs in Case No. 95 C 828 seek to recover money damages for the Health and Welfare Fund that were allegedly suffered by the waste of Fund assets. We have concluded that the prosecution of these claims and issues by individual class members in separate actions would risk inconsistent adjudications, where one adjudication would, as a practical matter, be dispositive of the interests of other class members who are not parties to these proceedings and would substantially impair or impede the rights of other class members to protect their interests. Thus, pursuant to *Fed.R.Civ.P. 23(b)(1)(B)*, a class has been conditionally certified in Case No. 95 C 828, comprised of all participants in, or [*15] beneficiaries of, the Health and Welfare Fund and the Pension Fund at any time between July 1, 1989, and January 31, 1996. The court now certifies the classes as set forth above.

**Consolidation of cases**

On February 27, 1996, an order conditionally consolidating these two cases was entered by the Court. The fiduciary liability insurer covering the acts of fiduciaries of the Health & Welfare Fund and of the Pension Fund is Aetna Casualty & Surety Co. Defenses have been tendered to Aetna by defendants in Case No. 92 C 7042 and Case No. 95 C 828. Aetna has offered to pay in excess of $ 13,000,000 in settlement of these two cases, but Aetna has conditioned its offer on the consolidation of these two cases and the dismissal of both cases in a single order. There are common issues between the two cases with respect to the alleged waste of assets of the Health & Welfare Fund. Therefore, consolidation is proper and appropriate in order to effectuate the settlement agreement.

**Notice of Class Action Pendency and Settlement**

*Rule 23(c)(2)* provides that in any class action which is maintained under subdivision (b)(3), the members of the class are entitled to the best notice practicable [*16] under the circumstances, including individual notice to all members who can be identified through reasonable effort. *Fed.R.Civ.Pro. 23(c)(2)(1987)*. The notice shall advise each member that (a) the court will exclude the member from the class if the member so requests by a specified date; (b) the judgment, whether favorable or not, will include all members who do not request exclusion; and (c) any member who does not request exclusion may, if the member desires, enter an appearance through counsel. *Fed.R.Civ.Pro. 23(c)(2)(1987)*.

On March 7, 1996, 22,215 copies of the notice attached as Exhibit A to the certificate of providing class action notice were sent by first class mail to persons determined by Local 705 to be members of the classes conditionally certified by this court, as required by the court's order entered on February 27, 1996.

On March 8, 1996, a copy of the notice attached as Exhibit A to the certificate providing class action notice was mailed by certified first class mail to the United States Department of Labor, as required by the court's order entered on February 27, 1996.

On March 7, 1996, a form of notice attached as Exhibit E to the certificate providing [*17] class action notice was published in the Chicago Sun Times classified section, as required by this court's February 27, 1996 order.

The notices of class action pendency and settlement both by first class mail and by publication, fully and accurately informed all class members, the United States Department of Labor, and all other interested parties of the material elements of the parties' settlement agreement. Such notices constituted the best notice practicable under the circumstances.

Settlement notice was sent to more than 22,000 class members by first class mail and publication of settlement notice in a daily newspaper of general circulation in the Chicago area.

**REFERRAL TO THE SPECIAL MASTER AND THE APPLICABLE STANDARD OF REVIEW**

It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. *Armstrong v. Board of School Directors of the City of Milwaukee, 616 F.2d 305, 312 (7th Cir. 1979)*. In the class action context in particular, "there is an overriding public interest in favor of ... settlement". *Armstrong, 616 F.2d at 312*.

The Armstrong case is particularly illustrative in illuminating the issues [*18] before this court:

"Settlement of a class action is not, however, an unmixed blessing. Balanced against the 'overriding public interest in favor of settlement' are strong countervailing public policies which

counsel against automatic judicial acceptance of such agreements. First and foremost is the fact that most of those whose rights are affected by a class action settlement, the members of the class, are not involved in its negotiation nor are they present to voice their views in court. The class members must rely upon the representation of the class representatives and class counsel to protect their interests. While this representation is no doubt vigorous in most cases, on occasion the negotiating parties may find that their individual interests can best be served by a settlement which is not in the best interests of the class as a whole. Similarly, class counsel may be persuaded by the prospect of a substantial fee to accept a settlement proposal which leaves the class with less relief than could have been procured through more vigorous negotiation. In such cases, the class members may find that substantial rights have been bargained away in exchange for relief which inures [*19] primarily to the benefit of a few class members or class counsel. ..

In addition to this concern with the interests of class members, there is a concern with the interests of the public as a whole. The substantive issues involved in many class actions reflect a broad public interest in the rights to be vindicated or the social or economic policies to be established. In such cases, the ramifications of a settlement can extend far beyond the rights of individual class members. This public interest is present ....in such economic litigation as antitrust and consumers' rights actions. Uncritical acceptance of a class action settlement can, therefore, disturb important national policies beyond the immediate impact upon the rights of class members".

*Armstrong, 616 F.2d at 312.*

In the last decade, judges have increasingly sought the assistance of special masters in handling complex litigation. *See e.g. In re Joint Eastern and Southern Districts Asbestos Litigation*, NYAL CV 87-1383, CV 87-2273 (E & SDNY 1991); *In re DES Cases*, CV 91-3784., Misc. 91-456 (EDNY 1992).

*Federal Rule of Civil Procedure 53(b)* provides that reference to a master is the "exception and not [*20] the rule". *Fed.R.Civ. Pro. 53(b)(1993)*. In actions to be tried by a jury, the reference should take place only when "the issues are complicated; ... a reference shall be made only upon a showing that some exceptional condition requires it". *Fed.R. Civ.Pro. 53(b)(1993)*.

The order of reference to the master may "specify or limit the master's powers and may direct the master to report only upon particular issues or to receive and report evidence only and may fix the time and place for beginning and closing the hearings and for filing the master's report". *Fed.R.Civ.Pro. 53(c)(1993)*. Subject to the specifications and limitations stated in the order, the master "has and shall exercise the power to regulate all proceedings ... and to do all acts and take all measures necessary or proper for the efficient performance of the master's duties under the order". *Fed.R.Civ.Pro. 53(c)(1993)*. Thus, the master may require the production of evidence "upon all matters embraced in the reference, including the production of books, papers, vouchers, documents, and writings applicable thereto." *Fed.R.Civ.Pro. 53(c)(1993)*. When a party so requests, the master shall "make a record of [*21] the evidence offered and excluded in the same manner and subject to the same limitations as provided in the Federal Rules of Evidence for a court sitting without a jury". *Fed.R.Civ.Pro. 53(c)(1993)*.

*Federal Rule of Civil Procedure 53(e)(1)* provides that the master shall "prepare a report upon the matters submitted to the master by the order of reference and, if required to make findings of fact and conclusions of law, the master shall file the report with the clerk of the court and serve on all parties notice of the filing". *Fed.R.Civ.Pro. 53(e)(1)(1993)*. In an action to be tried without a jury, unless otherwise directed by the order of reference, the master shall file a transcript of the proceedings and of the evidence and the original exhibits with the report. *Fed.R.Civ.Pro. 53(e)(1)(1993)*.

In an action to be tried without a jury, Federal *Rule 53* provides that the court shall accept the master's findings of fact unless they are clearly erroneous. *Fed.R.Civ.Pro. 53(e)(2)(1993)*, see also *Anderson v. Mt.*

1997 U.S. Dist. LEXIS 1090, *21

*Clemens Pottery, 328 U.S. 680, 689, 66 S. Ct. 1187, 1193, 90 L. Ed. 1515 (1946).* The special master's legal conclusions are reviewed de novo. *Oil, Chem & Atomic [\*22] Workers Int'l Union v. National Labor Relations Board, 178 U.S. App. D.C. 278, 547 F.2d 575, 580 (D.C. Cir. 1976),* cert. denied, *431 U.S. 966, 97 S. Ct. 2923, 53 L. Ed. 2d 1062 (1977).* Within 10 days after being served with notice of filing of the report, any party may serve written objections thereto upon other parties. *Fed.R.Civ.Pro. 53(e)(2)(1993).* The district court has the power to adopt, modify or reject the report, in whole or in part. *Fed.R.Civ.Pro. 53(e)(2)(1993).* The court may also receive further evidence or recommit the report to the special master with further instructions. *Fed.R.Civ.Pro. 53(e)(2)(1993).*

**Referral to Special Master Frank McGarr**

This case was initially referred to the Honorable Frank J. McGarr as a Special Master on September 15, 1995 in an effort to facilitate settlement between the parties. The parties in *Cook v. McCarron, 92 C 7042,* and *Teamster Local 705, 95 C 0828,* participated in extensive negotiations which ultimately resulted in a formal stipulation and agreement of settlement, which has been submitted to this court for approval.

On February 15, 1996, this court preliminarily approved the settlement agreement and conditionally [\*23] consolidated cases *92 C 7042* and *95 C 0828* for settlement purposes.

On March 19, 1996, this case was again referred to Special Master Frank McGarr to determine the fairness of the settlement agreement. Special Master McGarr was given authority to hold hearings on the objections to the settlement agreement and to make recommended findings with respect to the final approval of the settlement agreement, petitions for attorneys' fees, costs, expenses and any petitions submitted by plaintiff for an incentive award.

Special Master Frank J. McGarr held a hearing on these objections on April 12, 1996. The transcript of that hearing demonstrates that Judge McGarr acted in accordance with the Federal Rules of Evidence. The following attorneys were present at the April 12, 1996 hearing: Charles Pressman, Stephen Seliger, Joel Hellman and Robin Potter all on behalf of the Cook plaintiffs; David Novak, Barbara Hillman, and Jeffrey Gilbert all on behalf of the Local 705 IBT Health and Welfare Fund; Michael Slutsky on behalf of Teamsters Local 705 in the Cook case and the current employee trustees of the Health and Welfare Fund; Lisa Brogan appeared on behalf of Daniel Ligurotis; James Cox appeared [\*24] on behalf of Stephen Bridge; Daniel Pierce appeared on behalf of Gildo Valerio; Julian Campbell appeared on behalf of Aetna; David Morgans appeared on behalf of Sherman Carmell; Robert D. Boyle appeared on behalf of Trustee Close. Additionally, one member of the pension fund, Robert McGinnis, was present. Special Master McGarr prepared a report and filed a transcript of the proceedings with the report in accordance with the mandate of *Federal Rule of Civil Procedure 53.* Special Master McGarr's recommended findings of fact with respect to the fairness of the settlement agreement were filed on May 17, 1996.

**Standard for Review of Class Action Settlement**

District court review of a class action settlement proposal is a two step process. *Armstrong, 616 F.2d at 314.* The first step is a preliminary, pre-notification hearing to determine whether the proposed settlement is "within the range of possible approval". *Armstrong, 616 F.2d at 314.* The purpose of the initial hearing is to ascertain whether there is any reason to notify the class members of the proposed settlement and proceed with a fairness hearing. *Armstrong, 616 F.2d at 314.* If the district court finds a settlement [\*25] proposal "within the range of possible approval", it then proceeds to the second step in the review process, the fairness hearing. *Armstrong, 616 F.2d at 314.* Class members are then notified of the proposed settlement and of the fairness hearing in which they and all interested parties have an opportunity to be heard. *Armstrong, 616 F.2d at 314.*

**I. Determination that the settlement agreement is within the range of possible approval**

On February 15, 1996, this court preliminarily found, subject to objections and further hearing, that the settlement agreement attached to the motion for preliminary approval of class action settlement was fair, reasonable, adequate and in the best interests of the classes.

**II. Fairness hearing**

The fairness hearing exists to enable the judge to determine whether the proposed settlement is "fair, reasonable and adequate". *Armstrong, 616 F.2d at 314.*

On the basis of all information that is available, the trial judge must decide whether or not to approve the proposed settlement. *Armstrong, 616 F.2d at 314.*

Certain factors have been consistently identified in the determination of fairness. *Armstrong, 616 F.2d at 314.* The [*26] court should consider the following in judging the fairness of the proposal:

> (1) *** the strength of the case for the plaintiffs on the merits, balanced against the amount offered in settlement;
>
> (2) 'The defendant's ability to pay';
>
> (3) The complexity, length and expense of further litigation';
>
> (4) The amount of opposition to the settlement;

Additionally, the court should also consider:

> (1) ***
>
> (2) Presence of collusion in reaching a settlement;
>
> (3) The reaction of members of the class to the settlement;
>
> (4) The opinion of competent counsel;
>
> (5) The stage of the proceedings and the amount of discovery completed;

The strength of the plaintiffs' case on the merits balanced against the settlement offer is the most important. *Armstrong, 616 F.2d at 314.* Although the court is required to consider the merits of the dispute to evaluate this factor, the district court must refrain from reaching conclusions on unlitigated issues. *Detroit v. Grinnel Corp., 495 F.2d 448, 456; Patterson v. Stovall, 528 F.2d 108, 114 (7th Cir. 1976).*

The court of appeals has required that district court approval of a settlement, pursuant to *Federal Rule of Civil Procedure* [*27] *23(e),* be given only where the district court finds the settlement fair, reasonable and

adequate. *Armstrong, 616 F.2d at 312.* In making a determination of fairness, the district court must set forth its reasons clearly in the record. *Dawson v. Pastrick, 600 F.2d 70, 75-76 (7th Cir. 1979).* A district court's determination that a settlement is fair, reasonable and adequate will be reversed only upon a showing that the court clearly abused its discretion. *Dawson v. Pastrick, 600 F.2d 70, 75 (7th Cir. 1979).*

When the court of appeals reviews the district court's approval of a class action, it will focus not only on the substantive law which governs the claims asserted in the litigation, but also on the general principles governing approval of class action settlements. *Armstrong, 616 F.2d at 315. See Airline Stewards & Stewardesses Ass'n v. American Airlines, Inc., 573 F.2d 960, 963 (7th Cir.), Dawson v. Pastrick, 600 F.2d 70, 75 (7th Cir. 1979).* The appellate court views the facts in the light most favorable to the settlement. *Patterson v. Stovall, 528 F.2d 108, 112 (7th Cir. 1976).* The court does not focus on individual components of settlements, but rather [*28] views these settlements in their entirety when evaluating their fairness. *McDonald v. Chicago Milwaukee Corp., 565 F.2d 416, 425 (7th Cir. 1977).* Since the district court's judgment is directly tied to its familiarity with the litigants, the history of the litigation and the merits of the substantive claims asserted, the court of appeals attempts to give the proper amount of deference to the district judge's decision. *Armstrong, 616 F.2d at 315.*

## A. Terms of the settlement

In the instant case, the settlement agreement provides for total payments into escrow of $ 14,025,000.00. This amount will be allocated as follows:

> (a) $ 13,162,862.95 will initially be paid to American National Bank & Trust Co. of Chicago as escrowee, for deposit to an interest-bearing account. Upon a resolution of the initial fee petitions of plaintiff's attorneys, plaintiff's petition for an incentive award, entry of a final order approving the settlement agreement and ruling on the petitions for fees, and an incentive award, the balance of the escrow will be paid to the Health & Welfare Fund.
>
> (b) $ 387,137.05 will initially be paid to American National Bank & Trust Co. of Chicago [*29] as escrowee, for deposit to

an interest bearing account. Upon a resolution of the initial fee petitions of plaintiff's attorney, plaintiff's petition for an incentive award, and entry of a final order approving the settlement agreement and ruling on the petitions for fees and an incentive award, the balance of the escrow will be paid to the pension fund.

(c) $ 450,000.00 will be paid into an escrow controlled by Aetna. These funds will be used to pay the attorneys' fees and litigation expenses of Aetna's insureds that were incurred during the period November 1, 1995, through January 31, 1996. The balance will be paid to the Health & Welfare Fund.

(d) $ 25,000.00 will be paid into an escrow controlled by Aetna. These funds will be used to pay certain litigation expenses incurred by the Funds after January 31, 1996. The balance will be paid to the Health & Welfare Fund.

In addition, the settlement agreement provides for structural relief concerning the future operation of the Health & Welfare Fund. This structural relief includes the following:

(a) By the latter part of this year, the Health & Welfare Fund will be required to maintain and, thereafter, to update [*30] certain essential eligibility data on a computerized eligibility system.

(b) The Health & Welfare Fund will be required to maintain an automated interface between its eligibility system and its claims payment system, in order to prevent automatic payments of benefit claims on behalf of ineligibles.

(c) The Health & Welfare Fund will be required to implement and to maintain procedures: for supplying participants with notices of employers' delinquencies in Fund contributions; for providing opportunities for employees to preserve their eligibility in the Fund by self-payments in the event of employer delinquencies; and for suspending or

canceling eligibility if neither employer contributions nor permissible employee self-payments are received after notice of delinquency and a grace period.

(d) The Health & Welfare Fund will be required to set contribution rates at levels sufficient to maintain reserves equal to or greater than twelve months of benefits costs.

(e) The Health & Welfare Fund will be required to set a contribution rate for each benefit level (the Fund being allowed to set different benefit levels within its welfare benefit plan) that is sufficient to cover [*31] the costs of benefits at such level. Disparities in contribution rates actually paid by various employers will be greatly reduced; benefits at any given level will not be provided unless an employer makes contributions at a rate within a certain percentage of a base rate set by the Fund for such level.

(f) A consultant will be selected to provide a report on the appropriate level of staffing for the Health & Welfare Fund. The Fund will be required to bring its staffing down to the level designated in the report or bear the burden of proving, before Special Master Frank McGarr that a higher level of staffing would be reasonable with respect to the operations of the Fund.

(g) The Health & Welfare Fund will cease sharing office space, staff, equipment, goods and services with Teamsters Local 705, unless the Fund can show that any such sharing arrangement is reasonable and that no more than reasonable compensation is being paid by the Fund. Any such sharing arrangement must be in writing and approved by the trustees of the fund.

(h) If the Health & Welfare Fund decides to operate its own clinic facility, it will be required to reduce its losses at the clinic over six years [*32] to 6-1/4% of

the losses in the current year, or to $ 200,000, whichever is larger. The Fund must also meet certain additional performance standards during each of the next five years. If these performance standards are not met, the Fund must either close the clinic, or bear the burden of proving before Special Master Frank J. McGarr the reasonableness of keeping the clinic open.

The settlement agreement mutually releases all claims in consequence of, arising out of, resulting from or relating to any allegations, claims or defenses which were raised or which could have been raised by, or which arise from or relate to, the facts, transactions, occurrences or subject matter described in, or encompassed by, either of these consolidated cases. The settlement agreement also releases any claims on any bonds and policies of insurance issued by Aetna. The release in the settlement agreement does not release certain claims against enumerated entities that are not parties to either of these consolidated cases; personal or individual claims that do not arise out of the facts, transactions or occurrences of the two cases; or claims for contributions against employers.

Any claims that the parties [*33] might have against William M. Mercer, Inc., arising out of the facts, transactions or occurrences of these consolidated cases will be assigned in subrogation to Aetna.

The settlement agreement also provides that the relative amounts of settlement contributions among various defendants and Aetna will not be disclosed to the plaintiff or class members. However, Aetna and the defendants have disclosed that more than $ 13,000,000.00 is being paid by Aetna from its own funds.

As a matter of background, the Health and Welfare Fund allegedly lost $ 25,982,280 in net assets. The monetary relief going directly from the settlement fund to the Health & Welfare Fund is at least $ 13,162,862.95. This is in excess of 50% of the total losses in the Fund's net assets between February 1987 and January 1994.

The issues relating to this portion of the settlement agreement were hotly contested by the parties, and resulted in compromise by all sides, but the settlement agreement provides meaningful relief for each of the

areas which Mr. Cook claimed were problems with the administration of the Health and Welfare Fund.

Continued litigation is a substantial risk for the Health and Welfare Fund and for [*34] plaintiffs. Certain of the Health and Welfare Fund's current union-appointed trustees have sued former union-appointed trustees for breaches of fiduciary duties in Case No. 95 C 828. Both current union-appointed trustees and current employer-appointed trustees have denied the allegations in Case No. 92 C 7042, where more than $ 20,000,000 is being sought for the Fund. The fund has also denied the allegations in case No. 92 C 7042. The plaintiffs in case no. 95 C 828 have complained about the construction of a clinic facility in close proximity to some of Chicago's preeminent medical institutions, but they have vehemently resisted the sale or lease of the facility to another medical institution. Proof of liability or damages may be difficult in light of these divergent positions taken by the current Fund administration.

There are additional risks of continued litigation. The losses in the assets of the Health & Welfare Fund occurred during a period of substantial inflation in medical costs. Plaintiff in case no. 92 C 7042 will be required to prove more than the losses to the Fund; he will be required to prove that the losses were caused by breaches of fiduciary duties by the trustees. [*35] In making this proof, plaintiff will be faced with the fact that the trustees sought, obtained and followed advice from William M. Mercer, Inc., an established benefits consultant.

Further, continued litigation of this case creates a risk with respect to the source of funds available to pay for any judgment that might be recovered in this case. The source of more than $ 13,000,000 in settlement funds is Aetna, the Funds' fiduciary liability carrier. These settlement funds are being paid out of a policy with a limit of $ 15,000,000. The policy limits cover both benefits to be paid to injured parties and costs of defense, with benefits payable being reduced by the costs of defense. As of the time of Special Master McGarr's report, Aetna was paying on claims being submitted for the work of twenty-six defense counsel. Continued litigation will diminish the source of settlement funds available to pay any judgment in these cases.

Aetna has already informed counsel for the parties that it has potential defenses to coverage of claims which create additional risks for the plaintiffs. Among these

defenses, Aetna contends that the complaint in case No. 95 C 828 shows that the losses to both [*36] Funds were caused by criminal acts, which are not covered by the policy, i.e. Aetna asserts that the insurance applications contained false statements.

In the event that these cases do not settle, there is a strong possibility that the Aetna policy limits will be eroded and further litigation will reduce the ability to collect on any judgment.

## OBJECTIONS RAISED BY VARIOUS PARTIES

### Objection by Robert McGinnis, Class Member of the Pension Fund

### I. McGinnis' "motion" in opposition to pendency and settlement

    - McGinnis' Class Answer to Special Master Frank McGarr's Findings of Fact with respect to the fairness of the settlement agreement and the final judgment thereon

    - McGinnis' "motion" in opposition to attorney's fees and costs hearing by the Special Master Frank McGarr

On April 4, 1996, Robert McGinnis, a member of the Pension Fund class, filed an objection to the agreement. McGinnis addressed two aspects of the settlement agreement. First, he addressed notice, asserting that appointment of a special master was an unethical omission. Second, McGinnis addressed the agreement itself.

The majority of McGinnis's "class answer" to Special Master McGarr's [*37] recommended findings of fact addresses alleged insufficient notice to many of the class members which caused them to miss attending the April 12, 1996 hearing before Special Master McGarr. McGinnis asserts that the insufficient notice prevented him from submitting relevant materials within the applicable time requirements in order to be heard on those issues at the hearing. Yet, reflected over and over throughout the transcript of that April 12th hearing is Special Master McGarr's assurance to McGinnis that untimeliness of any of his objections which relate to the April 12, 1996 hearing does not prevent him from being heard on those issues.

Apparently after the hearing, on May 1, 1996,

McGinnis filed his opposition to attorney's fees and costs. This document addressed McGinnis' dissatisfaction with the attorney fees, costs and the incentive award that had been proposed. Then, on June 3, 1996, McGinnis raised the same objection that he had already raised in his April 4, 1996 objections. That is, that the class members were not properly notified. On June 3, 1996, McGinnis raised issues not previously raised in his earlier objections before Special Master McGarr at the April 12, 1996 [*38] hearing. McGinnis asserted that the 401(h) pension fund contributions were illegal.

McGinnis's arguments regarding IRS approval of transfer money pursuant to *Section 401(h)* were properly excluded from Special Master McGarr's consideration. The transcript is replete with representations from Local 705 counsel that McGinnis failed to raise the 401(h) issue at any time before the April 12, 1996 hearing before Special Master McGarr. This omission precludes him from doing so after that meeting took place. Although this court is very liberal in interpreting the assertions of those individuals proceeding pro se, McGinnis is held to similar standards as the counsel in this case. He will not be allowed to continuously put forth positions in an untimely fashion. April 12, 1996, or any time before that date, was the appropriate time for McGinnis to raise any objections to the settlement agreement, its approval, petitions for attorneys fees, costs, expenses and issues with regard to the incentive award. Under even the most liberal of standards, McGinnis's submissions with regard to the 401(h) issue are untimely.

As a threshold matter, let us assert that although this court, again, attempts to [*39] be sensitive and accommodating to a pro se individual such as Mr. McGinnis, his inarticulate and unsubstantial assertions do a grand disservice to his positions and arguments. As earnestly as we try, it is very difficult to decipher the exact theories McGinnis asserts, i.e. "This is not fair...", "Special Master Frank J. McGarr appears to be trying to discredit anyone who factually opposes his views and stands up for their rights", or "Almost all of the class members are aware of kangaroo court hearings". This court instead concludes that Special Master McGarr should be commended for a record which reveals the patience, accommodation and evenhanded approach accorded Mr. McGinnis.

McGinnis' "class" answer raises issues which transcend the issues before the court. For instance,

McGinnis asked why this settlement agreement allows defendants to become plaintiffs. The settlement agreement does not do this. McGinnis' questions regarding the eventual demise of trustees and fiduciaries who allegedly committed fraud is likewise beyond the scope of this settlement agreement. McGinnis also questions why some past trustees were not named as defendants -- such as Baker, Tenuata and others. Again, [*40] the determination of which defendants would be named is the plaintiff's determination and beyond the scope of this agreement. This court is not in possession of information that would lead it to conclude that these parties are indeed indispensable to the case and has not been supplied with any such information by McGinnis.

The submissions of McGinnis are replete with serious personal accusations of misconduct directed at various members of Cook counsel, in addition to Special Master McGarr. This court, in the absence of specific support, employs its discretion to disregard these claims as baseless and unfounded.

McGinnis then concurs in objections which he perceives to have been made by the Department of Labor prohibiting the continued association of former trustees with Local 705. We find that Special Master McGarr clearly articulated his reasons for making the determination that he did. In essence, we find nothing in McGinnis' "class" answer which diminishes Judge McGarr's recommended findings of fact with respect to the fairness of the settlement agreement and the final judgment thereon.

On May 13, 1996, McGinnis filed an answer to plaintiff Cook's motion for the adoption of [*41] the special master's recommended findings of fact as the findings of the court. It is not clear whether McGinnis is simply listing his objections in numerical order or whether he is specifically responding to Cook's motion. Nevertheless, it is not clear why McGinnis asserts that plaintiff Cook's motion to adopt the special master's recommended findings of fact constitutes a direct violation of the settlement agreement. This court finds such a proposition to be nonsensical, completely without merit, and exhibits a total lack of understanding of the procedural posture of this matter. This conclusion equally applies to McGinnis' assertion that plaintiff Cook's motion to adopt the settlement agreement is a direct violation of the settlement agreement. Further, we find no support in the record to conclude that Special Master

McGarr's actions associated with the filing of the report of his findings violated *Federal Rule of Civil Procedure 53(e)(1)* nor do we conclude that Special Master McGarr violated the settlement agreement by failing to address all of the evidence which was presented to him.

Another document dated May 13, 1996 and entitled "Class answer to plaintiff Archie Cook's proposed [*42] recommended findings of fact with respect to the fairness of the settlement agreement and final judgment thereon" was filed by McGinnis. In this document, McGinnis asserts that it would be illegal to certify the class under the conditions of the settlement agreement as written. Yet, our decision to do so comports both with *Federal Rule of Civil Procedure 23(c)(1)* and precedent in this circuit. *See Vickers v. Trainor, 546 F.2d 739, 747 (7th Cir. 1976); Fujishima v. Board of Education, 460 F.2d 1355, 1360 (7th Cir. 1972).* Rule 23(c)(1) provides the following:

> As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits.

*Fed.R.Civ.Pro. 23(c)(1)(1987).*

We find that our order of February 15, 1996, comports with the mandates of *Rule 23(c)(1)* and is not illegal, but rather is proper under the circumstances.

It is clear that McGinnis is dissatisfied with the actions of the trustees and administrators of both the Health and Welfare Fund, the Pension Fund, counsel [*43] for the parties in this case, Special Master McGarr and probably, this very court. Yet, it is clear that McGinnis' right to object does not entitle him to make scurrilous and baseless accusations with no substantiation. Therefore, to the extent that McGinnis raises cogent arguments that have a relation to the findings of fact we have addressed those arguments. The duplicitous, nonresponsive and unsupported assertions of McGinnis negates the necessity of addressing every one. Further, the appropriate standard of review does not require us to do so. *See Marshall v. Milwaukee Boiler Manufacturer, 626 F.2d 1339 (7th Cir. 1980).* Our review of the remainder of McGinnis' "class" answer to plaintiff

Cook's proposed recommended findings of fact leads us to conclude that McGinnis has not presented any assertions which have negated plaintiff Cook's proposed findings of facts.

With respect to pension fund member McGinnis, his manner of both raising and presenting issues to the court makes it very difficult to truly decipher the essence of his positions. Yet, viewing his assertions in their broadest sense, we find McGinnis' objections to be repetitive, redundant and without support. Essentially, [*44] we can see that McGinnis is outraged at the present state of the pension fund, as he may deserve to be. However, with regard to those intelligible issues raised by McGinnis we find Special Master McGarr's ultimate determination to be sound and appropriate. The settlement agreement provides the best resolution of the case before us.

**160 Participants**

On May 1, 1996, participants John Sabath Fraschetti, Douglas Page Chapman and 160 other participants objected in writing to the preliminarily approved settlement. Enclosed in the documents was a petition signed by IBT Local Union 705 participants of the Health and Welfare Fund. Specifically, they objected to the terms of settlement enumerated in (c)(2) and (c)(7) which provided that all claims against William M. Mercer would be assigned to Aetna Casualty and Surety Co., Petitioners contend that any settlement resulting from transactions with Mercer should not be assigned to Aetna but instead should go to the Health and Welfare Fund. Second, because petitioners contend that upwards of 20 million dollars has been dissipated from the pension fund, they contend that $ 387, 137.05 is an inadequate sum to be paid to the pension fund. Third, [*45] petitioners assert that complaints have been filed with the Department of Labor, and the Internal Revenue Service under ERISA which may have some bearing on the fiduciary duties of the defendants, trustees and administrators of the funds. Last, petitioners assert that parties who are defendants in one suit should not be allowed to become plaintiffs in a combined suit as proposed by the agreement. We will address each contention in turn.

First, the trustees sought, obtained and followed advice from William M.Mercer, Inc., an established benefits consultant. It appears logical that any cause of action against Mercer for the malfeasance of the trustees should go to the entity that will pay benefits to injured

parties and that is paying the costs of defense, which entity is Aetna. It would be unfair to allow Aetna to pay those costs and then prevent it from attempting to recoup its losses elsewhere. Second, the settlement agreement provides that the balance of the escrow of $ 387,137.05 will be paid to the Pension fund. Nevertheless, we agree with Special Master McGarr in finding that the allocation in the settlement agreement is fair and reasonable and adequately reflects the respective [*46] claims of the two funds, the respective likelihood of success and the likely damages that the respective funds might recover.

**United States Department of Labor**

On April 3, 1996, the United States Department of Labor filed its objections to the proposed settlement agreement. The Department's sole objection to the settlement agreement relates to the absence of any provision which prohibits the continued and future association by employee trustees, former employee trustees, Stephen Bridge and medical service providers Dalessandro, Dalessandro, Ltd., and D & K Vascular Labs, Inc., and attorney Sherman Carmel, with the Local 705 Pension and Health and Welfare Funds. In other words, while the settlement agreement provides a remedy for past financial harm to the Funds' participants allegedly caused by all of the aforementioned parties, it does not preclude their future relationship or involvement with the Funds and the possibility that they will again cause financial harm to the participants. Thus, the department recommends that the settlement agreement be modified to require, as a condition to its final approval by the court, that Stephen Bridge resign as an employer trustee of the [*47] Funds and that he, the former employee trustees, William D. Dalessandro, William D. Dalessandro, Ltd., D & K Vascular Labs, Inc., and Sherman Carmell each individually agree to be permanently enjoined from serving as or occupying a position of trustee, fiduciary, service provider or consultant to the Local 705 pension and health and welfare funds, and from exercising, directly or indirectly, any discretionary authority or control with respect to the administration or disposition of the assets of said Funds..

While the United States Department of Labor has requested that the settlement agreement be modified to preclude future participation of certain individuals in the activities of the Funds, this court finds sufficient safeguards in this settlement agreement to police and observe the trustees' future behavior. Cook attempted, in

negotiations, to obtain certain relief which related to persons who might control the activities of the Funds, but these efforts were rejected in the course of negotiations. Additionally, at this time, only one of the individuals identified by the Department of Labor is presently associated with the administration of either fund. Therefore, even though the [*48] consent decree does not contain the specific terms which are requested by the Department of Labor, we agree with Special Master McGarr in finding that the settlement agreement is reasonable.

**Trustee William V. Close**

Employer Trustee William V. Close filed an objection to the preliminarily approved settlement on March 26, 1996. One of the current trustees of the funds, William Close, has objected to the settlement on three grounds: (1) that the settlement agreement does not require the immediate closing of the Health & Welfare Fund's clinic facility, which Mr. Close contends is losing millions of dollars; (2) that the settlement agreement does not address the failure of the Pension Fund to follow certain formalities required under the Internal Revenue Code, *26 U.S.C. Section 401(h)*, in making payments to the Health & Welfare Fund; and (3) that the settlement agreement contains a confidentiality clause precluding defendants from disclosing the allocation of contributions to the settlement funds, other than the disclosure that Aetna is paying more than $ 13,000,000.

We also agree with the special master in finding that the terms of the settlement agreement which relate to the [*49] Health & Welfare Fund's clinic facility are fair and reasonable in the context of the agreement as a whole. The agreement does not require the clinic facility to remain open if the trustees decide to sell it, lease it, or otherwise to close it. The Fund is required to reduce the losses at the clinic facility in order for the facility to remain open. The Fund is required to reduce the losses at the clinic facility over the next several years by millions of dollars, or face the burden of proving to the court that the clinic facility should remain open. A majority of the trustees threatened to reject any settlement offer that required the immediate closing of the clinic facility. Counsel for the class in case no. *92 C 7042* argued for the sale, lease or closing of the clinic facility. We find that the terms of the settlement agreement relating to the clinic facility are the result of reasonable compromise on both sides.

Special Master McGarr found that counsel for the pension fund class has demonstrated that they investigated and considered issues relating to the contributions in light of *section 401(h)* and reasonably discounted the value of any claim related to the speculative character [*50] of the claims described in the objection and the low likelihood of any actionable loss or recovery to the Pension Fund balanced against the benefit of the settlement agreement of the pension fund.

Although we do not find Special Master McGarr's factual findings clearly erroneous, we agree with his conclusions but for reasons different from his. Close properly asserts that *42 U.S.C. 401(a)(2)* requires that the use or diversion of funds for any use or purpose other than the exclusive benefit of employees of their beneficiaries is prohibited. Close is also correct when he asserts that *42 U.S.C. 401(b)* also prohibits discrimination in favor of officers, shareholders and highly compensated employees. The settlement agreement does not address the failure of the pension fund to follow formalities which are required by the tax code and ERISA. However, this settlement agreement is not the proper vehicle or the proper mechanism to resolve those issues.

ERISA has established fiduciary standards and rules concerning prohibited transactions that plans must comply with. These requirements were placed under the jurisdiction of the Department of Labor which was given authority to issue individual [*51] or class exemptions and to provide guidance relating to fiduciary standards. *42 U.S.C 404, 406, 407* and *408, et seq.* Participation in prohibited transactions subjects the offender to an excise tax of up to 100% under the Internal Revenue Code and possible civil liability under the Labor Title of the United States Code. *Sinder v. US, 655 F.2d 729 (6th Cir. 1981), Continental*, 87-2 USTC (CCH) 9442 (ND Ill. 1987). Prohibited transactions are those engaged in by a disqualified person or "a party in interest" such as a fiduciary. *Sinder v. US, 655 F.2d 729 (6th Cir. 1981), Continental*, 87-2 USTC (CCH) 9442 (ND Ill. 1987). When more than one person has been assessed for the same 100% penalty, they are jointly and severally liable. *Sinder v. US, 655 F.2d 729 (6th Cir. 1981), Continental*, 87-2 USTC (CCH) 9442 (ND Ill. 1987). [1]

> 1    The plaintiffs continual reliance on the determination letter is of no consequence. A determination letter is a written statement issued by the district director that applies the precedents

which have been announced by the National Office. *Treas.Reg.Section 601.201(a)(3)*. Section 6110(j)(3) explicitly states that written determinations may not be cited or used as precedent. Further, neither the determination letter that plaintiffs rely upon nor the attached Local 705 International Brotherhood of Teamsters Pension Plan, addresses any aspect of prohibited transfers which are central to Close's objections.

[*52] Therefore, although we find Close's assertions are correct, they have no bearing on the Special Master's findings of fact or the ultimate determination related to the fairness of this settlement agreement. Instead, they directly relate to the liability of trustees who initiated, participated in or implicitly acceded to transactions which potentially may be found to be prohibited. The ultimate liability for these decisions rests personally on these trustees and does not bear on the ultimate approval of the settlement agreement.

The confidentiality of the individual defendants is problematic because their individual contributions are directly related to contribution claims which might take place in the future. Yet, this again, is not directly tied to the fairness of the agreement nor its propriety to the situation before us. Reviewing the record, it is clear that individual defendants took the position that they would not agree to the settlement agreement absent a confidentiality clause. Aetna, in turn, would not agree to pay anything into the settlement fund unless all of the individual defendants were parties to the settlement agreement. Counsel for the classes reasonably concluded [*53] that the total settlement fund was a fair and adequate settlement amount, which would have been lost by an insistence on a disclosure of the allocations of contributions. Therefore, this provision was reached by compromise by all sides.

On July 3, 1996, Local 705 filed a brief opposing Close's motion for leave to file untimely objections to Special Master McGarr's findings of facts. In open court, Local 705 claimed that Close's objections simply were not timely. At that time in open court, this court advised Close that the motion to file untimely objections would be taken with the case. The motion for leave to file untimely objections is denied.

Throughout all of these negotiations, both sides have been represented by experienced and competent attorneys. These attorneys have opined that the settlement

is fair, adequate and in the best interest of the respective classes that they represent. These attorneys have executed the settlement agreement and have provided their personal assents to it. Reviewing Special Master McGarr's findings of fact we find they are not clearly erroneous. Therefore, they are accepted.

Further, the settlement agreement which has been presented to this court [*54] is fair, adequate and reasonable to each of the respective classes and in the best interests of the absent class members in each of the respective classes. Therefore, the settlement agreement is approved in its entirety.

## ATTORNEYS' FEES

When a case such as this results in the creation of a common fund for the benefit of a plaintiff class, the district court will exercise its equitable powers to award plaintiffs' attorneys' fees out of the fund. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975)*. The attorneys' fee award is then taken as a share of the fund, thereby diminishing the sum which is ultimately retained by the plaintiff class. *Alyeska, 421 U.S. at 257-58*. The common fund doctrine (also known as the "equitable fund" doctrine and the "fund-in-court" doctrine) is based on the "equitable notion that those who have benefitted from litigation should share its costs." *Skelton v. General Motors Corporation, 860 F.2d 250, 252 (7th Cir. 1988)*.

The seventh circuit has found that both the lodestar approach and the percentage approach may be appropriate in the determination of attorney's fee awards. *Florin v. Nationsbank* [*55] *of Georgia, 34 F.3d 560, 565 (7th Cir. 1994)*. The decision of which method to employ remains within the discretion of the district court. *Florin, 34 F.3d at 565*. Special Master McGarr has suggested that this court apply the percentage of recovery rather than the lodestar method for computing an appropriate fee. Just as the seventh circuit acknowledged in *Lorin*, this court recognizes that there are advantages to the utilization of the percentage method in common fund cases -- mainly the relative simplicity of its administration.

The Seventh Circuit requires the court to balance the competing goals of attorney compensation for services rendered on behalf of the class and the protection of the fund class members' interests. *Skelton v. General Motors Corp., 860 F.2d 250, 257 (7th Cir. 1988)*. When the

plaintiff class is unrepresented with regard to attorneys' fees, the interests of the class must be guarded. *Florin v. Nationsbank of Georgia, 60 F.3d 1245, 1247 (7th Cir. 1995).* Yet, the attorneys who have represented their clients must have an incentive to continue to do so on an "inescapably contingent" basis. *Florin, 60 F.3d at 1247 citing Matter of Continental* [*56] *III Sec. Litig., 962 F.2d 566, 569.*

Here, counsel for Archie Cook have requested an attorneys' fee of $ 4,785,000 plus costs in the amount of $ 1,232,749.16. As a basis for finding such a fee appropriate in this case, Special Master McGarr has asserted that the riskiness of the litigation and the amount of recovery which ultimately will befall the plaintiffs justify the use of the percentage method for the amount of attorneys fees in this case, as Cook counsel were directly responsible for the result. We do not disagree with Special Master McGarr in his assertion that there was riskiness in this litigation; however, because this is a common fund case, we find that we owe a responsibility to return as much as possible to the aggrieved persons in this situation -- the plaintiffs. Further, objections which have been raised by individual pensioners in addition to those raised by Local 705 Health and Welfare Fund, require us to examine the actual amount of attorneys fees which are to be awarded in this case. The total immediate cash benefit which has accrued to the Health & Welfare Fund as a result of the Cook litigation is between $ 14,536,819 (13,162,862 + 1,373,957) and 14,998,957 (13,625,000 [*57] + 1,373,957). The value of the structural relief obtained by Cook class counsel is substantial despite the dispute of the union to plaintiff's evaluation. Yet, as a matter of law, we find the percentage method to be inapplicable to this case as it defeats the whole purpose of attempting to make the plaintiffs whole.

Taking these issues into account, we find that the Lodestar method is the better determinant of the attorneys' fees for the plaintiffs' counsel in this case. The Lodestar method provides for greater accountability and a more careful check on excessive fees. *Harman v. Lyphomed, Inc., 945 F.2d 969, 974 (7th Cir. 1991).* Calculation of the lodestar is the starting point for any award of attorney's fees. *Dutchak v. Central States, 932 F.2d 591 (7th Cir. 1991).* The Lodestar represents the number of hours which have been reasonably expended multiplied by the appropriate hourly rate. *Dutchak, 932 F.2d at 595.* Once the lodestar is calculated, adjustments, where appropriate, increase or decrease the award in light of other factors. *Dutchak, 932 F.2d at 595.* When attorneys' receipt of payment is contingent on the success of litigation, reasonable compensation may [*58] demand that the hourly rate multiplied by the hours worked is increased, because this rate would be the amount that attorneys would have received for services, regardless of success. *Skelton, 860 F.2d at 257.* To account for the contingent nature of the compensation, a court can assess the riskiness of litigation. *Skelton, 860 F.2d at 257.* Although it is difficult, the court must make a retroactive calculation of the probability of success as measured at the beginning of litigation. *Skelton, 860 F.2d at 257.* Then, the court must place plaintiffs' lawyers in the unseemly position of convincing the court that their clients' case was weak. *Skelton, 860 F.2d at 257.* To avoid this scenario, it has been suggested that a standard risk multiplier be used in contingent fee arrangements. *Skelton, 860 F.2d at 257.* Decisions of the district court, the determination of attorney's fees and its decision of whether to award a risk multiplier, generally are reviewed only for abuse of discretion. *Skelton, 860 F.2d at 257.*

Lodestar, which incorporates reasonable hourly rates and reasonable time expended is appropriate here, with a multiplier of 1.5 which incorporates the degree [*59] of risk which Cook counsel have taken as a result of this litigation. We find the hourly rates and submitted time for Cook class counsel which have been proposed are approved as follows:

| Counsel | Hourly rate | Time expended | Total Fee |
|---|---|---|---|
| | | | |
| Charles Pressman | $ 325 | 1467.6 | 476,970.00 |
| Stephen G. Seliger | $ 295 | 449.6 | 132,632.00 |
| Joel M. Hellman | $ 260 | 1475.75 | 383,695.00 |

1997 U.S. Dist. LEXIS 1090, *59

| | | | |
|---|---|---|---|
| Robin Potter | $ 250 | 1112.23 | 278,057.50 |
| Mary L. Mikva | $ 235 | 23.00 | 5,405.00 |
| James G. Bradtke | $ 215 | 164.20 | 35,303.00 |
| Mary Ann Wilson | $ 215 | 23.00 | 4,945.00 |
| Jennifer Soule | $ 175 | 4.20 | 735.00 |
| Steven Tandle | $ 175 | 5.60 | 980.00 |
| Kelly Lambert | $ 145 | 7.10 | 1029.50 |
| James A. Field | $ 115 | 8.75 | 1006.25 |
| Paralegals | $ 80 | 1165.90 | 93,272.00 |
| | | TOTAL FEES | 1,414,030.30 |
| TOTAL FEES X MULTIPLIER OF 1.5 | | | 2,121,045.40 |

We have reviewed the amount of time which has been reported to have been spent on this case by various members of Cook class counsel, up to January 31, 1996. Although objectors argue that the hours claimed are excessive, that associates and paralegals were not used for lesser tasks, that hourly rates are excessive, that hours expended in the preparation of fee petitions are [*60] improperly included and that the comparison of the amount sought and the hours expended reveals a fee claim with an excessive hourly rate, we find that the hours appear to be representative of the work which was performed by the attorneys here. However, we note that it is preferable to break out the time spent on specific tasks to enable this court, or any reviewing court, to more specifically determine the accuracy of the billing involved.

## COSTS

We have reviewed the following expenses from the Cook class counsel:

| Type of Expense | Amount |
|---|---|
| | |
| Reporter fees and transcripts | $ 20,949.05 |
| Consulting experts | |
|   Admin Sys Des and OBA | $ 7,957.50 |
|   Reed-Ramsey | $ 6,080.10 |
|   Prof. Albert Madansky | $ 11,500.00 |
|   Prof. Roger Feldman | $ 1,273.00 |
| Computer Services | |
|   Analytical Comp. Serv. | $ 22,271.00 |
|   RIMS | $ 475.00 |
|   Xanadex | $ 1,647.85 |
| Dedicated space (rent) | |
|   Potter & Schaffner | $ 302.44 |
| Photocopying | |

1997 U.S. Dist. LEXIS 1090, *60

| | |
|---|---|
| Vendors | $ 26,994.83 |
| In-house | |
| Charles Pressman | |
| 35,997 @ .10 | $ 3,599.70 |
| Joel M. Hellman | |
| 35,059 @ .10 | $ 3,505.90 |
| Robin Potter | |
| 57,778 @ .20 | $ 11,555.60 |
| Telephone conference charges | $ 664.01 |
| Data reporting services | $ 705.09 |
| Filing, service and witness fees | $ 757.31 |
| Lexis | $ 1,569.13 |
| TOTAL EXPENSES | $ 133,440.31 |

[*61] We agree with objections that have been raised which point out that certain categories of claimed costs are not compensable. Copying costs should properly be 10 cents per page and office space costs are subsumed into attorney's fees. Therefore, Cook class counsel should be reimbursed for costs of $ 92,258.31, which should be paid from the settlement escrow for the benefit of the Health and Welfare Fund. Further, Local 705 class counsel have incurred $ 25,617.79 in the prosecution of this action, for which they should be reimbursed out of the settlement fund.

**INCENTIVE AWARD FOR ARCHIE COOK**

This circuit has recognized the appropriateness of incentive awards. *In re Continental*, 962 F.2d at 571-572. Archie Cook has spent hundreds of hours submitting himself to formal discovery and has provided an abundance of information to Cook class counsel during the course of litigation. We find that $ 25,000 is a reasonable incentive award to be paid to Mr. Cook.

DATE: January 22, 1997

Blanche M. Manning

United States District Court



6 of 7 DOCUMENTS

**CYNTHIA KERNATS, TIFFANY GUY, MARION JOHNSON, and TENISHA MCCOY, individually, and on behalf of all others similarly situated, Plaintiffs, v. COMCAST CORPORATION, Defendant.**

**Case Nos. 09 C 3368and09 C 4305**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2010 U.S. Dist. LEXIS 112071*

October 20, 2010, Decided
October 20, 2010, Filed

**PRIOR HISTORY:** *Kernats v. COMCAST Corp., 2010 U.S. Dist. LEXIS 20276 (N.D. Ill., Jan. 14, 2010)*

**COUNSEL:** [*1] For Cynthia Kernats, Plaintiff: Douglas M. Werman, LEAD ATTORNEY, David Erik Stevens, Werman Law Office, P.C., Chicago, IL; James X. Bormes, Law Office of James X. Bormes, P.C., Chicago, IL; Jamie G. Sypulski, Law Office of Jamie G. Sypulski, Chicago, IL; Maureen Ann Bantz, Werman Law Offices, P.C., Chicago, IL.

For Tiffany Guy, Marion Johnson, Tenisha McCoy, Individually, and on Behalf of All Others Similarly Situated, Plaintiffs: Douglas M. Werman, Werman Law Office, P.C., Chicago, IL.

For Comcast Corporation, Defendant: Sari M. Alamuddin, LEAD ATTORNEY, Christopher Joseph Boran, Stephanie Marie Christiansen LaRocco, Morgan Lewis & Bockius LLP, Chicago, IL.

**JUDGES:** Virginia M. Kendall, United States District Court Judge.

**OPINION BY:** Virginia M. Kendall

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Cynthia Kernats, Tiffany Guy, Marion Johnson, and Tenisha McCoy, individually and on behalf of all others similarly situated ("the Plaintiffs"), sued Defendant Comcast Corporation ("Comcast") alleging violations of the Illinois Minimum Wage Law, *820 ILCS 105/1 et seq.* ("IMWL"), for non-payment of all overtime wages (Count I) and the Illinois Wage Payment and Collection Act, *820 ILCS 115/1, et seq.* ("IWPCA"), for non-payment [*2] of all straight-time wages (Count II). The Named Plaintiffs also individually allege violations of the Fair Labor Standards Act ("FLSA"), *29 U.S.C. § 201, et seq.*, for non-payment of overtime wages (Count III). Pursuant to *Federal Rule of Civil Procedure 23(b)(3)*, the Plaintiffs move to certify their state law claims (Counts I and II) as a class action. For the reasons stated below, the Court grants the Plaintiffs' Motion.

**BACKGROUND**

The Plaintiffs work as hourly, non-exempt customer account representatives ("CAEs") in one of Comcast's eight Illinois customer service call centers. (R. 20, Am. Compl. PP 8-11; 21.) [1] In these eight Illinois call centers,

Case: 1:11-cv-08390 Document #: 43-1 Filed: 11/09/12 Page 90 of 119 PageID #:257

Page 2
2010 U.S. Dist. LEXIS 112071, *2

Comcast employs approximately 2,300 CAEs. (Amend. Compl. P 21; R. 23, Answer P 21.) Although certain call centers address different types of customer issues, all CAEs share the same basic job description and primary duty--providing service and support to Comcast's customers and potential customers over the telephone--and all undergo similar training, work under common employment policies, and are subject to the same compensation scheme. (See Am. Compl. P 17; R. 48, Pls' Class Cert. Mem. at 4.)

> 1   Comcast has operated four of the eight call [*3] centers--those located in Oak Brook, Schaumburg, Tinley Park, and Woodridge--throughout the class period. (Def. Appx. 34, Haubert Decl. PP 2-3.) Comcast acquired their other four Illinois call centers--those located in Champaign, Peoria, Rockford, and Springfield--in January of 2008. (See Haubert Decl. P 3; Def. Appx. 15, Browning Dep. at 13:25-14:25; Def. Appx. 19, Holt Dep. at 4:18-22.)

> Named Plaintiff Cynthia Kernats worked as an hourly, non-exempt CAE in Comcast's Woodridge call center between May of 2007 and May of 2008. (Answer P 8.) Named Plaintiffs Tiffany Guy, Marion Johnson, and Tenisha McCoy have all worked as hourly, non-exempt CAEs in Comcast's Oakbrook call center since July 2008. (Answer PP 9-11; Pls' Ex. 9, Guy Dep. at 197:8-18; Pls' Ex. 21, Johnson Dep. at 17:24-19:12; Pls' Ex. 8, McCoy Dep. at 26:13-26:17.)

At the beginning of her shift, each CAE is required to log into her computer. (See Am. Compl. P 2.) Comcast refers to this procedure as the "NT login"; the Court will refer to it as the "Initial Login." It is only after completing this Initial Login that a CAE can access and load the computer software applications she needs to take customer calls and, since 2008, to [*4] log into the telephone system itself. [2] (See, e.g., Def. Appx. 27, Wright Dep. at 30:8-15; Def. Appx. 45, Zandonai Decl P 3; Def. Appx. 39, Lewis Decl. P 4; Def. Appx. 33, Green Decl. P 4; Def. Appx. 26, Niles Dep. at 64:5-65:8.) Specifically, before taking customer calls, CAEs are required to have the CSG billing system loaded on their computer because it contains needed customer information. (See, e.g., Pls' Ex. 12, Goodman Dep. at

90:13-94:23; Pls' Ex. 4, Haubert Dep. at 101:7-10; Pls' Ex. 5, Holt Dep. at 55:5-25, 56:16-25.) Comcast also requires CAEs to perform non-phone activities, such as learning about new products, services, marketing campaigns, and other updates by reviewing company emails and accessing Comcast's "Casper" on-line reference tool. (See, e.g., Pls' Ex. 10, LahrDep. at 185:16-19, 186:15-19; Holt Dep. at 57:4-17, 100:5.) CAEs are also required to review their individual performance reports on a daily basis. (Pls' Ex. 11, Coffman Dep. at 153:21-25; Pls' Ex. 5, Holt Dep. at 86:17-24.)

> 2   Since 2008, Comcast has used the Cisco telephone system. (Haubert Dep. at 98:6-17.) To log into this system, a CAE types her assigned username, password, and extension into the Cisco [*5] computer application. (Def. Appx. 5 at COM00000190.) Before this time, Comcast used the Aspect telephone system, which did not require the use of a computer to sign into the system. (Haubert Dep. at 98:6-17.) Instead, a CAE would type her identification number into a physical telephone at her desk. (Green Decl. P 6; Coleman Decl. P 6; Wright Dep. at 51:1-52:12; Lahr Dep. at 100:21-25.)

Throughout the class limitation period, Comcast's Oak Brook, Tinley Park, Schaumburg, and Woodridge call centers have used the following metrics to evaluate CAE productivity: Sign On Time; Customer Availability; Average Handle Time; Comcast Quality Experience; Sales Upgrade Rate; and Work Order Accuracy. (Haubert Decl. P 8; Def. Appx. 7, 2007 Billing/Service Goals.) The other four call centers began using the metric system in August of 2009. (See Holt Dep. at 44:10-45:2.) The Sign On Time metric measures the percentage of the CAE's scheduled shift that she is logged into the telephone system. (Def. Appx. 7, 2007 Billing/Service Goals.) CAEs must maintain a Sign On Time of 96% to avoid being placed into the "Improvement Required" category, but to be labeled as a "Strong Performance Achiever," a CAE must [*6] maintain a Sign On Time of 98%. (Def. Appx. 7, 2007 Billing/Service Goals.) Customer Availability, in turn, measures the percentage of total Sign On Time that the CAE is available to take customer calls. (Def. Appx. 7, 2007 Billing/Service Goals.) To avoid being placed into the "Improvement Required category, CAEs must maintain a Customer Availability of 90%. (Def. Appx. 7, 2007 Billing/Service Goals.) To

be a "Strong Performance Achiever," however, CAEs must maintain a Customer Availability of 92.5% or more. (Def. Appx. 7, 2007 Billing/Service Goals.)

Comcast has also used three different methods of CAE timekeeping during the limitations period: the Manual System, the Automated System, and Employee Self Service ("ESS"). (Lahr Dep. 84:15-21.) Under the Manual System, CAEs completed handwritten timesheets, rounding their time to the nearest quarter-hour. (Def. Appx. 8 at P0273-274.) Under the Automated System, used in the Oak Brook, Woodridge, Tinley Park, and Schaumburg call centers between 2006 and December 13, 2008, timesheets were generated from CAE's phone logins--not the Initial Login. (*See, e.g.*, Lahr Dep. at 98:19-99:5; Holt Dep. at 39:24-41:24; Haubert Dep. at 42:1-5.) Comcast [*7] personnel adjusted the phone login times based on any exceptions, and then rounded those times to the nearest quarter-hour for pay purposes. (Haubert Decl. P 6.) Since December 14, 2008, Comcast has used ESS in all of its eight call centers. (Haubert Dep. at 42:1-5.) ESS is a computerized timesheet that requires CAEs to manually report their own time. The timesheets are audited by the CAE's supervisor by comparing the timesheets to the CAE's work schedules, exceptions, and the telephone login reports. (Haubert Dep. at 163:14-164:19.)

The Plaintiffs allege that Comcast failed to pay them and other similarly situated CAEs for all work performed, including overtime wages, in violation of Illinois wage and hour laws. (Am. Compl. P 16.) Specifically, the Plaintiffs allege that Comcast required or knowingly permitted CAEs to perform unpaid work after their Initial Login, but before their scheduled start time, including booting-up their computers and initializing essential software programs. (Am. Compl. P 18; Pls' Class Cert. Mem. at 1.) The Plaintiffs allege that this Initial Login to the computer system is the first principal activity of each CAE's day. (Pls' Reply at 8.)

The Plaintiffs contend [*8] that as a result of working this uncompensated time, they and other similarly-situated CAEs accrue time over forty hours in the workweek, for which they are not compensated at an overtime rate. (Am. Compl. P 4.) To the extent that any uncompensated off-the-clock work by CAEs was straight-time hours, rather than overtime, the Plaintiffs also allege that Comcast violated the IWPCA. (Am. Compl. PP 41-46.) The Plaintiffs seek to certify two

classes, one as to their IMWL claim and one as to their IWPCA claim. The Plaintiffs' proposed definition for the IMWL class is:

> All persons employed as Customer Account Executives in Illinois by Defendant Comcast Corporation from June 3, 2006, to the conclusion of this action who worked in excess of forty (40) hours in any individual workweek, and who were not paid for all overtime worked at the rate of one and one-half times their regular rate of pay.

(Pls' Class Cert. Mem. at 13.) The Plaintiffs' proposed definition for the IWPCA class is:

> All persons employed as Customer Account Executives in Illinois by Defendant Comcast Corporation from August 17, 2002, to the conclusion of this action who were not paid for all time worked in individual workweeks.

(Pls' [*9] Class Cert. Mem. at 13.)

During the limited class discovery, Comcast produced electronic records that identified CAE Initial Login times and scheduled start times. Specifically, Comcast produced 2,895,897 records relating to the Initial Login and scheduled start times of 7,933 CAEs for the period of April 26, 2005 through January 18, 2010. (*See* Pls' Ex. 3, Madansky Report P 3.) Although no usable data is available for over 60% of the CAEs, the Plaintiffs' expert, Professor Albert Madansky's identified 355,265 records from 3,192 CAEs in which he could determine both the Initial Login time and the CAE's scheduled start time. (Madansky Report PP 3, 5.) According to Madansky, for these 3,192, the data demonstrates that the average difference between the CAEs' Initial Login and their scheduled start time is 11.4 minutes. (Madansky Report P 7.) The parties also exchanged written discovery, secured declarations from class representatives, took a number of depositions.

## STANDARD OF REVIEW

The Court has broad discretion to resolve whether certifying a class is proper under *Federal Rule of Civil*

Procedure 23. *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998). In making this determination, the Court [*10] takes the substantive allegations in the complaint as true and, generally, does not examine the ultimate merits of the case. *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, 657 F.2d 890, 895 (7th Cir. 1981).* Before deciding whether a case should proceed as a class action, however, the Court should "make whatever factual and legal inquiries are necessary under *Rule 23.*" *Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672, 675 (7th Cir. 2001). The Plaintiffs bear the burden of demonstrating that their case meets all of the requirements of *Rule 23. Williams v. Chartwell Fin. Servs., Ltd.,* 204 F.3d 748, 760 (7th Cir. 2000).

A party seeking to certify a class action must first show that the putative class satisfies the four threshold requirements of *Rule 23(a)*: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Fed. R. Civ. P. 23(a).* If the party meets this initial burden, it must then show that the requirements for one of the subsections of *Rule 23(b)* are met. *See Oshana v. Coca-Cola Co.,* 472 F.3d 506, 513 (7th Cir. 2006). Here, the Plaintiffs seek certification under *Rule 23(b)(3),* which requires the Plaintiffs to demonstrate that questions [*11] of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. In addition to the Rule 23 requirements, the party seeking class certification must also provide a workable class definition by showing that the members of the class are identifiable. *See Oshana,* 472 F.3d at 513.

## DISCUSSION

### I. *Rule 23(a)* Requirements

The Plaintiffs contend that their IMWL and IWPCA claims against Comcast satisfy the four threshold requirements of *Rule 23(a).* Comcast does not dispute that the Plaintiffs' claims meet the requirements of numerosity and adequacy of representation. Comcast argues instead that the Plaintiffs cannot establish commonality and typicality.

To meet the commonality requirement in *Rule 23(a),* a plaintiff must show that questions of law or fact common to the class exist. *Fed. R. Civ. P. 23(a)(2).* This requires that the claims of the Named Plaintiffs and those of the class arise from "[a] common nucleus of operative fact," and is satisfied where the defendant has "engaged in standardized conduct towards members of the [*12] proposed class . . . ." *Keele,* 149 F.3d at 594. In other words, a plaintiff satisfies the commonality requirement if he can show that "the class members' claims hinge on the same conduct of the defendants." *Ross v. RBS Citizens, N.A.,* No. 09 C 5695, 2010 U.S. Dist. LEXIS 107779, 2010 WL 3980113, at *3 (N.D. Ill. Oct. 8, 2010) (Lefkow, J.). Similarly, typicality requires a showing that the Named Plaintiffs' claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De la Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir. 1983) (citation omitted). A plaintiff can satisfy the typicality requirement "even if there are factual distinctions between the claims of the named plaintiffs and those of other class members." *Id.* Accordingly, "similarity of legal theory may control even in the face of differences of fact." *Id.*

Here, because the Plaintiffs allege that members of the putative classes are subject to standardized conduct by Comcast and because the Named Plaintiffs' IMWL and IWPCA claims arise from the same practice that gives rise to the claims of other class members, the Plaintiffs [*13] meet the requirements of commonality and typicality. Specifically, the Plaintiffs allege that the members of the putative classes are subject to Comcast's practice of failing to compensate CAEs for all time worked. According to the Plaintiffs, Comcast has a company-wide practice, applicable to all members of both putative classes, that permitted CAEs to work without compensation after their Initial Login but before the start of their scheduled shifts.

Comcast argues that the Plaintiffs cannot meet either requirement because Plaintiffs cannot prove that members of the putative classes are subject to a written Comcast policy supporting their allegations. In fact, Comcast argues, its written policies make clear that CAEs are not expected to work before their scheduled start time. *(See, e.g.,* R. 55, Def. Appx. 1 at COM00003516 ("Employees are expected to be at work, be ready to begin working at their scheduled start time . . . .").) Further, Comcast contends, its written policies emphasize that if CAEs do begin working prior to their scheduled start time, they should record any pre-shift work for pay purposes. *(See, e.g.,* Def. Appx. 1 at

COM00003564, Def. Appx. 1 at COM00003623.) Finally, [*14] Comcast points to the fact that its employees are periodically reminded of this requirement and are told to report any violations of its timekeeping policies to Human Resources. (See, e.g., Def. Appx. 6 at COM00012670; Def. Appx. 10 at P211; Def. Appx. 1 at COM00003623; Def. Appx. 1 at COM00003554.) In the face of these formal policies that apply to all members of the putative class, Comcast argues, the Plaintiffs cannot show that the class members' claims arise from Comcast's standardized course of conduct.

The Plaintiffs do not dispute that the formal, written policies cited by Comcast exist. They have instead alleged that despite these policies, CAEs are subject to a company-wide practice that encouraged, or, at the very least, permitted, CAEs to log into their computers before their scheduled start time without compensating them for that time. See, e.g., Russell v. Illinois Bell Telephone Co., Inc., 721 F. Supp. 2d 804, No. 08 C 1871, 2010 U.S. Dist. LEXIS 65446, 2010 WL 2595234, at *9 (N.D. Ill. June 28, 2010) (Kennelly, J.) (in the FLSA context, "lawful written (or verbal) policies will not shield the company from liability if plaintiffs can show other company-wide practices that may have been contrary [*15] to those policies and violated the FLSA"). For support, the Plaintiffs point to an email from Donna C. Thacker ("Thacker") to certain call center managers, in which Thacker asks the recipients to communicate to the CAEs at their call centers that they are not allowed to complete their Initial Login until the scheduled start time. (Pls' Ex. 20 at COM00003655.) According to the email, while Thacker realized that "it does take the computers a while to boot up" and that "this may create a few issues of instant availability of the CAEs," she concluded that this "is the best process." (Pls' Ex. 20 at COM00003655.) The Plaintiffs assert that this email suggests that there was an unwritten, company-wide practice of allowing Plaintiffs to perform uncompensated work before their scheduled start time.

The Plaintiffs also argue that Madansky's data analysis, while limited, demonstrates that a significant number of CAEs were completing their Initial Login before their scheduled start time. (Pls' Ex. 3 at 1-2.) At the very least, the Plaintiffs argue, this data demonstrates that Comcast's written policy "can only have been honored in the breach." (Pl's Reply at 5.) Finally, the Plaintiffs point to [*16] Comcast's metric system--a systematic practice by Comcast applicable to most putative class members until 2009 and all putative class members since. The Plaintiffs argue that the metric system encourages CAEs to perform uncompensated work outside their scheduled work hours. According to the Plaintiffs, to meet their billing and service goals and also perform other tasks required for their position, such as loading necessary computer applications, reviewing their company emails and any changes in policy, and calling customers back, it was necessary for CAEs to either arrive early and complete their Initial Login or to perform these tasks during what were supposed to be scheduled breaks.

The Plaintiffs' allegations of standardized conduct on the part of Comcast are enough to meet the relatively low hurdle of proving commonality. See, e.g., Driver v. AppleIllinois, LLC, 265 F.R.D. 293, 303 (N.D. Ill. 2010) (quoting Smith v. Aon Corp., 238 F.R.D. 609, 614 (N.D. Ill. 2006)) ("The commonality requirement is not difficult to meet."); Scholes v. Stone, McGuire & Benjamin, 143 F.R.D. 181, 185 (N.D. Ill 1992) ("[T]he [*17] commonality requirement has been characterized as a 'low hurdle' easily surmounted."); Ross, 2010 U.S. Dist. LEXIS 107779, 2010 WL 3980113, at *3 (same). The claims of the putative classes hinge on the same conduct of Comcast: specifically, Comcast's failure to pay members of the class for work done after completion of their Initial Login, but before their scheduled start time. The allegation of a policy or practice applicable to a class of employees is enough to establish a common question of law or fact. See, e.g., Ross, 2010 U.S. Dist. LEXIS 107779, 2010 WL 3980113, at *3 (finding that the plaintiffs' proposed class met the commonality requirement).

Similarly, the Named Plaintiffs' claims in this case are sufficiently typical of the claims of the class as a whole to satisfy the typicality requirement, also a relatively low hurdle. See, e.g., Owner-Operator Independent Drivers Ass'n, Inc. v. Allied Van Lines, Inc., 231 F.R.D. 280, 282 (N.D. Ill. 2005) (calling Rule 23(a)(3) a "low hurdle" that "requires neither complete coextensivity nor even identity of claims"). The Named Plaintiffs' claims rest on the theory that CAE's Initial Login is the first principal activity of their day and that all work done after the Initial Login is compensable [*18] work. According to the Named Plaintiffs, Comcast had a company-wide practice of not paying CAEs for work performed between this Initial Login and their scheduled start time. The Plaintiffs' allegations suggest

that this practice affected CAEs at all of Comcast's Illinois call centers throughout the limitations period. While there may be factual differences between claims of the Named Plaintiffs and those of other class members, their claims are nevertheless based on the same legal theory. *De La Fuente, 713 F.2d at 232* ("[S]imilarity of legal theory may control even in the face of differences of fact."). The Plaintiffs thus satisfy the typicality requirement.

For those reasons, the Court finds that the Plaintiffs have met the threshold requirements of *Rule 23(a)*.

## II. *Rule 23(b)(3)*

Having concluded that the putative class meets the requirements of *Rule 23(a)*, the Court now turns to the requirements of *Rule 23(b)(3)*. As discussed above, to meet this requirement, the Plaintiffs must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently [*19] adjudicating the controversy." *Fed. R. Civ. P. 23(b)(3); see also Payton v. County of Kane, 308 F.3d 673, 680 (7th Cir. 2002)* (plaintiff must satisfy at least one of the categories under *Rule 23(b)*). Classes brought under *Rule 23(b)(3)* are those "in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Products, Inc. v. Windsor, 521 U.S. 591, 615, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)* (citation omitted).

### A. Predominance

Although it is related to the commonality requirement of *Rule 23(a)*, the predominance requirement is far more demanding. *See Amchem Prod., Inc., 521 U.S. at 623-24*. It tests whether a proposed class is "sufficiently cohesive" to warrant adjudication as a class. *See id. at 623*. To satisfy this inquiry, a plaintiff must show that common issues not only exist, but that they outweigh any questions affecting only individual members. *See, e.g., Ross, 2010 U.S. Dist. LEXIS 107779, 2010 WL 3980113, at *6; Driver, 265 F.R.D. at 303; Cicilline v. Jewel Food Stores, Inc., 542 F. Supp. 2d 831, 837-838 (N.D. Ill. 2008)*. Thus, the Plaintiffs bear the burden [*20] of demonstrating "that the elements of liability are capable of proof at trial through evidence that

is common to the class rather than individual to the members." *Driver, 265 F.R.D. at 303; see also Simer v. Rios, 661 F.2d 655, 672 (7th Cir. 1981)* (the predominance inquiry is a two step process, focusing first "on the substantive elements of plaintiffs' cause of action and . . . the proof necessary for the various elements" and then on "the form that trial on these issues would take").

To establish liability under the IMWL, the Plaintiffs would have to prove that: (1) members of the putative class performed work before the start of their shift; (2) Comcast required or permitted that work to be performed; (3) they worked for more than forty hours during the week that the alleged pre-shift work was performed; and (4) they were not paid at one and one-half times their regular hourly rate for that work. *See 820 ILCS 105/4a(1)*. With respect to their IWPCA claim, the Plaintiffs would have to prove (1) members of the putative class performed work before the start of their shifts; (2) Comcast required or permitted that work to be performed; (3) they were not paid for that work. *See 820 ILCS 115/3*.

Here, [*21] the amount of evidence required to prove liability on both claims that is common to all putative class members outweighs the evidence individual to each class member. First, as discussed in the Court's analysis in Section I, although Comcast has a formal policy stating that all hours worked will be compensated, the Plaintiffs have alleged that an unofficial, company-wide practice exists that denies putative class members overtime or compensation for time worked. The Court concludes that the proof the Plaintiffs have offered is enough to infer that the common issue of whether a company-wide practice exists to deny overtime or compensation will predominate over the variations in methods used to accomplish the alleged policy, such as engaging in a supervisor-by-supervisor analysis to determine the source of the alleged requirement. *See, e.g., Ross, 2010 U.S. Dist. LEXIS 107779, 2010 WL 3980113* (concluding, despite the defendants' argument "that determining whether overtime was denied would require individualized, or at least branch by branch, manager by manager, determinations," that the plaintiff met the predominance requirement).

Second, unlike the cases relied on by Comcast, the Plaintiffs in this case allege that [*22] the CAE's Initial Login is the first principal activity of a CAE's workday. Pursuant to the continuous workday rule, Plaintiffs argue,

any activity completed after the first principal activity of the day--including anything undertaken before the CAE's scheduled start time--is compensable. *See IBP, Inc. v. Alvarez, 546 U.S. 21, 28-29, 126 S. Ct. 514, 163 L. Ed. 2d 288 (2005)*; 29 C.F.R. § 790.6(a) ("Periods of time between the commencement of the employee's first principal activity and the completion of his last principal activity on any workday must be included in the computation of hours worked . . . ."). This is a threshold legal issue common to each class members' claims that outweighs any individualized inquiry into whether CAEs were actually working during the time between their Initial Login and their scheduled start time.

Third, the Plaintiffs' data evidence, along with the Thacker email, is enough to demonstrate that a class-wide analysis as to whether Comcast had actual or constructive knowledge of class members' uncompensated work activity outweighs any individualized inquiry into whether each CAE's supervisor knew that the CAE was completing her Initial Login before her scheduled start time. The fact that Thacker [*23] sent the email supervisors at a number of Comcast's call centers suggests that supervisors throughout the company may have had knowledge of early Initial Logins. Finally, while potential class members were subject to three different timekeeping systems and two different telephone systems during the class period, and determination of whether alleged pre-shift work went unpaid may require a separate analysis depending on the system in place, "[w]hen a proposed class challenges a uniform policy, the validity of that policy tends to be the predominant issue in the litigation." *Streeter v. Sheriff of Cook County, 256 F.R.D. 609, 614 (N.D. Ill. 2009)*. Here, the common threshold issues relating to liability--whether Comcast had an informal practice of permitting its CAEs to perform uncompensated work after the first principal activity of their day--outweigh any individual questions.

**B. Superiority**

The second requirement for class certification under *Rule 23(b)(3)* is "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Fed. R. Civ. P. 23(b)(3)*. Here, there are a large number of potential class members each with the same claim under [*24] the same two statutes and each potentially entitled to a relatively small recovery. Deciding each claim separately would be an inefficient

use of both judicial and party resources and because of the small individual recovery, many potential plaintiffs may not even bring their claims. This situation makes the Plaintiffs' claims ideal for resolution as a class action. *See Murray v. GMAC Mortgage Corp., 434 F.3d 948, 953 (7th Cir. 2006)* ("*Rule 23(b)(3)* was designed for situations . . . in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate"). Thus, the Court concludes that the resolution of these issues on a class-wide basis is superior to allowing repetitive individual suits. *See, e.g., Ross, 2010 U.S. Dist. LEXIS 107779, 2010 WL 3980113, at *8* (resolution of IMWL case as class action superior and "promotes judicial economy and efficiency and consistency of judgments").

For those reasons, the Plaintiffs' IMWL and IWPCA claims satisfy the requirements of *Rule 23(b)(3)*.

**CONCLUSION AND ORDER**

Because the Plaintiffs have satisfied the required elements of *Rule 23(a)* and *Rule 23(b)*(3), the Court grants their Motion for Class Certification. The IMWL class is defined [*25] as: All persons employed as Customer Account Executives in Illinois by Defendant Comcast Corporation from June 3, 2006, to the conclusion of this action who worked in excess of forty (40) hours in any individual workweek, and who were not paid for all overtime worked at the rate of one and one-half times their regular rate of pay. The IWPCA class is defined as: All persons employed as Customer Account Executives in Illinois by Defendant Comcast Corporation from August 17, 2002, to the conclusion of this action who were not paid for all time worked in individual workweeks. The Court authorizes notice to issue to putative class members at the Plaintiffs' expense, and appoints counsel for the Named Plaintiffs as class counsel for both classes.

/s/ Virginia M. Kendall

Virginia M. Kendall

United States District Court Judge

Northern District of Illinois

Date: October 20, 2010



3 of 3 DOCUMENTS

**JOSE VILLANUEVA, MIGUEL VILLANUEVA, GLORIA BERNAL, ROSALBA ESCOBAR, LUIS BARBOSA, EBER CORREA, and LUZ VERONICA CORREA, on behalf of themselves and all others similarly situated, Plaintiffs, v. DAVIS BANCORP, INC., Defendant.**

**No. 09 CV 7826**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2011 U.S. Dist. LEXIS 74089*

**July 8, 2011, Decided
July 8, 2011, Filed**

**SUBSEQUENT HISTORY:** Reconsideration denied by *Villanueva v. Davis Bancorp, Inc., 2011 U.S. Dist. LEXIS 103473 (N.D. Ill., Sept. 13, 2011)*

**COUNSEL:** [*1] For Jose Villanueva, Miguel Villanueva, Gloria Bernal, Rosalba Escobar, Luis Barbosa, Eber Correa, Luz Veronica Correa, on behalf of themselves and all other persons similarly situated, known and unknown, Plaintiffs: Douglas M. Werman, LEAD ATTORNEY, David Erik Stevens, Werman Law Office, P.C., Chicago, IL; Maureen Ann Bantz, Werman Law Offices, PC, Chicago, IL.

For Davis Bancorp, Inc., Defendant: Gary L. Smith, PRO HAC VICE, Loewenstein, Hagen, Oehlert & Smith, Springfield, IL; Mark J Sheppard, Mark J. Sheppard, Chicago, IL.

**JUDGES:** JOAN HUMPHREY LEFKOW, United States District Judge.

**OPINION BY:** JOAN HUMPHREY LEFKOW

**OPINION**

**OPINION AND ORDER**

Plaintiffs, Jose Villanueva, Miguel Villanueva, Gloria Bernal, Rosalba Escobar, Luis Barbosa, Eber Correa, and Luz Veronica Correa, filed this putative class/collective action against Davis Bancorp, Inc. for violation of the Fair Labor Standards Act ("FLSA"), *29 U.S.C. § 201 et seq.*, and the Illinois Minimum Wage Law ("IMWL"), *820 Ill. Comp. Stat. § 105/1 et seq.* Before the court is plaintiffs' motion for class certification of their IMWL claims. For the following reasons, the motion [#24] is granted. [1]

> 1 The court's jurisdiction of the FLSA claims rests on *29 U.S.C. § 216(b)* and [*2] of the IMWL claim on *28 U.S.C. § 1367*.

**BACKGROUND**

Davis is an Illinois corporation that transports bank checks on behalf of clients. Plaintiffs are former courier delivery drivers who were contracted with Davis to pick up and drop off financial records at banking centers in the Chicago area. Plaintiffs allege that Davis has a policy of denying overtime pay to its employees in violation of the IMWL.

## I. The *Rodriguez* Litigation

This is the second case filed by Davis's courier drivers alleging violations of the IMWL and the FLSA. On January 21, 2009, Luis Enrique Rodriguez filed a putative class action in this district alleging claims nearly identical to those alleged here. [2] *See* Dkt. #1, *Rodriguez v. Davis Bancorp, Inc.*, Case No. 09-C-372 (hereinafter "*Rodriguez*"). Before a motion for class certification had been filed, the parties engaged in settlement negotiations before Magistrate Judge Keys. They agreed to resolve the matter as a collective action under the FLSA rather than as a class action under the IMWL. Davis identified thirty-six courier delivery drivers who had worked for it during the relevant time period and mailed an opt-in notice to each of these individuals as required by *29 U.S.C. § 216(b)*. [*3] J.R. Davis Decl. ¶ 5 & Ex. A. Nine drivers consented to participate in the *Rodriguez* settlement.

> 2 Rodriguez asserted a claim for unjust enrichment that has not been asserted by the plaintiffs in this case.

On December 8, 2009, Judge Keys entered orders approving the parties' settlement agreement and dismissing the *Rodriguez* case with prejudice. Dkt. #33, #34 in *Rodriguez*. The settlement agreement provides that Davis shall have "no duty under this General Agreement to make any payment or provide other consideration to any individual who fails to 'opt in,' with the exception of [Rodriguez], who need only execute and return his Individual Agreement and Release to receive payment from Davis." Dkt. #31-2, ¶ 2 in *Rodriguez*. Each courier driver who participated in the *Rodriguez* settlement executed an Individual Settlement and Release that provides:

> **Release of Wage Claims and Attorneys' Fees**. Employee knowingly and voluntarily releases and forever discharges Employer . . . from any and all claims which Employee has or may have against [Employer] for unpaid overtime wages (including any liquidated damages related to those wages) as of the date of execution of this General Agreement, for any alleged [*4] violation of the Fair Labor Standards Act or the Illinois Minimum Wage Law that were asserted

> under any and all federal state or local law and for any unjust enrichment claims relating to any operating expenses of the vehicle used by Employee.

Dkt. #31-2, Ex. A in *Rodriguez*. The settlement agreement contains an identical provision. Dkt. #31-2, ¶ 5 in *Rodriguez*. Davis agreed to pay up to $165,000.000 to settle the nine drivers' claims.

## II. The *Villanueva* Litigation

At some point after the *Rodriguez* settlement, Davis determined that the names of several drivers had not been disclosed to the *Rodriguez* plaintiffs. Davis now estimates that it employed 159 drivers during the relevant time period. J.R. Davis Decl. ¶ 3. Thus, Davis failed to provide opt-in notice to 123 potential participants in the *Rodriguez* settlement.

Plaintiffs filed their complaint in this case on December 16, 2009, alleging claims on behalf of those individuals who did not participate in the *Rodriguez* settlement. Plaintiffs seek to certify the following IMWL overtime wage class:

> All persons employed by Defendant in the job position of courier driver since January 21, 2006, through and including the present, who have not been [*5] paid overtime for all time worked in excess of forty (40) hours in individual work weeks, and who did not sign a release of their claims as part of the settlement in the matter of *Rodriguez v. Davis Bancorp*, No. 09 C 0372 (N.D. Ill.).

The statute of limitations for a claim brought under the IMWL is three years. *See 820 Ill. Comp. Stat. § 105/12(a)*. Plaintiffs assert that the statute of limitations was tolled between January 21, 2009, when the *Rodriguez* litigation commenced, and December 16, 2009, when the complaint in this case was filed.

## LEGAL STANDARD

A party seeking to certify a class action must meet two conditions. First, the movant must show the putative class satisfies the four prerequisites of *Rule 23(a)*: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *Fed. R. Civ. P. 23(a)*;

*Oshana v. Coca-Cola Co., 472 F.3d 506, 513 (7th Cir. 2006); Rosario v. Livaditis, 963 F.2d 1013, 1017 (7th Cir. 1992).* Second, the action must qualify under at least one of the three subsections of *Rule 23(b). Fed. R. Civ. P. 23(b); Rosario, 963 F.2d at 1017; Hardin v. Harshbarger, 814 F. Supp. 703, 706 (N.D. Ill. 1993).* Here, plaintiffs seek certification under *Rule 23(b)(3),* [*6] which requires a finding that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Fed. R. Civ. P. 23(b)(3).*

Courts retain broad discretion in determining whether a proposed class meets the Rule 23 certification requirements. *Keele v. Wexler, 149 F.3d 589, 592 (7th Cir. 1998).* While the requirements of *Rule 23* should be liberally construed to support the policy favoring the maintenance of class actions, *King v. Kansas City S. Indus., 519 F.2d 20, 25--26 (7th Cir. 1975),* the moving party bears the burden of showing that the requirements for class certification have been met. *Hardin, 814 F. Supp. at 706.*

## DISCUSSION

Davis does not argue that plaintiffs have failed to satisfy any of the four requirements of *Rule 23(a),* and therefore plaintiffs have satisfied their burden with respect to these requirements. *See Vaughn v. King, 167 F.3d 347, 354 (7th Cir. 1999)* ("It is not the responsibility of [the] court to make arguments for the parties."). Davis vigorously disputes that plaintiffs' proposed class [*7] satisfies *Rule 23(b)(3)*'s "superiority" requirement, however. Davis also argues that the statute of limitations for plaintiffs' claims should not be tolled.

## I. *Rule 23(b)(3)*'s "Superiority" Requirement

*Rule 23(b)(3)* provides that a class can be maintained if "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Fed. R. Civ. P. 23(b)(3).* In considering the satisfaction of the superiority requirement, the court will look at "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy

already commenced by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Fed. R. Civ. P. 23(b).*

Davis first argues that the superiority requirement is not satisfied because there is an inherent conflict between an "opt-in" collective action under the FLSA [*8] and an "opt-out" class action under the IMWL. This argument was recently rejected by the Seventh Circuit in *Ervin v. OS Restaurant Services, Inc., 632 F.3d 971 (7th Cir. 2011),* which also considered claims brought under the FLSA and the IMWL. As the court of appeals explained, "there is no categorical rule against certifying a *Rule 23(b)(3)* state-law class action in a proceeding that also includes a collective action brought under the FLSA." *Id. at 973--74.* "In combined actions, the question whether a class should be certified under *Rule 23(b)(3)* will turn -- as it always does -- on the application of the criteria set forth in the rule." *Id. at 974.*

In this case, the factors favor the use of a class action to adjudicate the IMWL claims. The court is not aware of any pending suits brought by individual class members. This suggests that members of the class do not have strong incentive to individually control the prosecution of their cases. Concentrating separate actions based on the same underlying conduct in one action promotes judicial economy and efficiency and consistency of judgments. Davis argues that it will be difficult to manage a IMWL class action in the event that a collective [*9] action is also certified under *section 216(b)* because potential group members will be confused by the various opt-in and opt-out notices. This problem can be solved by the use of adequate notice procedures, however. *Id. at 978* (citing *O'Brien v. Encotech Const. Servs., Inc., 203 F.R.D. 346, 352 (N.D. Ill. 2001); Ladegaard v. Hard Rock Concrete Cutters, Inc., No. 00 C 5755, 2000 U.S. Dist. LEXIS 17832, 2000 WL 1774091, at *7 (N.D. Ill. Dec. 1, 2000)).* Moreover, the risk of confusing potential class members might increase if the IMWL action and the FLSA action were to proceed separately. *Id.* Davis also asserts that it will be prohibitively difficult to manage the class because the members' status as "employees" may not be the same under both the IMWL and the FLSA, depending on whether the motor carrier exemption applies under Illinois law, and because the court will have to calculate damages differently under the two statutes. These issues are not complicated and would arise whether

or not plaintiffs' claims under the IMWL proceed individually or as a class action. They do not present a compelling reason to deny class certification. Therefore, although some difficulties may be encountered in managing the class action, [*10] the class is relatively small, and the court is confident that the parties can devise solutions to address the issues that arise and ensure that the adjudication of the case is both fair and efficient.

Davis also argues that because the IMWL class may have more members than the FLSA collective action, state law issues predominate and the court should decline to exercise supplemental jurisdiction under *28 U.S.C. § 1367(a)*. The Seventh Circuit addressed and rejected this argument in *Ervin* as well. *See id. at 979--81.* In deciding whether the exercise of supplemental jurisdiction is appropriate, the court looks to the type of the claim asserted under the federal and state laws rather than the number of parties involved. *Id. at 980.* Because plaintiffs' IMWL claims "essentially replicate the FLSA claims--they plainly do not predominate." *Id. at 980* (quoting *Lindsay v. Gov't Emps. Ins. Co., 448 F.3d 416, 425, 371 U.S. App. D.C. 120 (D.C. Cir. 2006)).* Therefore the court need not decline to exercise supplemental jurisdiction if it certifies plaintiffs' proposed class. *Id. at 981* ("In all but the most unusual cases, there will be little cause for concern about fairness or comity."). Therefore plaintiffs' class satisfies [*11] the requirements of *Rule 23(a)* and *Rule 23(b)(3).*

## II. Statute of Limitations

Plaintiffs argue that the three-year statute of limitations was tolled during the pendency of the *Rodriguez* litigation under *American Pipe & Construction Company v. Utah, 414 U.S. 538, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974),* and the doctrine of equitable tolling.

In *American Pipe* the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *414 U.S. at 554.* Subsequently, in *Crown, Cork & Seal Co., Inc. v. Parker, 462 U.S. 345, 103 S. Ct. 2392, 76 L. Ed. 2d 628 (1983),* the Court held that it does not matter whether the member of the putative class intervenes in the original action or files an independent suit. The Illinois Supreme Court has adopted the tolling rules set forth in *American Pipe and*

*Crown, Cork. See Portwood v. Ford Motor Co., 701 N.E.2d 1102, 1103, 183 Ill. 2d 459, 233 Ill. Dec. 828 (1998); Steinberg v. Chicago Med. School, 371 N.E.2d 634, 645, 69 Ill. 2d 320, 13 Ill. Dec. 699 (1977).* [3] Illinois courts also apply class action [*12] tolling to jurisdictional limitation periods created by statute. *Hess v. I.R.E. Real Estate Income Fund, Ltd., 629 N.E.2d 520, 531, 255 Ill. App. 3d 790, 195 Ill. Dec. 935 (1993).*

> 3    The court applies Illinois tolling rules as required by the *Erie* doctrine. *See Bd. of Regents v. Tomanio, 446 U.S. 478, 485, 100 S. Ct. 1790, 64 L. Ed. 2d 440 (1980).*

*American Pipe* and *Crown, Cork* do not address whether the statute of limitations should be tolled if the second case to proceed is, like the first case, a class action. Nor is the court aware of any Illinois case that addresses this issue. The Seventh Circuit, however, recently confirmed that the statute of limitations may be tolled in these circumstances. *Sawyer v. Atlas Heating & Sheet Metal Works, Inc., 642 F.3d 560, 2011 U.S. App. LEXIS 10566, 2011 WL 2039663, at *3 (7th Cir. May 26, 2011).* According to the court's reasoning in *Sawyer,* the statute of limitations may be tolled so long as issues decided during the course of the first class action lawsuit do not preclude certification of a second class because of collateral estoppel. *2011 U.S. App. LEXIS 10566, [WL] at *4.* Furthermore, the rationale for class action tolling does not depend on whether the first class action was resolved before or after [*13] a class was certified. *2011 U.S. App. LEXIS 10566, [WL] at *3.* "Tolling lasts from the day a class claim is asserted until the day the suit is conclusively not a class action -- which may be because the judge rules adversely to the plaintiff, or because the plaintiff reads the handwriting on the wall and decides not to throw good money after bad." *Id.* The court is persuaded that the Seventh Circuit's reasoning is consistent with *American Pipe* and the Illinois courts' adoption of class action tolling.

The *Rodriguez* class action was filed on January 21, 2009 and asserted claims under the IMWL that are identical to those asserted here. The docket in that case reflects that claims were settled before the plaintiffs filed a motion for certification of an IMWL class. Therefore no issue that is relevant to the court's certification of plaintiffs' class was decided in the *Rodriguez* action. *See Sawyer, 2011 U.S. App. LEXIS 10566, 2011 WL 2039663, at *5* ("Issue preclusion applies only to subjects

actually and necessarily decided in the earlier suit."). Under *American Pipe* and *Crown, Cork*, the statute of limitations for plaintiffs' IMWL claim was tolled from January 21, 2009 until December 8, 2009, when Judge Keys entered an order approving the parties' [*14] settlement agreement. [4]

> [4] Plaintiffs request that the court toll the statute of limitations until December 16, 2009, when the complaint in this case was filed. Plaintiffs have not explained why class action tolling should extend past the end of the *Rodriguez* case. Therefore the court will only toll the statute of limitations until December 8, 2009.

Davis argues that the court cannot apply class action tolling to plaintiffs' IMWL claims because Illinois courts do not allow "cross-jurisdictional tolling." *See Portwood v. Ford Motor Co.*, *701 N.E.2d 1102, 1104--05, 183 Ill. 2d 459, 233 Ill. Dec. 828 (1998)*. The sequence in this case is not cross-jurisdictional, however, as the *Rodriguez* case and this case were both filed in the same federal district. In *Portwood*, the plaintiffs had previously filed class actions in the District Court for the District of Columbia, and the Illinois trial court had declined to toll the statute of limitations for the pendency of the suit in federal court. It is clear from the Illinois Supreme Court's opinion that term "cross-jurisdictional" refers to situations where the same claims have been filed in different forums. Indeed, the court declined to apply cross-jurisdictional [*15] tolling primarily out of a concern for forum-shopping. It concluded that unless every state were to allow cross-jurisdictional tolling, plaintiffs who fail to certify a class in federal court will file a disproportionate number of cases in Illinois. *Id. at 1104--05*. The policy concerns articulated in *Portwood* are not implicated here. On the other hand, the goals of *American Pipe* and *Crown, Cork* are furthered by allowing class action tolling in this case. *See In re Copper Antitrust Litig.*, *436 F.3d 782, 794 (7th Cir. 2006)* ("The essential rationale of *American Pipe* is that members of a class whose claims are embodied in a class action should not be required by the exigencies of the statute of limitations to clutter the courts with duplicative lawsuits so long as their claims are encompassed by the class action."). Moreover, in *Portwood* the court confirmed that "[t]olling the statute of limitations for individual actions filed after the dismissal of a class action is sound policy when both actions are brought in the same court system." *Id. at 1104*. Accordingly, the

statute of limitations for plaintiffs' IMWL claims will be tolled for 321 days. *See Walker v. Sheriff of Cook Cnty.*, *No. 08 C 1866, 2009 U.S. Dist. LEXIS 25350, 2009 WL 803783, at *3 (N.D. Ill. Mar. 27, 2009)* [*16] (tolling plaintiffs claims under *42 U.S.C. § 1983* because of the filing of a related class action lawsuit in this district); *but see Ottaviano v. Home Depot, Inc., USA*, *701 F. Supp. 2d 1005, 1012--13 (N.D. Ill. 2010)* ("Under *Portwood*, the filing of the *Griffin* and *Aquilino* state law class actions in federal court had no effect on the running of the limitations period for Plaintiffs' state law claims."). Plaintiffs' proposed class will include courier drivers employed by Davis from January 26, 2006 to the present. [5]

> [5] Because class action tolling is appropriate under *American Pipe* and *Crown, Cork*, the court does not decide whether equitable tolling also applies. Indeed, it is unclear whether equitable tolling could toll the statute of limitations under the IMWL. *See Hess*, *629 N.E.2d at 531* ("Although there is authority in Illinois for the proposition that a jurisdictional limitation is not subject to *equitable* tolling . . . we believe that there is a fundamental distinction between equitable tolling and class action tolling."); *see also Fid. Nat'l Title Ins. Co. of New York v. Howard Sav. Bank*, *436 F.3d 836, 839 (7th Cir. 2006)* (it is unclear whether Illinois courts recognize the doctrine [*17] of "equitable tolling" as it is applied by federal courts). In contrast to class action tolling, which is used to promote judicial efficiency and preserve the rights of absent class members, Illinois courts use equitable tolling to "excuse untimely filing by an individual plaintiff . . . where the plaintiff has been induced or tricked by the defendant's conduct into allowing the filing deadline to pass." *Id.; see also Hollander v. Brown*, *457 F.3d 688, 694 n.3 (7th Cir. 2006)* (describing the difference between "equitable tolling" as applied by Illinois courts and courts in this district and noting that Illinois courts often use the terms "equitable tolling" and "equitable estoppel" interchangeably). Plaintiffs do not assert that they were actively misled by Davis or that Davis prevented them from filing suit in a timely manner. *See Clay v. Kuhl*, *727 N.E.2d 217, 223, 189 Ill. 2d 603, 244 Ill. Dec. 918 (2000)*. For these reasons, it is unlikely that equitable tolling

### III. Whether Plaintiffs' Claims Were Released As Part of the *Rodriguez* Settlement

Plaintiffs' class contains two groups of courier drivers: (1) drivers who were not identified in *Rodriguez*, and [*18] (2) drivers who were identified in *Rodriguez* but failed to opt-in to the FLSA collective action. Davis argues that the court should not toll the statute of limitations for drivers who were not identified in *Rodriguez* because class certification was never requested in *Rodriguez*. This line of reasoning is not supported by *American Pipe* or *Crown, Cork. See Sawyer, 2011 U.S. App. LEXIS 10566, 2011 WL 2039663, at *2* ("The Court's goal of enabling members of a putative class to rely on a pending action to protect their interests can be achieved only if the way in which the first suit ends -- denial of class certification by the judge, abandonment by the plaintiff, or any other fashion -- is irrelevant."). The court will toll the statute of limitations for the drivers whom Davis previously failed to identify.

The court will also toll the statute of limitations for those drivers who did not opt-in to the *Rodriguez* collective action. The *Rodriguez* settlement agreement does not release claims on behalf of drivers who did not sign an individual release agreement. Davis argues that the parties agreed that it would not provide any "payment or . . . other consideration" to drivers who failed to opt-in to the collective action, [*19] however this provision only applies to Davis's obligations "under [the settlement agreement]." While Davis is correct that drivers who failed to opt-in cannot claim a portion of the amounts paid under the settlement agreement, they are not barred from bringing individual or class claims under the IMWL.

### CONCLUSION AND ORDER

Because plaintiffs have satisfied the necessary elements of *Rule 23(a)* and *Rule 23(b)(3)*, the court grants plaintiffs' motion for class certification [#24]. The class is defined as: "All persons employed by Davis Bancorp, Inc. in the job position of courier driver since January 29, 2006, through and including the present, who have not been paid overtime for all time worked in excess of forty (40) hours in individual work weeks, and who did not sign a release of their claims as part of the settlement in the matter of *Rodriguez v. Davis Bancorp*, No. 09 C 0372 (N.D. Ill.)." Miguel Villanueva and Rosalba Escobar are appointed as class representatives for the class. Douglas Werman and Davis Stevens are appointed class counsel.

Dated: July 8, 2011

/s/ Joan Humphrey Lefkow

JOAN HUMPHREY LEFKOW

United States District Judge



**Dionne Michelle Williams-Green v. J. Alexander's Restaurants, Inc.**

09 CV 5707

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS

*277 F.R.D. 374; 2011 U.S. Dist. LEXIS 99373*

September 1, 2011, Decided
September 1, 2011, Filed

**COUNSEL:** [**1] For Dionne Michelle Williams-Green, Tricia Briley, individually and on behalf of a class of persons similarly situated, Plaintiffs: Catherine P. Sons, Converse & Brown LLC, Chicago, IL; James X. Bormes, Law Office of James X. Bormes, Chicago, IL.

For J. Alexander's Restaurants, Inc., Defendant: Noah A. Finkel, LEAD ATTORNEY, Julie K.C. Reyes, Seyfarth Shaw LLP, Chicago, IL.

**JUDGES:** Blanche M. Manning.

**OPINION BY:** Blanche M. Manning

**OPINION**

[*376] **STATEMENT**

This dispute involves allegations by plaintiff Dionne Michelle Williams-Green that her employer, J. Alexander's Restaurants, Inc., violated state wage laws by operating an improper tip pool and by failing to pay the proper amount of overtime pay. Williams-Green has filed a motion for class certification, and both parties have filed motions for summary judgment. *See Federal Rule of Civil Procedure 56.* For the reasons that follow, the motion for class certification is granted, the defendant's

motion for summary judgment is granted in part and denied in part, and the plaintiff's motion for summary judgment is denied.

The court has subject-matter jurisdiction over this dispute because the parties are diverse (J. Alexander's is a Tennessee corporation with its principal place [**2] of business in Tennessee) and because calculations set out in the defendant's notice of removal reasonably suggest that damages may exceed $5,000,000. *See 28 U.S.C. § 1332(d).*

**BACKGROUND**

The following facts are undisputed except where noted. Defendant J. Alexander's operates restaurants across the country, including three in Illinois. Between November 2006 to December 2009, plaintiff Dionne Michelle Williams-Green worked as a server at two of those locations, one in Chicago and one in Northbrook.

When J. Alexander's hired Williams-Green, it informed her that like other servers, she would receive less than the full minimum wage because most of her money would come from tips. It also told her that it operates a tip pool, under which a portion of the tips earned by servers and bartenders is re-distributed to non-tipped staff members such as hosts and food runners. Under the tip pool, tipped employees contribute a tip

Case: 1:11-cv-08390 Document #: 43-1 Filed: 11/09/12 Page 103 of 119 PageID #:270

Page 2

277 F.R.D. 374, *376; 2011 U.S. Dist. LEXIS 99373, **2

share in the amount of 3% of their sales, which is collected by a manager at the end of their shift. Non-tipped staff then receive tips from the tip pool. A restaurant may take what is known as a tip credit, which allows it to pay its tipped employees less than the full minimum [**3] wage, as long as those employees receive enough in tips to cover the difference.

The parties dispute whether the entire tip pool was distributed to the non-tipped staff each day, or whether J. Alexander's improperly retained a portion of the tip pool. Williams-Green testified at her deposition that five managers--Ryan Marks, Kimberly Lashawzia, Jason Benish, Alexandria Demas, and Cory Milner--told her that the tip pool [*377] was split three ways between hosts, food runners, and that J. Alexander's retained a portion. According to Williams-Green, Marks told her that J.Alexander's retained a third of the 3% servers and bartenders had contributed to the pool.

J. Alexander's disputes that it kept any portion of the tip pool, and stresses that its corporate policy required that 100% of the tip pool be distributed to employees. J. Alexander's has also identified deposition testimony or declarations from Benish, Demas, and Milner in which those managers denied telling Williams-Green or any employee that J. Alexander's retained a portion of the tip pool.

In further support of its position, J. Alexander's director of information systems, Jason Parks, compiled summaries of tip pool distributions at the [**4] restaurant's three Illinois locations. Parks sampled each restaurant during different two-week pay periods between 2002 and 2010. He sampled a total of 10 pay periods at the Chicago location, 11 pay periods at the Northbrook location, and 12 pay periods at the Oak Brook location. The summaries show that during the sampled periods, the Chicago location distributed to employees a total of $7.80 more from the tip pool than had been contributed by tipped employees. However, during 4 of the 10 pay periods sample, J. Alexander's failed to distribute all of the money it had collected for the tip pool. At the Northbrook location, J. Alexander's failed to distribute all of the money it had collected for the tip pool for 7 of the 11 pay periods sampled, for a total shortage of $244.35. At the Oak Brook location, J. Alexander's failed to distribute all of the tip pool 10 of the 12 weeks sampled, for a total shortage of $837.89.

In addition to her claim that J. Alexander's retained a

portion of the tip pool, Williams-Green alleges that J.Alexander's failed to compensate her for work she performed off-the-clock. Williams-Green testified that she always arrived to work one hour early. She testified [**5] that sometimes she would read or do crossword puzzles during that hour, but 3-4 times a week a manager would ask her to help perform "side work" to prepare the restaurant for opening. She contends that on some occasions, she would perform the work without telling her manager that she had not yet clocked in. On those occasions on which she would tell the manager that she had not yet clocked in, the manager would respond that she should clock in, or would offer to compensate her with lunch. She also testified that she never reported to anyone that she had worked off-the-clock, and never asked to be compensated for any work off-the-clock.

Finally, Williams-Green alleges that J. Alexander's failed to pay her time-and-a-half for her overtime. J. Alexander's admits that it had failed to aggregate the hours of employees who had worked at two different locations during the same week. It contends that as a result, it did not realize those employees' hours totaled more than 40 during a single week and, therefore, failed to pay them the correct rate for their overtime. After Williams-Green filed this suit, J. Alexander's discovered its error and sent checks to the affected employees in the amount [**6] of the overtime they were due plus interest calculated at the rate of 2% per month.

Williams-Green quit J. Alexander's in April 2009, after obtaining a job with Amtrak. She then filed what purports to be a class action lawsuit on August 4, 2009, seeking to represent two subclasses of plaintiffs: (1) employees who participated in the tip pool, and (2) employees who were improperly paid for overtime. The complaint consists of two counts. Count I alleges a claim under the Illinois Wage Payment and Collection Act, which Williams-Green alleges J. Alexander's violated by paying her sub-minimum wages while operating an invalid tip pool and by failing to properly pay for her overtime. Count II alleges a claim under the Illinois Minimum Wage Act, which Williams-Green alleges that J. Alexander's also violated by paying her a subminimum wage while operating an invalid tip pool.

Before the court are a motion for class certification filed by Williams-Green, as well as cross-motions for summary judgment. In the motion for class certification, William-Green seeks certification on her claim that J.

Case: 1:11-cv-08390 Document #: 43-1 Filed: 11/09/12 Page 104 of 119 PageID #:271

Page 3

277 F.R.D. 374, *377; 2011 U.S. Dist. LEXIS 99373, **6

Alexander's improperly paid employees a sub-minimum wage.

[*378] In J. Alexander's motion for summary judgment, [**7] it seeks judgment on the three issues raised by Williams-Green in this case: (1) that J. Alexander's was not entitled to take a tip credit because it shared in the proceeds of its tip pool; (2) that J. Alexander's failed to properly compensate employees for their overtime; and (3) that J. Alexander's failed to compensate Williams-Green for work she performed off-the-clock. The final issue is not alleged in the complaint but, rather, appears to be an allegation William-Green first leveled during her deposition.

In Williams-Green's motion for summary judgment, she seeks partial summary judgment limited to liability on the same three issues identified in J. Alexander's motion for summary judgment.

## ANALYSIS

### I. SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Valenti v. Qualex, Inc., 970 F.2d 363, 365 (7th Cir. 1992),* citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* [**8] Moreover, a court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *See Valenti, 970 F.2d at 365; see also Anderson, 477 U.S. at 248.*

Thus, in order to withstand a motion for summary judgment, the nonmoving party must show that a dispute about a genuine issue of material fact exists. *See Anderson, 477 U.S. at 248.* The nonmoving party may not merely rest upon the allegations or details in his pleading, but instead, must set forth specific facts showing there is a genuine issue for trial. *See Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 248.*

### II. J. ALEXANDER'S MOTION FOR SUMMARY

## JUDGMENT [85-1]

### A. Propriety of the Tip Credit

First, J. Alexander's seeks summary judgment on Williams-Green's claim that it was not entitled to a tip credit and, therefore, failed to fully compensate her as required under the Illinois Wage Payment and Collection Act or the Illinois Minimum Wage Act. Under the Illinois Wage Payment and Collection Act, an employer must pay an employee for time worked. *See 820 Ill. Comp. Stat. 115/1 et seq.; Miller v. Kiefer Specialty Flooring, Inc., 317 Ill. App. 3d 370, 739 N.E.2d 982, 986, 251 Ill. Dec. 49 (Ill. App. Ct. 2000)* ("The [**9] purpose of the Act is to provide employees with a cause of action for the timely and complete payment of earned wages or final compensation without retaliation from employers."). Meanwhile, the Illinois Minimum Wage Act establishes the minimum hourly rate employers must pay. *See 820 Ill. Comp. Stat. 105/4(a)(1).*

However, for employees who are customarily tipped, an employer may take what is called a tip credit, which allows them to pay those employees only 60% of the minimum wage as long as the employer can demonstrate that the employee's tips made up the remaining 40% of the minimum wage and that the employer did not retain any of the tips. *See 820 Ill. Comp. Stat. 105/4(c); Gillis v. Twenty Three East Adams Street Corp., No. 04 CV 4012, 2006 U.S. Dist. LEXIS 12994, 2006 WL 573905, at *1 (N. D. Ill. Mar. 6, 2006).* Tip credits are treated identically under both the Illinois Minimum Wage Act and the federal Fair Labor Standards Act, and so cases on the requirements for a tip credit under the FLSA are also relevant to the requirements of the Illinois Minimum Wage Act. *See Morgan v. SpeakEasy, LLC, 625 F. Supp. 2d 632, 650 (N.D. Ill. 2007)* ("Courts have held that the IMWL parallels the FLSA, and that the same analysis [**10] generally applies to both statutes.").

J. Alexander's argues that Williams-Green's only evidence that it was not entitled [*379] to take a tip credit, and therefore failed to pay her the full minimum wage, are alleged statements that J. Alexander's retained a portion of the tip pool. As noted above, an employer cannot take a tip credit if it retains any portion of its employees' tips and, instead, must pay its employees the full minimum wage. *See 820 Ill. Comp. Stat. 105/4(c); Driver v. Appleillinois, LLC, 265 F.R.D. 293, 307 (N.D. Ill. Mar. 2, 2010)* ("If the employer retains any of the tips, the tip pool is deemed invalid, and

277 F.R.D. 374, *379; 2011 U.S. Dist. LEXIS 99373, **10

the employer loses the tip credit."). J. Alexander's contends that Williams-Green's "general assertions, without specific factual support, that she was told by her managers each time she asked about tip share distribution that the restaurant retained one-third, would not allow a reasonable jury to conclude that J. Alexander's operated an improper tip pool." J. Alexander's Memorandum [86-1] at 6. Yet if the managers made the statements that Williams-Green has testified they made, the statements could constitute admissions by J. Alexander's because, according [**11] to J. Alexander's undisputed statements of fact, distributing the tip pool fell within the scope of the responsibilities of a manager. *See* Joint Statement of Undisputed Facts and Additional Facts [87-1] ¶ 114. Because the alleged statements concerned matters within the scope of the managers' employment, the alleged statements are potentially admissions by J. Alexander's that it retained a portion of the tip pool. *See Simple v. Walgreen Co., 511 F.3d 668, 672 (7th Cir. 2007).* Such direct evidence is sufficient to withstand J. Alexander's motion for summary judgment on the issue of the propriety of its tip pool and its entitlement to a tip credit.

Therefore, J. Alexander's motion for summary judgment on the issue of the tip credit is denied.

**B. Off-the-Clock Work**

Next, J. Alexander's seeks summary judgment on Williams-Green's claim that she was never paid for work she performed off-the-clock. This claim comes not from the complaint but, rather, statements Williams-Green made during her deposition. The only state statute she cites in her response to the motion for summary judgment on this claim is the Illinois Minimum Wage Law, so the court will limit its analysis to that statute.

Under the [**12] Illinois Minimum Wage Law, an employer must compensate a employee for work "not requested but suffered or permitted." *Ladegaard v. Hard Rock Concrete Cutters, Inc., No. 00 CV 5755, 2004 U.S. Dist. LEXIS 16288, 2004 WL 1882449, at \*4 (N.D. Ill. Aug. 18, 2004).* Work is not considered suffered or permitted unless the employer knew or should have known about it. *Id.*

Williams-Green contends that she performed work prior to her shift and that manager knew she was working off-the-clock. However, her contention is unsupported by the record. According to her own deposition testimony, each time a manager asked her to perform pre-shift work, she first asked to clock-in:

> Q: Okay. So were there any times that they told you to start that you didn't ask to clock in?
>
> A: No.
>
> Q: So each time they asked you to start your side work, you would ask them to clock in?
>
> A: Yes.

Williams-Green Deposition (attached as Tab 3 to Appendix to Parties' Joint Statements of Fact [88-1]) at 109. She also testified that her managers would either direct her to clock in or they would offer to compensate her with lunch:

> Q: Did you ever say to them, I'm not clocked in yet?
>
> A: Yes.
>
> Q: Okay. And what would they say to you?
>
> A: And sometimes they would say, Well, [**13] go ahead and clock in, don't worry about it, we'll take care of it. Or they would say, We'll just buy you lunch.

*Id.* at 108-09. Thus, according to her own account of events, when asked to perform pre-shift work, Williams-Green always asked to clock in, to which a manager responded by either telling her to clock in or by offering to compensate her with lunch. Nowhere did [*380] Williams-Green testify that a manager knew that any of the work she performed was done off-the-clock. As a result, she has no evidence that J. Alexander's knew that she was performing work for which she was not being compensated. *See Bjornson v. Daido Metal U.S.A., Inc., 12 F. Supp. 2d 837, 842 (N.D. Ill. 1998)* (employer is liable only if it knew that plaintiff performed work for which he was not compensated).

Accordingly, J. Alexander's motion for summary judgment on her off-the-clock claim is granted.

**C. Overtime Pay**

The parties agree that J. Alexander's has paid

Case: 1:11-cv-08390 Document #: 43-1 Filed: 11/09/12 Page 106 of 119 PageID #:273

Page 5

277 F.R.D. 374, *380; 2011 U.S. Dist. LEXIS 99373, **13

Williams-Green and other similarly-situated employees the overtime wages they were due plus interest. As a result, J. Alexander's contends Williams-Green's claim under the Illinois Wage Payment and Collection Act for overtime pay has become moot.

Once a party [**14] has received the relief it sought, its claim becomes moot and a federal court lacks subject-matter jurisdiction over it. *See Pakovich v. Verizon Ltd. Plan, 653 F.3d 488, 2011 U.S. App. LEXIS 15014, 2011 WL 3010497, at \*3 (7th Cir. July 22, 2011)* ("Federal courts lack subject matter jurisdiction when a case becomes moot"). In her response brief, Williams-Green does not dispute that the overtime claim is moot. Rather, she contends that she is nevertheless entitled to pursue attorneys' fees under the Act. *See 820 Ill. Comp. Stat. 115/14(a)*. A claim for attorneys fees is "separate from the merits of the action," and a district court retains jurisdiction to entertain a claims for fees even when the underlying claim has become moot. *See Pakovich, 653 F.3d 488, 2011 U.S. App. LEXIS 15014, 2011 WL 3010497, at \*3*.

Accordingly, Williams-Green's overtime pay claim is dismissed for lack of subject matter jurisdiction, and the motion for summary judgment on that claim is denied as moot. The court expresses no opinion at this time as to whether Williams-Green is entitled to attorneys' fees on this claim.

## III. WILLIAMS-GREEN'S MOTION FOR SUMMARY JUDGMENT [91-1]

### A. Propriety of the Tip Pool

Having denied J. Alexander's motion for summary judgment on this claim, the court [**15] now turns to Williams-Green's argument that she is entitled to summary judgment because J. Alexander's own evidence establishes that it improperly operated the tip pool and, therefore, was not entitled to take a tip credit. In support, she relies upon J. Alexander's summaries of tip pool distributions. As noted above, J. Alexander's director of information systems prepared summaries of sampled pay periods at each of J. Alexander's Illinois restaurants during the period from 2002 through 2010. The summaries detail the tips contributed into the tip pool as well as the tips distributed from the pool. According to the summaries, on occasion the restaurants distributed all of the tips collected, but many times it failed to do so. For instance, during the pay period ending January 22, 2006,

the Chicago restaurant collected $3,779.74 from tipped employees, but distributed only $3,775.25, a difference of $24.49. In fact, the Chicago location failed to distribute all of the tips that had been contributed into the tip pool during four of the ten weeks sampled.

Even larger discrepancies were reported at the Northbrook and Oak Brook locations. For instance, during the pay period that ended September [**16] 18, 2005, tipped employees at the Northbrook location contributed $2,891.84 to the tip pool, but J. Alexander's distributed only $2,764.53, a difference of $127.31. Similarly, during the pay period that ended April 15, 2007, tipped employees at the Oak Brook location contributed $6,6870.07 to the tip pool, while J. Alexander's distributed just $6,371.14 of that amount. In total, J. Alexander's failed to distribute all of the money it had collected for the tip pool for 7 of the 11 pay periods sampled at the Northbrook location, and for 10 of the 12 pay periods sampled at the Oak Brook location.

Under the Illinois Minimum Wage Act, an employer is entitled to pay an employee 60% of the minimum wage as long as the employee's tips make up the remaining 40% of the minimum wage and that the employer did not retain any of the tips. *See 820 Ill. Comp. Stat. 105/4(c); Gillis, 2006 U.S. Dist. LEXIS 12994, 2006 WL 573905, at \*1*. The Minimum Wage Act does not prohibit an [*381] employer from operating a tip pool, in which tipped employees turn over a partion of their tips to the employer, provided that the employer does not retain any of the tips. *See Morgan v. SpeakEasy, LLC, 625 F. Supp. 2d 632, 652 (N.D. Ill. 2007)*. Retention of [**17] any portion of the proceeds of a tip pool constitutes impermissible participation in the pool, and the invalidation of the employer's tip credit. *Id.*

The summaries of the tips collected and distributed establishes that, at times, J. Alexander's did not distribute all of the proceeds of the pool. However, the summaries do not explain what happened to the tips that were collected but not distributed. Additionally, J. Alexander's has identified testimony from managers that the restaurant did not retain any portion of the tip pool. *See, e.g.,* Deposition of Corey Miler (attached as Tab 2 to Appendix to Parties' Joint Statement of Undisputed Material Facts and Additional Facts [88-1]) at 71("It [the tip pool proceeds] is given to whoever works as a hosti or service well or a possible food runner in my restaurant that day."); Deposition of Brinker Wolf (attached as Tab

277 F.R.D. 374, *381; 2011 U.S. Dist. LEXIS 99373, **17

4 to Appendix to Parties' Joint Statement of Undisputed Material Facts and Additional Facts [88-1]) at 109 ("If it's [the tip share] $300.00, we take $300.00 and distribute that $300.00 out correctly to the tip share employees.").

While it is possible that the undistributed tips were retained by J. Alexander's, the summaries [**18] do not establish definitively that they were. Thus, the record before the court consists of assertions by Williams-Green that managers told her the restaurant retained a portion of the tip pool, denials by those managers, and summaries prepared by J. Alexander's that do not fully account for all the tip shares collected. Because of the remaining disputed questions of fact, and because Williams-Green is entitled to summary judgment only if she can show the absence of any material question of fact, her motion for summary judgment on the propriety of the tip pool is denied.

**B. Off-the-Clock Work**

As discussed in connection with J. Alexander's motion for summary judgment on this same issue, Williams-Green has failed to identify sufficient evidence that J. Alexander's knew of her off-the-clock work. Because J. Alexander's is entitled to summary judgment on this claim, Williams-Green motion for summary judgment on the claim is denied.

**C. Overtime Pay**

As discussed above, the parties agree that J. Alexander's has paid the overtime pay due and, therefore, the overtime claim is moot and dismissed for lack of subject matter jurisdiction. The court expresses no opinion at this time as to whether Williams-Green [**19] is entitled to attorneys' fees on this claim.

**IV. MOTION FOR CLASS CERTIFICATION [48-1]**

Williams-Green seeks certification of a class of J. Alexander's employees who participated in its allegedly invalid tip pool, and whom she alleges were improperly paid a sub-minimum wage in violation of the Illinois Minimum Wage Law and the Illinois Wage Payment and Collection Act. To obtain class certification, Williams-Green must demonstrate that the proposed class meets the requirements of *Federal Rule of Civil Procedure 23*. *Siegel v. Shell Oil Co., 612 F.3d 932, 935 (7th Cir. 2010)*. Under *Rule 23*, one or more members of a class may sue on behalf of all members of the class if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

*Fed. R. Civ. P. 23(a)*. If those four requirements are met, the case may proceed as a class action if the potential class meets one of the three provisions of *Rule 23(b)*. *Siegel, 612 F.3d at 935*. [**20] Williams-Green contends that the proposed class satisfies the third provision, which reads as follows:

[*382] (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

277 F.R.D. 374, *382; 2011 U.S. Dist. LEXIS 99373, **20

*Fed. R. Civ. P. 23(b)(3)*. The burden falls on the plaintiff to demonstrate that the requirements of *Rule 23* have been satisfied. *Arreola v. Godinez, 546 F.3d 788, 794 (7th Cir. 2008)*. The court has broad discretion to determine whether the movant has satisfied the requirements for class certification. *See Ervin v. OS Restaurant Services, Inc., 632 F.3d 971, 976 (7th Cir. 2011)*. The requirements [**21] of *Rule 23* should be liberally construed to support the policy favoring the maintenance of class actions. *See Brown v. Yellow Transportation, Inc., No. 08 CV 5908, 2011 U.S. Dist. LEXIS 52345, 2011 WL 1838741, at *2 (N.D. Ill. May 11, 2011)*. In making its determination, the court may look beyond the pleadings. *Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551-52, 180 L. Ed. 2d 374 (2011)* ("sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question") (internal quotation marks and citation omitted).

The defendants contend that class certification must be denied for two reasons: (1) the proposed class cannot satisfy the commonality requirement of *Rule 23(a)(2)*, and *(2)* the proposed class cannot satisfy the predominance and superiority requirements of *Rule 23(b)(3)*.

**A. Commonality**

J. Alexander's argues that Williams-Green's motion for class certification should be denied because she cannot establish that "there are questions of law or fact common to the class" as required under *Rule 23(a)(2)*. Commonality is established with evidence that the claims arise from a "common nucleus of operative fact" such as where a defendant "engaged in standardized conduct towards members [**22] of the proposed class." *Keele v. Wexler, 149 F.3d 589, 594 (7th Cir. 1998)*.

Williams-Green has satisfied the showing required under *Rule 23(a)(2)*. She has alleged standardized conduct by J. Alexander's, namely, its retention of a portion of the tip pool in violation of Illinois law. In addition, she has identified several managers who reportedly told her that J. Alexander's retained a portion of the tip pool. If proved, J. Alexander's was not entitled to the tip credit, and members of the class should have been paid the full minimum wage. While the damages

each proposed class member suffered would vary with the number of hours they worked, the fact that damages may need to be individually calculated does not defeat commonality. *See George v. Kraft Foods Global, Inc., 251 F.R.D. 338, 347 (N.D. Ill. 2008)*.

J. Alexander's argues that, much like the situation recently addressed by the U.S. Supreme Court in *Wal-Mart Stores, Inc. v. Dukes*, Williams-Green's allegations involved isolated incidences of improper conduct by individual managers rather than uniform conduct undertaken in furtherance of company-wide policy. *See Wal-Mart Stores, 131 S. Ct. at 2554*. In support, it cites *Driver v. AppleIllinois, LLC, 265 F.R.D. 293, 308 (N.D. Ill. 2010)*, [**23] where the court denied class certification because of the "absence of any indication of a policy or practice of AppleIllinois of improperly using tip pool proceeds (as opposed to the improper actions of some store managers)." J. Alexander's contends that, like in *Driver*, its policy required the tip pool to be distributed solely to employees, and that, even if Williams-Green's allegations are proved true, she has identified only isolated incidents of improper conduct by individual [*383] managers rather than the type of standardized conduct required to establish commonality.

However, unlike the plaintiff in *Driver*, Williams-Green has identified evidence to support her allegations of a widespread practice. For instance, managers purportedly told her that J. Alexander's retains a portion of the tip pool. In addition, J. Alexander's own financial summaries show that all three of its Illinois locations repeatedly (though not consistently) collected more in tip shares than they redistributed. Therefore, the record in this case has raised a disputed question of material fact whether J. Alexander's improperly retained tip pool proceeds, unlike the record in *Driver* in which there was an absence of [**24] any such evidence.

Accordingly, Williams-Green has demonstrated that her claims regarding the operation of the tip pool arise from a common nucleus of fact based upon standardized conduct and, therefore, has satisfied the commonality requirement of *Rule 23(a)(2)*.

**B. Predominance and Superiority**

J. Alexander's also argues that class certification should be denied because Williams-Green cannot establish two of the requirement elements under *Rule*

Case: 1:11-cv-08390 Document #: 43-1 Filed: 11/09/12 Page 109 of 119 PageID #:276

Page 8

277 F.R.D. 374, *383; 2011 U.S. Dist. LEXIS 99373, **24

23(b): predominance and superiority.

**1. Predominance**

The *Rule 23(b)* predominance requirement looks to whether the proposed class is "sufficiently cohesive" to warrant "adjudication by representation." *Wal-Mart Stores, 131 S. Ct. at 2566* (internal quotation marks and citation omitted). Such an inquiry requires the court to identify "the substantive issues that will control the outcome, assess[] which issues will predominate, and then determin[e] whether the issues are common to the class." *Hyderi v. Washington Mut. Bank, FA, 235 F.R.D. 390, 398 (N. D. Ill. 2006)*. J. Alexander's argues that Williams-Green cannot establish predominance because she has "failed to show any standardized conduct or policy that applied to all tipped employees and thus individualized [**25] inquiry into the merits of each employee's claims will be necessary." Response [58-1] at 8. However, as discussed in the previous section on commonality, the record contains evidence that managers allegedly told Williams-Green that J. Alexander's retains a portion of the tip pool, and J. Alexander's own summaries show that tip shares were not always fully redistributed.

Contrary to J. Alexander's contention, Williams-Green has satisfied the predominance requirement because the controlling substantive issue is the propriety of J. Alexander's tip pool. If J. Alexander's operated an improper tip pool, then liability will be established as to each proposed class member. Accordingly, Williams-Green has established that the predominate issue is common to each member of the proposed class.

**2. Superiority**

Second, J. Alexander's briefly argues that Williams-Green cannot establish that class certification is the superior method of resolving this dispute because she failed to establish predominance. However, as J.

Alexander's argument about predominance failed, so too does its argument about superiority. Because this case "presents issues that are shared by members of the proposed class[] . . . [c]lass [**26] certification is more efficient than individual suits to deal with these common questions." *Schmidt v. Smith & Wollensky, LLC, 268 F.R.D. 323, 330 (N. D. Ill. 2010)*.

**C. Class Is Certified**

In summary, J. Alexander's arguments that class certification is inappropriate because Williams-Green cannot satisfy the requirements of demonstrating commonality, predominance of common issues, and the superiority of adjusting the controversy as a class action are unavailing. Because it has identified no other basis for denying Williams-Green's motion, the motion for class certification is granted. The court adopts the following class definition as proposed by Williams-Green:

> All persons who worked for Defendant in Illinois as hourly employees at any time between August 16, 2002, and the present [*384] who participated in one or more tip pools operated by Defendant.

Pursuant to *Federal Rule of Civil Procedure 23(c)(1)(B)* and *(g)*, Williams-Green's counsel, James X. Bormes of the Law Office of James X. Bormes, and Catherine P. Sons of Converse & Brown LLC, are appointed as class counsel.

**CONCLUSION**

For the reasons stated, Williams-Green's motion for class certification [48-1] is granted, the class is defined as [**27] stated above, and James X. Bormes and Catherine P. Sons are appointed class counsel. J. Alexander's motion for summary judgment [85-1] is granted in part and denied in part, while Williams-Green's motion for summary judgment [91-1] is denied.



2 of 2 DOCUMENTS

**CHARLES EVERETT WINSTON, et al., Plaintiffs, v. JOSEPH SPEYBROECK, Sheriff of St. Joseph County, et al., Defendants.**

**CAUSE NO. L 3:94-CV-150AS**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION**

*1996 U.S. Dist. LEXIS 12131*

**August 2, 1996, Decided**
**August 2, 1996, ENTERED [*1]**

**SUBSEQUENT HISTORY:** Adopting Order of August 14, 1996, Reported at: *1996 U.S. Dist. LEXIS 12129*.

**DISPOSITION:** RECOMMENDED that the settlement agreement and consent decree be approved.

**COUNSEL:** For CHARLES EVERETT WINSTON, 3:94cv150, plaintiff: Charles P Rice, Shawn P Ryan, South Bend, IN.

For JOSEPH SPEYBROECK, JOSEPH NAGY, Sheriff of St. Joseph County, 3:94cv150, defendant: Larry L Ambler, Allen Fedder Herendeen and Kowals, South Bend, IN. A Howard Williams, South Bend, IN.

For RICHARD JASINSKI, (3:94cv150), JOSEPH ZAPPIA, (3:94cv150), RICHARD LARRISON, (3:94cv150), JAMES RIENEBOLD, (3:94cv150), HANK KEULTJES, (3:94cv150), RAFAEL MORTON, (3:94cv150), JOE BALDONI, (3:94cv150), LARRY JASINSKI, (3:94cv150), DENNIS SCHAFER, (3:94cv150), GATHA VAUGHN, (3:94cv150), GEORGE NOME, (3:94cv150), JIM REINHOLTZ, (3:94cv150), defendants: David T Ready, Doran Blackmond Ready Hamilton and Williams, South Bend, IN.

**JUDGES:** Robin D. Pierce, U.S. Magistrate Judge. Allen Sharp, CHIEF JUDGE, UNITED STATES DISTRICT JUDGE

**OPINION BY:** Robin D. Pierce

**OPINION**

**REPORT AND RECOMMENDATION**

This class action, brought on behalf of all past, present, and future prisoners incarcerated in the St. Joseph County Jail (the "Jail") in South Bend, Indiana, challenges conditions of confinement, including alleged overcrowding, at the [*2] Jail. The parties have now reached a final settlement agreement. That agreement, along with a proposed consent decree, was filed with the court on June 21, 1996 (Dkt. # 210). The court subsequently conducted a fairness hearing concerning the proposed settlement on July 12, 1996. The St. Joseph County Council approved the settlement agreement and consent decree on July 23, 1996. For the reasons which follow, it is recommended that the proposed consent decree as previously tendered to the court on June 21, 1996, be approved and entered.

*Procedural History*

This action was commenced by the receipt and subsequent filing of a complaint on February 15, 1994. On October 18, 1994, Chief Judge Sharp made a preliminary determination that the action filed by Charles Everett Winston should be maintained as a Class Action and consolidated all pending and subsequently filed litigation regarding the conditions at the Jail into the action filed by Charles Everett Winston. On January 18, 1995, the court determined that this action was properly maintained as a class action.

Plaintiffs' complaint, as amended, charged that the Jail is overcrowded, that some inmates are forced to sleep on floors, [*3] that the plumbing, ventilation, and heating are inadequate, that dangerous inmates are not classified and segregated from the general population, that pre-trial detainees are housed with convicted felons, and that the Jail lacks facilities for outdoor exercise or recreation. Plaintiffs sought an order to correct the overcrowding and related conditions, compensatory and punitive damages, and injunctive relief closing the Jail.

On May 7, 1996, following settlement negotiations, the parties reached agreement upon a partial interim consent decree which, among other things, provided for an inmate population cap at the present St. Joseph County Jail. Class members were subsequently provided with notice of the proposed partial interim consent decree (Dkt. # 190), and the court conducted a fairness hearing regarding that matter on May 31, 1996 (Dkt. # 200). On June 5, 1996, the undersigned issued a Report and Recommendation, recommending that the partial interim consent decree be approved and entered (Dkt. # 204).

Following further negotiations, the parties reached a comprehensive settlement agreement, including a proposed consent decree, which was filed with the court on June 21, 1996 (Dkt. [*4] # 210). On that date, Judge Sharp issued an Order approving the notice of the proposed settlement (Dkt. # 209). The terms of the consent decree were conditioned upon the approval of a majority of the St. Joseph County Council after a public hearing. The court conducted a fairness hearing concerning the proposed settlement on July 12, 1996. On July 23, 1996, the St. Joseph County Council approved the consent decree and evidence of the approval was subsequently filed with this court.

*Adequacy of Notice*

On June 21, 1996, the parties filed a settlement agreement and proposed consent decree which was approved by the court on the same date. At the same time, counsel for the plaintiff class also filed an affidavit stating that individual notice to class members was not practicable and that notice of the proposed settlement by publication was the best form of notice under the circumstances. The court, pursuant to terms of the settlement agreement and proposed consent decree, entered an order certifying a class, setting a hearing on the proposed settlement and prescribing the notice to be given class members. The notice was to be published on two separate occasions, at least five days [*5] apart, in the South Bend Tribune. According to the notice, the consent decree provided:

(A) That the Sheriff of St. Joseph County, the Board of County Commissioners of the County of St. Joseph and the St. Joseph County Council shall construct and finance a new St. Joseph County Jail facility with a minimum capacity of 600 inmates that fully complies with the Indiana Jail Standards and the federal laws mandating compliance in design prior to commencing actual construction of the jail facility with construction to begin on or before December 1, 1996.

(B) The St. Joseph County Sheriff will maintain a program of classification and segregation of dangerous inmates at the current St. Joseph County Jail.

(C) The St. Joseph County Sheriff will ensure that all inmates confined to the Jail for a continuous period in excess of twelve hours will be provided with a bunk or mattress.

(D) The St. Joseph County Sheriff will meet with counsel for the Plaintiff class and all necessary persons to determine the most effective way of improving the heating, cooling, ventilation and plumbing systems, recreation and exercise opportunities in the current St. Joseph County Jail pending the completion [*6] of the new Jail. The Sheriff of St. Joseph County and the St.

Joseph County Commissioners and St. Joseph County Council shall in good faith consider all recommendations of counsel for the Plaintiff Class.

(E) The population cap imposed upon the Jail by the Partial Interim Consent Decree shall remain in effect.

(F) The Plaintiff Class shall waive any and all claims for damages, either compensatory or punitive damages against the defendants.

(G) Members of the Plaintiff Class who were or are inmates at the St. Joseph County Jail prior to the date of the execution of this Consent Decree by the parties may exclude themselves from the class by filing with the Committee of Counsel appropriate written indication that they request exclusion from the Class.

The notice further stated that the court would conduct a fairness hearing on July 12, 1996 at 2:00 p.m., and advised class members that they had a right at the fairness hearing to comment on or object to the settlement agreement and consent decree. Class members were also advised of the procedure for filing objections.

Based upon its review of the procedures the parties have adopted for notifying the class members, the court finds [*7] that the class members have been fully and accurately advised of the terms of the proposed consent decree, as well as the procedure for bringing comments supporting or objecting to the consent decree to the attention of the court. In addition, the comment period provided in the notice fully satisfied the requirements of *Rule 23(e) of the Federal Rules of Civil Procedure. See Van Horn v. Trickey, 840 F.2d 604 (8th Cir. 1988); Diaz v. Romer, 801 F. Supp. 405, 408 (D. Colo. 1992).*

*Approval of Settlement*

Before a court can approve a class action settlement, it must determine that the settlement is lawful, fair, reasonable and adequate. *Isby v. Bayh, 75 F.3d 1191, 1199 (7th Cir. 1996); E.E.O.C. v. Hiram Walker & Sons, Inc., 768 F.2d 884, 889 (7th Cir. 1985); Gautreaux v. Pierce, 690 F.2d 616, 631 (7th Cir. 1982); Armstrong v.* *Board of Sch. Directors, etc., 616 F.2d 305, 313 (7th Cir. 1980).* Among the factors that a court should consider in making this "fairness" determination are: the strength of the plaintiffs' case compared to the defendants' offer; the likely length, complexity and expense of further litigation; the amount of opposition to the settlement [*8] among affected parties; the opinion of competent counsel; and the stage of the proceedings and the amount of discovery already completed. *Isby, 75 F.3d at 1199; E.E.O.C., 768 F.2d at 889; Armstrong, 616 F.2d at 314.* In considering a proposed class action settlement, a court may either approve or disapprove of the settlement; it may not rewrite the parties' agreement. *Armstrong, 616 F.2d at 315; Harris v. Pernsley, 654 F. Supp. 1042, 1049 (E.D. Pa. 1987).* A court "may not deny approval of a consent decree unless it is unfair, unreasonable, or inadequate." *E.E.O.C., 768 F.2d at 889.*

The court's initial inquiry is concerned with whether the settlement is lawful. As the Seventh Circuit has explained, a court "cannot approve a class action settlement 'which either initiates or authorizes the continuation of clearly illegal conduct.'" *Isby, 75 F.3d at 1197* (quoting *Armstrong, 616 F.2d at 315*). At the same time, the Seventh Circuit has pointed out that in applying this principle "'the court must not decide unsettled legal questions; any illegality or unconstitutionality must appear as a legal certainty on the face of the agreement before a settlement can be [*9] rejected on this basis.'" *Isby, 75 F.3d at 1197* (quoting *Armstrong, 616 F.2d at 320*). Furthermore, "in determining whether to reject a settlement as initiating or authorizing a clearly illegal or unconstitutional practice, prior judicial decisions must have found that practice to be illegal or unconstitutional as a general rule.'" *Isby, 75 F.3d at 1197* (quoting *Armstrong, 616 F.2d at 321*).

In this case, nothing suggesting illegality or unconstitutionality is apparent on the face of the settlement agreement and proposed consent decree. The only other matter of which the court is aware relates to the enforceability of the proposed consent decree in light of the recently enacted Prison Litigation Reform Act (the "Act" or "PLRA"), Pub. L. No. 104-134, 110 Stat. 1321, §§ 801-810 (Apr. 26, 1996) (amending 18 U.S.C. § 1326). The PLRA limits prospective relief (all relief other than compensatory monetary damages) in prison or jail condition cases to that necessary to correct the violation of the federal right of a particular plaintiff or plaintiffs. Section 802 of the Act amended 18 U.S.C. § 626(a)(1)(B)

1996 U.S. Dist. LEXIS 12131, *9

to prohibit a federal court from granting or approving prospective [*10] relief unless the court finds that:

    1. The relief is narrowly drawn;

    2. The relief extends no further than necessary to correct the violation of the federal right;

    3. The relief is the least instructive means necessary to correct the violation of the federal right; and

    4. The relief will not adversely impact the public safety or the operation of the criminal justice system.

The relief specified in the proposed consent decree in this case passes muster under the PLRA. Uncontradicted evidence in the record, in the form of admissions by St. Joseph County Sheriff Joseph Speybroeck, establishes that the present Jail is overcrowded and that the physical structure of the Jail does not meet federal constitutional standards for a jail facility. Sheriff Speybroeck has also admitted that the only feasible means of providing the inmates at the Jail with a facility which meets minimum constitutional requirements is by construction of a new jail; the physical structure of the existing Jail cannot be modified to meet federal constitutional standards.

The terms of the consent decree, moreover, have been narrowly drawn to remove the court from the decisionmaking process [*11] of St. Joseph County. The consent decree was made contingent upon approval by a majority of the members of the St. Joseph County Council and County Commissioners. Control with respect to the costs associated with construction of the Jail will be retained by the St. Joseph County Council. And, no master will be appointed to oversee the construction of the Jail. The consent decree will not place this court in the position of an architect, accountant, or appropriating body for the Jail. Instead, the proposed decree limits the court's role in enforcing its terms. Ultimately, the court finds that the proposed relief in the form of the consent decree is narrowly drawn; that it extends no further than necessary to correct the violation of the federal rights asserted in plaintiffs' complaint; that it is the least intrusive means necessary to correct the violation of those rights; and that it will not adversely impact the public safety or the operation of the criminal justice system.

The court must next examine the strength of the plaintiffs' case compared with the defendants' settlement offer. *Isby, 75 F.3d at 1199*; *E.E.O.C., 768 F.2d at 889*; *Armstrong, 616 F.2d at 314*. In this [*12] regard, the court firmly believes that plaintiffs' chances of success would be relatively low by comparison to what defendants have offered under the settlement agreement and proposed consent decree -- the construction of a new Jail. To prevail on their claims for injunctive relief, plaintiffs would be required to demonstrate that their constitutional rights under the *Fourteenth Amendment* (in the case of pre-trial detainees) or the *Eighth Amendment* (in the case of convicted prisoners) were violated. To demonstrate a constitutional violation under either Amendment, plaintiffs would have to show that defendants acted with "deliberate indifference." *Steele v. Choi, 82 F.3d 175, 178 (7th Cir. 1996)*; *Antonelli v. Sheahan, 81 F.3d 1422, 1427-28 (7th Cir. 1996)*; *Zarnes v. Rhodes, 64 F.3d 285, 290 (7th Cir. 1995)*.

In clarifying the term "deliberate indifference" in an *Eighth Amendment* context, the Supreme Court explained that a prison official cannot be found liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, [*13] and he must also draw the inference." *Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970, 1979, 128 L. Ed. 2d 811 (1994)*; *see Houston v. Sheahan, 62 F.3d 902 (7th Cir. 1995)*; *Miller v. Neathery, 52 F.3d 634, 638-39 (7th Cir. 1995)*; *Dorsey v. St. Joseph Co. Jail Officials, 910 F. Supp. 1343, 1351 (N.D. Ind. 1996)*. Because plaintiffs' claims for injunctive relief are aimed at the defendants in their official capacities, plaintiffs would also be required to establish "a direct causal link between a municipal [or county] policy or custom" and the claimed constitutional deprivation. *City of Canton, Ohio, v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 1202-03, 103 L. Ed. 2d 412 (1989)*; *Starzenski v. City of Elkhart, 87 F.3d 872, 1996 WL 344927, *5 (7th Cir. June 25, 1996)*.

Here, it is apparent that plaintiffs would have a difficult time proving that the defendants established the conditions of the Jail to inflict wanton pain, or that they are deliberately indifferent to whether the conditions at the Jail have such an effect. Moreover, even if plaintiffs were to prove deliberate indifference, as well as establish a causal link between a constitutional violation and an official [*14] policy or custom of the county, Judge

Sharp's Memorandum of June 10, 1996, strongly implies that the court would not allow itself to become involved in ordering the construction of a new Jail if the parties did not agree to it on their own. Thus, the relief which defendants have offered as part of the settlement -- the construction of a new Jail -- extends well beyond any relief the court might order if plaintiffs were successful at trial.

The next factor -- the likely length, complexity and expense of further litigation -- militates strongly in favor of approval of the proposed consent decree. Indeed, continued litigation of conditions of confinement at the Jail would require the resolution of many difficult and complex issues, entail considerable additional expense, and involve an estimated seven weeks of trial time. The resolution of plaintiffs' injunctive claims at this point through the proposed consent decree will clearly result in considerable savings in terms of time and expense. The consent decree represents an outcome at least comparable, if not far superior, to that which plaintiffs might achieve by proceeding to trial.

The next factor -- the amount of opposition to the [*15] settlement among affected parties -- strongly favors approval. Indeed, opposition to the proposed consent decree is essentially nonexistent. Only one former inmate of the Jail submitted a written objection to the settlement and only one class member appeared at the fairness hearing to voice an objection.

The next factor is concerned with the opinion of competent counsel. In the present case, all of the parties are represented by very capable and competent counsel. It is clear that counsel have represented their clients ably throughout the negotiation process which led to the present agreement. There is no indication that the proposed consent decree, or any aspect of it, is the product of collusion among or between counsel for the plaintiff class and the attorneys for defendants. The court has no reason to doubt the judgment of counsel in recommending the approval and adoption of the consent decree.

The last factor calls for consideration of the stage of the proceedings and the amount of discovery completed. Since the filing of this action, plaintiffs have undertaken extensive discovery, including 8 depositions, the submission of over 100 interrogatories to defendants, interviews [*16] with over 50 potential witnesses, inspection of defendants' books and records on several occasions, and review of approximately 6,000 documents produced by defendants. It is clear, as counsel for plaintiffs maintain, that they have completed sufficient investigation to provide them with sufficient insight into the facts underlying plaintiffs' claims, as well as the strengths and weaknesses of those claims.

Having reviewed the terms of the parties' settlement agreement and proposed consent decree, and having considered the matters presented at the fairness hearing, the court finds that the settlement agreement and consent decree are lawful, fair, reasonable, and adequate. Accordingly, it is **RECOMMENDED** that the settlement agreement and consent decree be approved, that the consent decree be entered by the court, [1] and that final judgment be entered thereon.

    1 On July 31, 1996, plaintiffs' counsel submitted a proposed form of order entitled "Judgment Order Approving Consent Decree." The form of order contained a discussion together with findings regarding the issues involved in the courts "fairness" determination, as well as a consent decree for the court's approval and signature. The court understands that the form of judgment order was tendered as a convenience to the court, much like proposed findings of fact and conclusions of law. The language of the proposed judgment order, however, differs in important respects from the settlement agreement and proposed consent decree which was filed with the court on June 21, 1996.

    The proposed consent decree tendered on July 30, 1996, omits a number of provisions which were contained in the Settlement Agreement and Consent Decree" tendered to the court on June 21, 1996. It also contains one provision which does not appear at all in the original settlement agreement and consent decree -- a provision that states: That federal law mandates the construction of a new jail facility for St. Joseph County, Indiana." ( Proposed Judgment Order Approving Consent Decree, p. *10 P 4*.) This provision was apparently lifted verbatim from a proposed order granting plaintiffs' partial summary judgment which plaintiffs previously submitted on May 31, 1996 (Dkt. # 201). Following a hearing, the undersigned recommended the denial of that motion on June 6,

1996 (Dkt. # 205), and that recommendation was formally approved and adopted by Judge sharp on July 22, 1996 (Dkt. # 218). This apparent attempt to have the court revise the settlement agreement and consent decree which the parties had previously agreed upon -- which was made the subject of the notice to members of the class and voted upon by the County Council -- is completely inappropriate.

[*17] **NOTICE IS HEREBY GIVEN that within ten (10) days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings** and/or recommendations. *Fed.R.Civ.P.* *72(b).* **FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.** See *Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); Lerro v. The Quaker Oats Company, 84 F.3d 239 (7th Cir. 1996); Lockert v. Faulkner, 843 F.2d 1015 (7th Cir. 1988); Video Views, Inc. v. Studio 21 Ltd., 797 F.2d 538 (7th Cir. 1986).*

Dated this 2nd day of August, 1996.

Robin D. Pierce, U.S. Magistrate Judge



7 of 7 DOCUMENTS

**KEMAL S. YON, LaSHAWN MILLER, NATHAN ANDREWS, DAVID STANCIEL, and BRIAN BOONE, Plaintiffs, v. POSITIVE CONNECTIONS, INC.; and MICHAEL D. PERRY, Defendants.**

No: 04 C 2680

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2005 U.S. Dist. LEXIS 3396; 10 Wage & Hour Cas. 2d (BNA) 650*

**February 2, 2005, Decided**

**DISPOSITION:** Plaintiff Miller's Motion for Class Certification of Illinois Minimum Wage Law Claim granted.

**COUNSEL:** [*1] For Kemal S Yon, on behalf of himself and all other plaintiffs similarly situated, known and unknown, Plaintiff: Douglas M. Werman, Law Office of Douglas M. Werman, Chicago, IL; Jamie G. Sypulski, Law Offices of Jamie G. Sypulski, Chicago, IL.

For LaShawn Miller, on behalf of themselves and all other plaintiffs similarly situated known and unknown, Plaintiff: Jamie G. Sypulski, Law Offices of Jamie G. Sypulski, Chicago, IL.

For Positive Connections, Inc., an Illinois corporation, Michael D Perry, Defendant: Timothy Michael Nolan, Nolan Law Office, Chicago, IL.

**JUDGES:** Judge John W. Darrah.

**OPINION BY:** JOHN W. DARRAH

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiffs, Kemal S. Yon, LaShawn Miller, Nathan Andrews, David Stanciel, and Brian Boone, filed suit against Defendants, Positive Connections, Inc. and Michael D. Perry, in state court. Thereafter, Defendants removed the action to federal court. Plaintiffs allege that Defendants violated: (1) the Illinois Minimum Wage Law ("IMWL"), *820 ILCS 105/1*; and (2) the Fair Labor Standards Act ("FLSA"), *29 U.S.C. § 201*.

Presently before the Court is Miller's Motion for Class Certification [*2] of his Illinois Minimum Wage Law Claim only. Miller, a bus driver employed by Defendants, seeks to certify a class of all bus drivers employed by Defendants since March 8, 2001, who worked in excess of forty hours in any individual work week but who were not paid overtime pay at one-and-one-half times their regular hourly rate.

**LEGAL STANDARD**

"The Federal Rules of Civil Procedure provide the federal district court with broad discretion to determine whether certification of a class action lawsuit is appropriate." *Keele v. Wexler, 149 F.3d 589, 592 (7th Cir. 1998)* (quotation and citation omitted). In determining whether the class action requirements are met, "a judge should make whatever factual and legal inquiries are necessary under *Rule 23*." *Szabo v.*

Page 2

2005 U.S. Dist. LEXIS 3396, *2; 10 Wage & Hour Cas. 2d (BNA) 650

*Bridgeport Machines, Inc.,* 249 F.3d 672, 676 (7th Cir. 2001) (*Szabo*).

To receive class certification, Miller must satisfy all four elements of *Federal Rule of Civil Procedure 23(a)*, which include: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Miller must also satisfy at least one of the three provisions under [*3] *Federal Rule of Civil Procedure 23(b)*; Miller attempts to meet the requirement of *Rule 23(b)(3)*.

Defendants contend that Plaintiff has failed to meet all these requirements. Defendants further contend that Plaintiff is not entitled to relief under the Illinois Minimum Wage Law.

## ANALYSIS

### The Illinois Minimum Wage Law

Defendants contend that Miller's motion for certification should fail because the putative class members cannot succeed on the merits and cite *Szabo, 249 F.3d at 675-76*. However, *Szabo* does not permit a court to reach the merits of a matter in deciding class certification but, rather, only make the factual and legal inquiries necessary to determine whether a class should be certified. *Belbis v. County of Cook, 2002 U.S. Dist. LEXIS 22426, No. 01 C 6119, 2002 WL 31600048, at *6 (N.D. Ill. Nov. 18, 2002)*.

#### The Requirements of Rule 23(a)

Defendants dispute whether Miller has met the four requirements of *Rule 23(a)* for class certification.

*Federal Rule of Civil Procedure 23(a)(1)* requires that the class be so numerous that joinder of all the members is impracticable. [*4] A plaintiff does not need to demonstrate the exact number of class members as long as a conclusion is apparent from good-faith estimates. *Peterson v. H & R Block Tax Servs., 174 F.R.D. 78, 81 (N.D. Ill. 1997)*. "Common sense assumptions" can be made in order to support a finding of numerosity. *Grossman v. Waste Management, Inc., 100 F.R.D. 781, 785 (N.D. Ill. 1984)*. However, conclusory allegations that joinder is impracticable or speculation about the size of the class may not be relied upon to prove numerosity. *Marcial v. Coronet Ins. Co., 880 F.2d 954, 957 (7th Cir. 1989)*.

Defendants contend that the proposed class is exceedingly small because there are only approximately ten people who would qualify. Miller has shown that from five pay periods, thirty-nine different employees on eighty-seven different instances worked in excess of forty hours per week without receiving overtime pay. No discovery cut-off has yet been set; the proposed class seeks to recover overtime for pay periods in three years; and Defendants employed more than two-hundred bus drivers over the last three years. It is likely that more class members may subsequently [*5] be discovered. Accordingly, the proposed class meets the numerosity requirement.

Commonality exists under *Rule 23(a)(2)* if the class members share common questions of law or fact. The requirement is usually satisfied when a common nucleus of operative facts unites a class. *Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992)*. The presence of some factual variations among the class members does not defeat commonality, so long as there is at least one question of law or fact common to the class. *Rosario, 963 F.2d at 1017*. Defendants contend that commonality is not present because Miller was one of the few bus drivers who worked longer hours during special charter trips, as opposed to morning and afternoon school routes and, further, that Miller's claims are not common because he double-billed several hours per day by submitting time records for the same work to different supervisors. Despite Defendants' arguments, the claims presented by the proposed class contain common questions of law and fact. The common issues to be resolved concern whether the members of the proposed class each worked in excess of forty hours and whether the proposed class [*6] members were paid overtime wages.

The typicality requirement of *Rule 23(a)(3)* is closely related to the commonality requirement of *Rule 23(a)(2)*. *Ruiz v. Stewart Associates, Inc., 171 F.R.D. 238, 242 (N.D. Ill. 1997)*. A plaintiff's claim is typical if it: (1) arises from the same event, practice, or course of action that gives rise to the claims of other class members; and (2) the claims of the plaintiff and the class members are based on the same legal theory. *Rosario, 963 F.2d at 1018*. Defendants argue that Miller's claim is not typical because each potential class member's claim will have to be individually scrutinized. Defendants also argue that each Plaintiff's FLSA claim will have to be reviewed under an exception, *29 U.S.C. § 207(n)*. However, Miller's claim and the claims of the potential class members arise from the same course of action -- the

2005 U.S. Dist. LEXIS 3396, *6; 10 Wage & Hour Cas. 2d (BNA) 650

alleged failure to pay overtime pay. These claims are based upon the same legal theory, as well. Finally, whether an exception applies to Plaintiffs' FLSA claims, as argued by Defendants, is not now relevant to determining whether a class for the IMWL claim should be certified. [*7] Therefore, the typicality requirement is also met.

The class representatives must also "fairly and adequately protect the interests of the class". *Fed. R. Civ. P. 23(a)(4)*. Two factors are used to determine whether the class is adequately represented. First, no conflicts of interest must exist between the named plaintiff and the class members. *Gaspar v. Linvatec Corp., 167 F.R.D. 51, 58 (N.D. Ill. 1996)*. Second, the named plaintiff's counsel must adequately protect the interests of the class by being qualified, experienced, and generally able to conduct the proposed litigation. *Rosario, 963 F.2d at 1018*. Miller's attorney appears qualified, experienced, and capable to conduct this litigation; and no conflicts of interest between Miller and the class members have been shown. Miller's counsel will adequately protect the interests of the class.

*The Requirements of Rule 23(b)(3)*

*Rule 23(b)(3)* requires "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to the available methods for the fair [*8] and efficient adjudication of the controversy."

Defendants contend that Miller's proposed class action fails to meet the superiority requirement of *Rule 23(b)(3)* and argue that certifying a class action based on the IMWL and *Rule 23* would circumvent the requirements of the FLSA. *Rule 23* includes all class members unless they specifically choose to "opt-out." To the contrary, the FLSA makes a "crucial policy decision" and requires all potential class members to "opt-in." *McClain v. Leona's Pizzeria, Inc., 222 F.R.D. 574, 577 (2004)* (citation omitted). Thus, Defendants argue that Miller would circumvent the federal policy by bringing a class action under similar state law claims here in federal court.

Several judges in this district have agreed with the rationale supporting this argument.

Were we to certify a class action for [the

plaintiff's] supplemental state claims based on the same facts and issues underlying [the plaintiff's] federal claim, we could very well be left with the rather incongruous situation of a[] [Fair Labor Standards Act] "class" including only a tiny number of employees . . . with a state-law class that nonetheless includes all [*9] or nearly all of the companies' present or former employees. To do so would effectively "allow a federal tail to wag what is in substance a state dog."

*McClain v. Leona's Pizzeria, Inc., 222 F.R.D. 574, 577 (N.D. Ill. 2004)* (Castillo, J.) (quoting *De Asencio v. Tyson Foods, Inc., 342 F.3d 301, 310 (3d Cir. 2003)* (*De Asencio*)) (other internal citations, quotations, and alterations omitted). Similarly, in *Rodriguez v. The Texan, Inc.*, the court held "that the policy and the underlying congressional intent would be thwarted if a plaintiff were permitted to back door the shoehorning in of unnamed parties through the vehicle of calling upon similar state statutes that lack such an opt-in requirement." *Rodriguez v. Texan, Inc., 2001 U.S. Dist. LEXIS 24652, No. 01 C 1478, 2001 WL 1829490, at *2 (N.D. Ill. Mar. 7, 2001)* (Shadur, J.). In *Harper v. Yale Int'l Ins. Agency, Inc., 2004 U.S. Dist. LEXIS 8476, No. 03 C 3789, 2004 WL 1080193, at * 5 (N.D. Ill. May 12, 2004)* (Pallmeyer, J.), the court stated:

In this case, Plaintiffs have opted to file their complaint in federal court, so there is no concern that Defendants have strategically removed the case [*10] to avoid a class action lawsuit. Plaintiffs, however, have arguably subverted congressional intent in creating the FLSA opt-in procedure by choosing to seek class certification of their [Illinois Minimum Wage Law] claims instead of pursuing an FLSA collective action.

In *Muecke v. A-Reliable Auto Parts & Wreckers, Inc., 2002 U.S. Dist. LEXIS 11917, No. 01 C 2361, 2002 WL 1359411, at * 2 (N.D. Ill. June 25, 2002)* (Kennelly, J.), the court noted that allowing class certification of the IMWL claims would create the "rather incongruous situation of an FLSA 'class' including only a tiny number of employees who are interested in seeking back wages, with a state-law class that nonetheless includes all or nearly all of the companies' present or former

2005 U.S. Dist. LEXIS 3396, *10; 10 Wage & Hour Cas. 2d (BNA) 650

employees." Finally, in *De La Fuente v. FPM Ipsen Heat Treating, Inc., 2002 U.S. Dist. LEXIS 24040, No. 02 C 50188, 2002 WL 31819226, at *2 (N.D. Ill. Dec. 16, 2002)* (Reinhard, J.), the court expressed its concern about certifying a state law class while the opt-in period for the FLSA claim was still open would confuse potential class members and, therefore, refused to certify the IMWL class action.

The reasoning of these opinions is compelling when the plaintiff [*11] has filed both federal and Illinois wage claims in federal court and seeks class certification on both. That is not the case here. Miller filed this action in an Illinois court where the claim under the IMWL, using the "opt out" provisions, would probably produce more class members than the FLSA claim, which was joined.

To permit Defendants to remove this case to federal court and then prevent class certification of the IMWL

claim on the grounds of *Rule 23(b)(3)* would effectively require Plaintiff to maintain a class action on the IMWL claim in state court and the FLSA claim in this court. This would be unfair and inefficient. Therefore, a class action on the IMWL claim is "superior to the available methods for the fair and efficient adjudication of the controversy."

## CONCLUSION

For the foregoing reasons, Miller's Motion for Class Certification of his Illinois Minimum Wage Law Claim is granted.

Dated: February 2, 2005

JOHN W. DARRAH

United States District Judge